# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | CIVIL ACTION NO. 07-81113-CIV-MARRA |
| ) | |
| ) | |
| ) | |
| IN RE PEGASUS WIRELESS ) | CONSOLIDATED AMENDED CLASS |
| CORPORATION SECURITIES ) | ACTION COMPLAINT |
| ) | FOR VIOLATIONS OF |
| LITIGATION ) | FEDERAL SECURITIES LAWS |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | JURY TRIAL DEMANDED |
| ) | |
| ) | |

## INTRODUCTION

1.     Through its first consolidated amended class action complaint, Lead Plaintiff the Pournaras Group ("Lead Plaintiff") brings this federal class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Pegasus Wireless Corporation ("Pegasus" or "Company") between December 22, 2005, and September 5, 2006, inclusive ("Class Period") and who were damaged thereby ("Class").   This suit seeks remedies under the Securities Exchange Act of 1934 ("Exchange Act").   As alleged herein, defendants published a series of materially false and misleading statements which defendants knew and/or were severely reckless

in not knowing were materially false and misleading at the time of such publication, and which omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants have sufficient minimum state and national contacts so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  At the time of the wrongdoing, Defendant Pegasus was headquartered and maintained its principal place of business in California.  On September 24, 2007, Judge Patel of the United States District for the Northern District of California transferred this case to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404. Pegasus maintains its executive offices and headquarters in this District, as of the time of the filing of this Consolidated Amended Complaint, and it has also filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Florida. Defendants Nicholas Peraticos, Stephen Durland, and William Horn are also domiciled within this District.

5.      In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Lead Plaintiffs, Michael Dattilo, Peter Gianoukas, Marat Khusainov, Michael Mitchell, and Nick Pournaras (collectively, "Pournaras Group") purchased the common stock of Pegasus at artificially-inflated prices during the Class Period and have been damaged thereby.

7.      Defendant **PEGASUS WIRELESS CORPORATION** is a Nevada corporation with its principal place of business during the Class Period, and at the time of the filing of the initial Complaint, at 48499 Milmont Drive, Fremont, California 94538.   According to the Company's profile:

> Pegasus Wireless Corp. engages in design, manufacture, and marketing of wireless hardware and software solutions for broadband fixed, portable networking, and Internet access worldwide. It offers various products in three major application areas: indoor and outdoor wireless networking, industrial wireless networking solutions, and wireless multimedia/video networking solutions.

As of the time of the filing of this Consolidated Amended Complaint, Pegasus maintains its executive offices and headquarters at 277 Royal Poinciana Way, #153; Palm Beach, Florida 33480.  On January 28, 2008, the Company filed a Chapter 11 voluntary petition for bankruptcy.

8.      Defendant **JASPER KNABB** ("Knabb") was, during the Class Period, Chief Executive Officer ("CEO"), President, and a member of the Board of Directors of the Company. During the Class Period, Knabb signed and certified the Company's SEC filings, including, but not limited to, Pegasus' interim Form(s) 10-QSB and 2005 Form 10-KSB.  In early 2002, Knabb joined OTC Wireless as Managing Director, left in April 2003 to join Frontier Wireless, and Knabb returned to OTC Wireless as President in 2004.  Knabb has a material history of legal and

financial problems.  Multiple lawsuits have been instituted against him, as explained in greater detail below, including suits alleging fraud, misrepresentation, breach of contract, and failure to pay on personal guarantees.  The Company never made mention of Knabb's past in its public disclosures.  Furthermore, Sean Lim ("Lim"), a former Pegasus employee who worked as a customer service representative and operations manager during the Class Period, maintained the Company's website and, as part of his duties, read Company-issued press releases.  **Lim confirmed in sworn testimony that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing[.]"**  Lim Dep. at 21:13-15 (Feb. 12, 2007), *Chich-Hsing Alex Tsao v. Pegasus Wireless Corp. and Jasper Knabb*, No. 1-06-cv-070797 (Cal. Sup. Ct., Santa Clara Cty.) ("Lim Dep.").

9.      Defendant **STEPHEN DURLAND** ("Durland") was, during the Class Period, Chief Financial Officer ("CFO") and a member of the Board of Directors of the Company. During the Class Period, Durland signed and certified the Company's SEC filings, including, but not limited to, Pegasus' interim Form(s) 10-QSB, 2005 Form 10-KSB, and 2006 Form 10-KSB. On March 9, 2006, the Public Company Accounting Oversight Board ("PCAOB") issued a report on its inspection of Durland & Company, a firm which Durland ran.  PCAOB identified deficiencies "of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."  The nine deficiencies included:

> (a) the Firm's failure to identify, or to address appropriately, departures from GAAP that related to potentially material misstatements in the audited financial statements concerning (a) the accounting for a business combination and (b) the reporting of earnings per share and related disclosures in light of a stock split;

> (b) the pervasive failure to perform and document audit procedures;

(c) inappropriately taking responsibility for the work of another auditor when the other auditor performed substantially all of the audit procedures that served as the basis for the Firm's opinion;

(d) the failure to evaluate disclosure of issuances of stock and to perform and document tests of stock issuances for two issuers;

(e) the failure to perform and document, for two issuers, sufficient procedures to evaluate the valuation, presentation, and disclosure of contingent liabilities and accrued expenses;

(f) the failure to perform and document an evaluation of patent assets for impairment;

(g) the failure to perform and document, for two issuers, tests of the sufficiency of the allowance for doubtful accounts receivable; and

(h) the failure to make the necessary inquiries about the professional reputation and technical knowledge of other auditors performing procedures related to the issuer's audit.

Despite the magnitude of the deficiencies uncovered by the PCAOB, in order to advance their scheme, defendants never disclosed that Durland, the CFO, ran an accounting firm that failed to comply with material aspects of general accounting principles.

10.     Defendant **ALEX TSAO** ("Tsao") was, during the Class Period, Chief Executive Officer and the Chairman of the Board of Directors of the Company.  Tsao co-founded OTC Telecom in 1993, which changed its name to OTC Wireless in 2000.  During the Class Period, Tsao signed and certified the Company's SEC filings, including, but not limited to, Pegasus' interim Form 10-QSB and 2005 Form 10-KSB.  Tsao is the brother-in-law of Defendant Jerry Shih.  On August 18, 2006, the Company filed Form 8-K, signed by Defendant Durland, announcing that the "Board [] accepted the retirement of Chich-Hsing 'Alex' Tsao, which included his resignation from all positions as officer and director."  Tsao did not voluntarily retire, but he was instead forced to leave the Company.  ***In April and May 2006, Tsao asked Knabb about $1 million that Knabb owed to the Company; Knabb told Tsao that he was in the***

***process of providing the funds.***   On June 19, 2006, the Board convened a conference call (both Tsao and Durland attended the call in a conference room at the Pegasus office).   Knabb questioned Tsao as to whether Tsao borrowed, used, pledged, signed, transferred out of his name, or hypothecated his personal stock -- received from the Pegasus and Blue Industries, Inc. merger, in violation of the merger agreement between Blue Industries, Inc. and Homeskills, Inc. -- to the Granite Investor Group.   At the end of the conference call, the Board, on voice vote, suspended Tsao.  Knabb instructed Durland at once to summarily escort Tsao out of the building. Soon thereafter, Tsao's attorney contacted the Board about the "highly suspect" actions of Knabb, Durland, and the Board of Directors.   As a result, Knabb approached Tsao and began negotiating a retirement agreement.   In exchange for Tsao's "retirement" from the Company, pursuant to a Non-Compete and Retirement Agreement, effective August 8, 2006, the Company would give Tsao a payout of $2,810,000 over a five year period.   Tsao eventually filed a lawsuit on September 8, 2006 against both Co-Defendant Knabb and Co-Defendant Pegasus in the Superior Court of California, Santa Clara County, Docket no. 1-06-cv-070797 for, among other things, breach of the Non-Compete and Retirement Agreement.   Tsao later claimed that in direct violation of valid attachment and injunction orders issued by the California trial court, Pegasus transferred out of California an asset -- shares of stock in two subsidiary corporations -- to preclude Tsao from enforcing any judgment against the company.   In December 2007, the California court found Pegasus in contempt and ordered the subsidiaries, two California corporations, to cancel the shares that they had issued to Pegasus and issue new shares bearing court-ordered transferability restrictions. Within a month of this order, Pegasus filed a Chapter 11 petition allegedly in bad faith in the United States Bankruptcy Court for the Southern District of Florida to take advantage of the discovery stay provisions of the Bankruptcy Code.

11.     Defendant **CASPAR LEE** ("Lee") was, during the Class Period, a member of the Board of Directors of the Company.   During the Class Period, Lee signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.   Lee resigned from Pegasus at the same time as Tsao, which, as reported by the Company was "due to his inability to attend board meetings because his work and travel schedule prevented him from attending[,]" despite the fact the Board also held meetings via conference call.

12.     Defendant **JERRY SHIH** ("Shih") was, during the Class Period, a member of the Board of Directors of the Company.   During the Class Period, Shih signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.   Shih and Tsao are brothers-in-law.   Shih served as the Chairman and CEO of AMAX Technologies, Inc. and AMAX Information Technologies, Inc., which Pegasus acquired in December 2005 for over $8 million; at the time, Tsao served as Chairman and CEO of the Company.   Shih suspiciously resigned from Pegasus at the same time as Defendants Lee and Tsao.

13.     Defendant **NICHOLAS PERATICOS** ("Peraticos") was, during the Class Period, a member of the Board of Directors of the Company.   During the Class Period, Peraticos signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.   The Company's SEC filings describe Peraticos as head of a London shipping firm called Pegasus Ocean Services, Ltd. ("POS").   That company is bankrupt and in liquidation, according to a news report, and "sources in the closely knit Greek shipping community say [POS] has been out of business for years."   As further noted in the news report, POS' demise is blamed on Peraticos, who issued $150 million in junk bonds in the late 1990s.   He then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the

business.  ***None of these material facts are disclosed or even hinted at in the Company's SEC filings.***

14.     Defendant **WILLIAM HORN** ("Horn") was, during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Horn signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB, and 2006 Form 10-KSB.

15.     Defendant **EDWARD CELANO** ("Celano") was, during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Celano signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

16.     Defendant **MICHAEL EATON** ("Eaton") was, during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Eaton signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

17.     The defendants referenced above in ¶¶ 8-16 are referred to herein as the "Individual Defendants."

18.     Defendant **POLLARD-KELLEY AUDITING SERVICES, INC.** ("Pollard-Kelley") is a Colorado corporation with its principal place of business at 1900 Rocky Spring Dr., Lake City, CO 81235.  Pollard-Kelley also maintains an office in Independence, Ohio. According to Pollard-Kelly's website:

> Pollard-Kelley Auditing Services, Inc is a Certified Public Accounting Firm which specializes in auditing. We are PCAOB qualified and our practice is limited primarily to the audits of publicly traded companies [including] Financial Audits, PCAOB Audits, Mergers & Acquisitions, Sarbanes-Oxley Compliance Services.

Pollard-Kelley served as the Company's auditor and principal accounting firm from April 4, 2005 through the present.  Pollard-Kelley was required to audit the Company's financial

statements in accordance with Generally Accepted Auditing Standards ("GAAS")[1], and to report the audit results to Pegasus, the Board of Directors, the audit committee, and the members of the investing public, including Lead Plaintiff and other members of the Class. Pollard-Kelly signed the Company's SEC filings, including, but not limited to Pegasus' 2005 Form 10-KSB and 2006 Form 10-KSB.  With knowledge of Pegasus's true financial condition, or in severe reckless disregard thereof, Pollard-Kelley certified the materially false and misleading financial statements of Pegasus, described below, and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements.  Without the materially false and misleading unqualified audit opinions, the fraud could not have been perpetrated.  Pollard-Kelley also served as the accountant and/or auditor of both OTC Wireless and Wireless Frontier during the time that Knabb was involved with these other two companies, and audited the balance sheets of AMAX, CNet, and SKI.

## <u>SUBSTANTIVE ALLEGATIONS</u>

19.    Pegasus Wireless Corporation was formed after a host of costume changes in the last several years involving multiple shell companies.  Founded in 2000, Pegasus was originally organized as a Nevada software company called Burrard Technologies, Inc.  After failing in that business, however, the Company went dormant in December 2001.  In April 2002, the Company acquired a Swiss water-treatment operator, changed its name to Blue Industries, Inc., and began

---

[1]     GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements.  Statements on Auditing Standards ("AU § __") are recognized by the AICPA as the interpretation of GAAS. As a result of Sarbanes-Oxley every public accounting firm that prepares or issues an audit report with respect to any public company must register with the Public Company Accounting Oversight Board ("PCAOB").  On April 16, 2003, the PCAOB adopted Interim Auditing Standards, consisting of GAAS, as described in the AICPA's Auditing Standards Board's Statement of Auditing Standards No. 95, and related interpretations.

marketing an allegedly chemical-free water-treatment process.  Again, the Company's plan failed, and by December 2003 it went inactive.  In 2004, Knabb and Defendant Durland orchestrated a reverse merger via share exchange between OTC Wireless and a shell company called Homeskills, Inc. (in which Durland served as CFO).  The surviving company was renamed Pegasus Wireless Corporation.  In May 2005, Knabb and Durland effected a reverse merger with Blue Industries, Inc. (in which Durland's CPA firm served as the auditor, a firm which had one partner and no professional staff), another shell company.

20.     The Company purported to provide wireless networking systems and claimed to be *"a leading provider of advanced wireless solutions*."  The Company's competitors included industry giants and product category leaders such as Cisco Systems, Linksys, D-Link, Netgear, and Microsoft.  Both prior to and throughout the Class Period, Pegasus consistently claimed to possess *"cutting-edge"* technology for streaming video.  But, in fact, the Company never appeared to have high-technology or cutting-edge products.  Lim testified in a sworn deposition, however, that numerous press releases issued by the Company were "erroneous, I think is a nice word to use."  Lim Dep. at 86:5-6.  Lim added, "[t]hey were funny, because anybody that knows -- of anybody who knows anything about high tech read them, they would be laughing, too, like, for instance, to claim that we invented the 802.11 standard."  *Id.* at 86:6-10.  Lim also confirmed that WiJet.e (formerly known as the Cynalynx product), touted as a breakthrough and revolutionary product, had problems obtaining a certification from the Federal Communications Commission for sale in the United States because that product "leak[ed] radiation."  Lim Dep. at 25:7-10.

### True, Undisclosed, and Material Adverse Facts
### Regarding Defendant Knabb's History

21.     In 2001, Defendant Knabb joined OTC Wireless (founded by Defendant Tsao) to

serve as Managing Director.  Knabb left in April 2003 to join Wireless Frontier as its President,

but he returned to OTC Wireless in 2004 to serve as its President.  At no time during the Class

Period did defendants ever disclose the material, adverse information about Knabb's past (even

though defendants made relevant at least 15 years worth of Knabb's past by touting his

experience), including involvement in numerous lawsuits bearing directly on Knabb's integrity,

credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities.

Defendants never disclosed any adverse information about Knabb's associations with convicted

felons, securities fraudsters, and the like.   Defendants also never disclosed any adverse

information Knabb's history of associating, managing, and serving as a corporate officer or

director with numerous companies that have consistently experienced irregular and suspicious

trading activity leading to a sudden rise and precipitous collapse of stock price.

    22.    Pegasus' SEC filings describe Knabb as follows:

> JASPER KNABB, President and Director, **has more than 15 years experience in the high tech industry.** Mr. Knabb's involvement in the technology business encompasses PC manufacturing and sales, computer gaming software development, Internet service provider and wireless system development and marketing. Prior to Pegasus Wireless, **Mr. Knabb was the President of Wireless Frontier, Inc.,** (OTC BB: WFRI), from 2003 to 2004 and was responsible for business development and successfully negotiating to bring the company to public via a reverse merger. Prior to Wireless Frontier, Mr. Knabb was a **Managing Director at OTC Wireless** responsible for business development from 2001 to 2002. Prior to OTC Wireless, Mr. Knabb founded and became the **President of Beach Access**, a privately held Internet Service Providing company, in 1998, and successfully sold the company in 2000.

In truth, however, Knabb's history with OTC Wireless, Wireless Frontier, and Beach Access --

and his close business ties with convicted felons, securities fraudsters, and the like -- constituted

material omissions that were not disclosed in the Company's SEC filings, as discussed in detail

below**.**  For example, Vision 2000 Ventures, run by Hung Chiu-Hu, owned approximately 13%

of Pegasus shares during the Class Period (acquired through Pegasus' acquisition of OTC

Wireless).  That company is based in Taiwan and also incorporated in the Cayman Islands. Knabb's dealings with Hung date as far back as 2001, when both were involved with OTC Wireless.  Hung was arrested on May 18, 2005 for the alleged embezzlement of US $456 million (NT $17 billion) from the Taiwan-based Pacific Electric Wire and Cable Co., Ltd.  Hung also allegedly embezzled over $68 million from other companies where he served as a board member.

23.     In addition to providing little or no detail about the prior history of the Company or its related party transactions, at no time during the Class Period did defendants ever disclose the manner in which Knabb financed the acquisition of tens of millions of dollars in Company stock he purported to purchase prior to and during the Class Period.  In total, Knabb reported to the SEC that he had purchased more than $26 million in Pegasus shares between the beginning of 2005 and the end of the Class Period.  Furthermore, based on the Company's SEC filings, Knabb obtained no salary from the Company beginning in July 2004, opting instead to take stock options in lieu of cash compensation for a period of two years.  Knabb had no identifiable source of income that could have allowed him to purchase $26 million in Pegasus shares.  Knabb, for one thing, never received a salary at Pegasus.  SEC filings of Wireless Frontier, Inc. report that Knabb earned only $196,808 as Director and President of that company from September 16, 2003 to September 16, of 2004.  Moreover, even prior to September 2003, lawsuits filed against Knabb indicate that he had little to no financial resources.  And, in at least two lawsuits before the Class Period began, Knabb's retained attorney filed a motion to withdraw.  Little, if anything, about Knabb's personal finances or his ability to pay for $26 million in Company stock was ever disclosed to investors by the Company.  Defendants knew of Knabb's past and/or were severely reckless in not knowing, investigating, or disregarding any information about Knabb's past.

24.     What now appears to be the reality based upon a review of state and federal documents is that Knabb had a significant history of financial difficulty, fraudulent activities, legal problems, and a very questionable past.  Defendants' failure to disclose any information about this past (all material partly because of Knabb's position in the Company) rendered any omissions and representations about Knabb false or misleading.

25.     **Filing a False Insurance Claim**.  On November 13, 2001, Knabb reported the theft of diving equipment and an SI Tex sounder.  Knabb filed a claim with his insurer, Lexington Insurance Company (a wholly-owned subsidiary of AIG International Group, Inc.), which then conducted its own investigation.  **On July 31, 2002, the North Myrtle Beach Police Department arrested Knabb for filing a false police report and presenting a false claim for payment.  Knabb allegedly filed a false police report when he reported a grand larceny that "did not happen."  As the police incident report also noted, "Knabb had knowledge where some of the item [sic] were located prior to him calling police and reporting the larceny."**

26.     **Securities Fraud and RICO Claims against Knabb**.  In April 2001, Babak Dowlatshahi filed suit in the United States District Court for the Eastern District of North Carolina, Docket no. 01-00269, against, *inter alia*, Knabb and BIFS Technologies Corp. ("BIFS"), a penny-stock company that then acquired BeachAcess.Net.  On June 16, 2000, BIFS announced a "strategic alliance" with OTC Telecom.  The lawsuit asserted claims pursuant to Section 10 of the Exchange Act, Sections 5 and 12(a)(1) of the Securities Act of 1933, violations of the Racketeer Influenced and Corrupt Organizations Act, and various violations of North Carolina state law related to deceptive trade practices.  Defendant Knabb was then OTC's Managing Director; that company later changed its named to OTC Wireless and was subsequently acquired by Pegasus.  The lawsuit alleges that Mr. Dowlatshahi sold his company

to Beach Access.Net, where Knabb served as CEO.  Mr. Dowlatshahi claimed that the terms of the acquisition agreement were violated and that he had been harmed after Knabb stopped paying vendors, despite making assurances that he would.  On January 14, 2002, a "Motion to Be Relieved as Counsel" was filed by Knabb's counsel after Knabb allegedly failed to pay attorney's fees.  The motion was granted on February 7, 2002.  The case eventually settled, with a Stipulation of Dismissal entered on December 19, 2002.

27.   **Misrepresentation by Knabb**.   In December 2000, BIFS filed suit to void Knabb's employment contract and rescind the issuance of 12 million option shares.  The suit was filed in the Court of Common Pleas, Fifteenth Judicial Circuit, State of South Carolina.  BIFS alleged that Knabb had misrepresented his ownership of BeachAccess.net, thus causing BIFS to attempt to purchase BeachAccess.net from Knabb and to enter into an employment agreement with him.  While the trial court found that BIFS had the right to terminate Knabb, it allowed him to keep stock options he had already received.  At the time of the ruling Knabb's rights to 12 million shares of BIFS were worth less than $36,000.  BIFS was eventually de-listed from the National Association of Securities Dealers Automated Quotation System ("NASDAQ") Pink Sheets on July 28, 2005 as the result of an SEC Administrative Action that arose out of the company's inability to file timely financial statements.

28.   **Default Judgment on a Commercial Note and a Promissory Note**.   On July 8, 1999, Centura Bank ("Centura") filed suit in Superior Court for Moore County, North Carolina, Docket no. 99-cvs-840, against Knabb and Microland, Inc., of which Knabb served as President.  Centura sought to recover on a Commercial Note in the original principal amount of $23,843.86 and a Promissory Note in the original principal amount of $200,000.  These notes were declared

in default after Microland, Inc. failed to make payments.  Knabb provided personal guarantees.

A default judgment was entered in the amount of $232,791.40.

29.     **Breach of Contract; Boat Sold at Marshal's Sale; Knabb Fails to Pay Attorney**.  On March 18, 2003, a verified complaint in Admiralty was filed in the United States District Court for the District of South Carolina, Docket no. 03-00839, seeking both an *in personam* and *in rem* judgment against Knabb and the M/V LEIGH MARIE for breach of a maritime contract, default, and foreclosure of a maritime lien.  The vessel was arrested and later sold in a Marshal's sale.  On October 23, 2003, Knabb's lawyer filed a motion to withdraw as counsel (which was granted on January 14, 2004) based on the failure to fulfill financial obligations to pay for legal services and the failure to cooperate or communicate in the litigation. The matter ultimately settled and the case was dismissed on June 2, 2004.

30.     **Failure to Pay for a Mercedes**.  On October 28, 2002, the Court of Common Pleas for Horry County, South Carolina, Docket no. 2002-CP-26-1075, ordered Knabb and his wife to deliver a Mercedes automobile to the plaintiff, John Weible, for failure to pay the car note.  To prevent the seizure of the car, Weible agreed to accept payment of $55,000 in lieu of delivery of the Mercedes.  Knabb secured a surety bond and/or loan through Robert Falanga in that amount.  Knabb, however, failed to make payments on the bond and Falanga instituted suit against Knabb and his wife in the Court of Common Pleas for Horry County, South Carolina, Docket no. 2002-cp-26-2926.

31.     **No Report of Purported Sale of SEI**.  While it was previously reported by *Investorideas.com* that Knabb sold his first company, Software Exchange Inc. ("SEI") for $80 million, there does *not* appear to be any record of any $80 million sale of SEI stock by Knabb or any record that Knabb owned $80 million of SEI stock. What records do exist indicate that SEI

filed for bankruptcy in the United States District Court for the Middle District of North Carolina, on or about May 24, 1990.

32. **Judgments against Knabb**.   Upon information and belief, a list of other judgments entered against Knabb in Moore County, North Carolina alone, in addition to the above, consist of the following:

> (a) *Storch v. Knabb*, Docket no. 01-cvs-819; outstanding default judgment entered on Knabb's **failure to pay a Promissory Note** in the amount of $52,500 plus 8% interest.

> (b) *Sanford Holshouser Law Firm and Samuel Poole v. Microland, Inc. and Knabb*, Docket no. 99-cvd-9308; judgment for $33,188.80.

> (c) *Thomas v. Knabb, et al.*, Docket no. 99-M-791; judgment for $3,681.04.

> (d) *Internal Revenue Service v. Knabb*, Docket no. 94-M-346; federal tax lien in the amount of $71,695.60.

> (e) *GMC v. Tammy Speer and Knabb*, Docket no. 91-M-200; judgment for $63,791.01 plus attorney's fees.

> (f) *Kletter v. Knabb*, Docket no. 91-cvs-59; default judgment for $133,450.16. Kletter, amongst others, invested money in a company owned by Knabb called Tri-V Software in order for the company to buy a manufacturing plant to build Nintendo game "knock offs".  **In truth, no manufacturing plant was ever built and Knabb pocketed the money.**

> (g) *Keith Hardware v. Knabb*, Docket no. 90-cvd-506; judgment for $3,959.44.

> (h) *First Union Bank v. Software Exchange, Inc. and Knabb*, Docket no. 90-cvs-312; judgment, on motion for summary judgment, of $51,983 and attorney's fees.

33. Defendants' failure to disclose the material, true facts concerning Knabb, including instances of fraudulent conduct, extended well beyond Knabb's personal finances. While defendants stated to investors that Knabb had been involved in companies such as BIFS Technologies and Wireless Frontier, and had more than 15 years experience in the high-tech industry, at no time did defendants ever disclose that these companies were both penny stocks

that had experienced very similar suspicious trading patterns – both experiencing unusual dramatic increases followed by sudden and dramatic price declines, all within a very compressed time frame.

34.     **Knabb's "Pump and Dump" Trading at BIFS.**  This irregular and suspicious trading activity first occurred at BIFS.  In early 2000, following the failure of that company, Knabb sold Beach Access to Biofiltration Systems ("Biofiltration"), a Florida-based penny-stock concern.  At that time, Biofiltration had no business operations or revenues of its own. Accordingly, to generate interest in BIFS stock, the company reportedly hired a stock promoter with a dubious criminal history to pump up its stock on the Over-the-Counter market.  In the run-up that followed, Knabb offered to swap ownership of Beach Access for 12 million shares of Biofiltration stock, agreeing to stay on as head of what would become a Biofiltration subsidiary. At the time Knabb was an executive at BIFS Technologies, between March and August 2000, BIFS shares traded from $0.03 per share to $2.26 per share -- an increase of almost 7,500%.   By December 2000, however, shares of BIFS had fallen back to $0.13 per share -- a 94% loss compared to August of that year.

35.     **Knabb's "Pump and Dump" Scheming Continues.**  The pattern of a sudden rise and collapse of the stock price of companies associated with Knabb also occurred at Wireless Frontier.  Four years after the collapse of BIFS, in 2004, when Knabb was CEO of Wireless Frontier, between January 2004 and March 2004, shares of Wireless Frontier increased from $0.15 to $0.90 per share -- *a gain of over 500%.*   Almost as quickly as these shares increased in value, however, by June 2004, shares of Wireless Frontier collapsed back to $0.13 per share -- an 86% loss compared to March 2004.

36.     Pollard-Kelley served as the accountant and/or auditor of both OTC Wireless and Wireless Frontier during the time that Knabb was involved with these companies.  As a result, Pollard-Kelley should have been fully aware or known, or was severely reckless in not becoming aware or knowing, of the financial shenanigans orchestrated at companies in which Knabb had prior involvement.

**Defendants' Materially False and Misleading
Statements and Omissions during the Class Period**

37.     On December 22, 2005, the first day of the Class Period, Pegasus issued a release announcing the acquisition of AMAX Engineering Corporation ("AMAX") in a partial cash and stock-based transaction.  This release provided information about this transaction, in part, as follows:

> **Pegasus Wireless Corporation Acquires AMAX Engineering Corporation for Distribution of Its Wireless Products; Company Now Owns One of Top Twenty-Five Distribution Centers in North America**
>
> Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of 51% controlling interest in AMAX Engineering Corporation for a combination of cash and restricted stock. ***The cash portion was partially financed by the purchase of 571,429 restricted shares of Pegasus Wireless Corporation's common stock by Jasper Knabb, the Company President. The acquisition of the company and its distribution facility will allow Pegasus to expedite its wireless products domestically, therefore increasing the company's revenue, as well as profit.*** Pegasus has previously been distributing its products from its manufacturing facilities overseas, and this acquisition will allow the company to provide end-to-end solutions for its clients, as well as meet the ever-increasing demand for its patented technology with greater confidence and rapidity.
>
> Jasper Knabb stated, "***We are delighted to add AMAX to our team of dedicated professionals.*** This company has established itself as a global leader in providing technology to all levels of the marketplace, and ***we at Pegasus believe that the values and standards upheld by AMAX will be an excellent fit with our overall vision for the future of our company.***"
>
> Knabb went on to say, "By bringing our operations into North America, especially into a reputable facility such as AMAX's, ***Pegasus is looking forward***

*to expanding our output of products without compromising our commitment to the execution of our business model, and the standards of excellence that we hold to the highest value.*" [Emphasis added.]

38.     The Company's December 22, 2005 release also described Pegasus and AMAX, in part, as follows:

*Pegasus Wireless' dedication to providing the most feature-rich, flexible and robust hardware and software solutions has made it a leader in the wireless communications industry*, and has landed the company partnerships with large names such as Hitachi, Lexmark, and Dell. In the same fashion, AMAX Engineering has shown a strong commitment to providing the highest quality of products and services, has partnered with companies such as Intel and AMD, and has grown to become one of the top twenty-five distribution centers in North America. *Pegasus' attainment of AMAX will solidify its place as a significant force in the fast-growing world of wireless technology*….

About AMAX Engineering Corporation
AMAX Engineering Corporation, a privately-held company, was founded and headquartered in the heart of the Silicon Valley in 1979. *Over the years, AMAX has distinguished and established itself as a global leader in providing technology to all levels of the marketplace.* [Emphasis added.]

39.     The statements made by defendants and contained in the Company's December 22, 2005 release announcing the AMAX transaction were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisition of AMAX was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The acquisition was part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)     The AMAX acquisition was also not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy because the acquisition of AMAX – a tiny competitor in the super-competitive computer sales market -- added little or nothing to the Company, except to create the false appearance that Pegasus was growing;

(c)     The AMAX acquisition was *not* conducted at arm's-length among disinterested and non-related parties, but rather constituted an interested deal among friends and family.  In truth, AMAX appears to have been acquired primarily because AMAX was secretly owned by Defendant Tsao and his brother-in-law, Defendant Shih;

(d)     Because defendant Knabb did not have any considerable assets, Knabb did not have the ability to "purchase" over 571,000 shares of Company stock to finance the acquisitions, despite defendants' representations that Knabb had made such purchases;

(e)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(f)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(g)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "values and standards upheld by AMAX" and "standards of excellence that we hold to the highest value").

40.     One week later, on December 29, 2005, Pegasus published another release announcing the acquisition of CNet Technology, Inc. ("CNet"), a China-based manufacturer of wireless products.   This release stated, in part, the following:

**Pegasus Wireless Corporation Acquires CNet Technology, Inc., a China-Based Manufacturer for Manufacturing of Its Wireless Products; Facility Will Provide Pegasus with Manufacturing Capability Needed for Business Growth**

Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of 51% controlling interest in CNet Technology, Inc., a China-based designer and manufacturer of computer network equipment, including wireless devices. ***The acquisition will be financed by a purchase of 222,222 restricted shares of Pegasus Wireless Corporation's common stock by Jasper Knabb, Company's President.*** The cash equivalent of $1 million will be used for the purchase of CNet Technology, Inc., while the additional $1 million cash will be used to obtain raw materials to begin the manufacturing of Pegasus Wireless' products that will be available for distribution within thirty days. The acquisition of CNet's manufacturing subsidiary will allow Pegasus Wireless to accelerate the assembly of its own products as well as goods for companies abroad, which will ultimately increase profit margins. …

**Jasper Knabb** remarked, "***We are thrilled at the addition of CNet Technology, Inc. to our fast-growing group of committed and talented specialists***. … **Knabb** further commented, "Together with Pegasus' recent acquisition of AMAX Technology, CNet Technology adds another critical piece into Pegasus' overall plan to become a complete end-to-end network communication solution and technology provider."

**Knabb** went on to say, "***The recognized capabilities of CNet Technology in conjunction with the standards that we at Pegasus uphold will no doubt be an asset to our company, as well as a tool for the overall vision of future success and increased value to Pegasus Wireless shareholders***." [Emphasis added.]

41.     The Company's December 29, 2005 release also described CNet, in part, as follows:

> CNet Technology, Inc. has been a leader in designing and manufacturing high-speed, cost-effective solutions for the worldwide networking and communications market. Their unique combination of sales and assembly has allowed for CNet to support a vast array of wireless demands, from the small and home offices to the vast enterprise systems that span multiple locations. ***Pegasus Wireless will be assuming command of CNet's manufacturing facility and coupling the production of their own products with the already reputable CNet merchandise, which will leave their sales team to continue the tradition of excellence that has been established over the years.*** [Emphasis added].

42.     The statements made by defendants and contained in the Company's December 29, 2005 release announcing the CNet transaction were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisitions of CNet and AMAX were not in the best interests of shareholders and were not part of a concerted business plan or legitimate growth strategy.  The acquisitions were part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)     Because defendant Knabb did not have any considerable assets, Knabb did not have the ability to "purchase" over 222,000 shares of Company stock to finance the acquisitions, despite defendants' representations that Knabb had made such purchases;

(c)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(d)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(e)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "The recognized capabilities of CNet Technology in conjunction with the standards that we at Pegasus uphold will no doubt be an asset to our company, as well as a tool for the overall vision of future success and increased value to Pegasus Wireless shareholders.").

43.     On January 19, 2006, Pegasus published another release announcing the acquisition of SKI Technologies, Inc. ("SKI"), a Taiwanese-based manufacturer of electrical and wireless communications products. This release stated, in part, the following:

> **Pegasus Wireless Corporation Acquires SKI Technologies, Inc. in Taiwan for Manufacturing of Its Wireless Products; Third Acquisition Gives Pegasus the Capacity to Become Paramount Wireless Technology Provider**
>
> Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of SKI Technologies, Inc., a Taiwanese manufacturer of electronics and wireless communications products, for a combination of cash and stock. ***The acquisition of SKI allows Pegasus to become a complete end-to-end solution provider to its customers: this acquisition in conjunction with the recent acquisitions of AMAX Engineering***

*Corporation and CNet Technology, Inc. gives Pegasus the capacity to engineer, manufacture, and distribute its wireless products through its own channels, therefore eliminating the need for contract manufacturing from outside venues*.

**Jasper Knabb**, President of Pegasus Wireless Corporation, commented on the acquisition by stating, "***This is a huge step toward the successful execution of our business plan***, and we are thrilled to have the committed professionals at SKI on board. SKI is dedicated to continually improving the manufacturing process by supplying the most competitive product at the lowest cost possible, and by selecting them as the element that concludes our strategic acquisitions, ***we are confident that we can now focus one hundred percent of our efforts on the organic growth of Pegasus Wireless as a united entity.***"

***While these planned acquisitions have culminated one portion of Pegasus Wireless Corporation's business plan, the Company is already looking forward to achieving their next goal***, which is to bring their products to the retail front. **Knabb** went on to say, "By targeting other acquisitions, we are now looking to brand our image as the premier wireless solutions provider and bring our products to the retail arena. ***This is consistent with our never-ending goal of growth, and will increase our revenues substantially as well as maximize shareholder value.***" [Emphasis added.]

44.     The Company's January 19, 2006 release also further described SKI, in part, as follows:

**About SKI Technologies, Inc**.

Established in 2001, ***SKI Technologies, Inc. is an aggressive force in the wireless communication and electronics manufacturing arena. …They have an advantage over their competition due to their specialized manufacturing ability and robust production experience, and are a driving force in the surrounding community***.  [Emphasis added.]

45.     The statements made by defendants and contained in the Company's January 19, 2006 release announcing the SKI transaction were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisitions of SKI, AMAX, and CNet were not in the best interests of shareholders and were not part of a concerted business plan or legitimate growth strategy. The acquisitions were part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "This is a huge step toward the successful execution of our business plan" and "our never-ending goal of growth, and will increase our revenues substantially as well as maximize shareholder value").

46.     On March 3, 2006, Pegasus published a release announcing that the Company had realized $17.6 million in revenues for the six month period ended December 31, 2005.  This release stated, in part, the following:

**Pegasus Wireless Reported $17.6 Million in Profitable Revenue for the Six Month Transition Period Ended December 31, 2005**

*…AMAX was acquired to expand our distribution channels as well as leverage off their product lines*.

Pegasus acquired CNet Technology, Inc. and SKI Technologies, Inc. on December 29, 2005 and January 19, 2006, respectively. … CNet and SKI are primarily manufacturing companies which allow Pegasus to deliver its products to the market in quantity and timeliness previously not available to the Company.

Pegasus reported $17.6 million in profitable revenue for the six month transition period ended December 31, 2005. …

**Jasper Knabb** said, "*We are pleased that our revenues came in at the expected levels. And we look forward to continually implementing our business plan.*" [Emphasis added.]

47.     The statements made by defendants and contained in the Company's March 3, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisitions of AMAX, CNet, and SKI were not in the best interests of shareholders and were not part of a concerted business plan or legitimate growth strategy. The acquisitions were part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)      Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)      At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)      Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "continually implementing our business plan").

48.      On or about March 3, 2006, defendants filed with the SEC the Company's 2005 Form 10-KSB for the year ended December 31, 2005, signed and certified by Defendants Knabb and Durland.  In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the 2005 Form 10-KSB also contained statements that attested to the purported sufficiency and completeness of the Company's controls and procedures, as follows:

> **[O]ur Chief Executive Officer and Chief Financial Officer (or persons performing similar functions) concluded that our disclosure controls and**

***procedures are effective in timely alerting them to material information required to be included in our periodic reports that are filed with the Securities and Exchange Commission….*** There have been no significant changes in the Company's internal controls or in other factors since the date of the Chief Executive Officer and Chief Financial Officer's (or persons performing similar functions) evaluation that could significantly affect these internal controls during the period covered by this report… [Emphasis added.]

49. The Company's 2005 Form 10-KSB also contained certifications by defendants Tsao and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures, including the following:

***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*** [Emphasis added.]

\*\*\*

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

\*\*\*

[Other certifying officers and I]:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

procedures, as of the end of the period covered by this report based on such evaluation;

***

[Other certifying officers and I have disclosed]:

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b)      *Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.* [Emphasis added.]

50.      Defendants Tsao and Durland also signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sabanes-Oxley Act of 2002 ("SOX Certification"), certifying, *inter alia*, that "*the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*" [Emphasis added].

51.      In addition to the foregoing, the 2005 Form 10-KSB also contained statements that purported to disclose the complete nature and extent of any transactions that had occurred between the Company, its executives and directors, and any related third-parties, as follows:

A      - **Facilities operating lease** - The Company leases it headquarters building from a majority stockholder. This lease calls for annual rent in the amount of $863,800.

B      - **Related companies** - The Companies record sales, accounts receivable, purchases, administrative expenses and accounts payable to and from 5 brother-sister related companies. *None of these companies own any stock of the Companies, nor do the Companies have any investment in these related companies. They are related by virtue of similar/common control.* [Emphasis added.]

52.      The statements made by defendants contained in the Company's 2005 Form 10-KSB, were materially false and misleading and were known by defendants to be false and

misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)      Defendants failed to disclose "any fraud, whether or not material" relative to Knabb's prior history.  Knabb, as CEO of the Company, had a "significant role" in the "internal control over financial reporting" and at no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price;

(b)      The Company failed to disclose that AMAX appears to have been acquired primarily because AMAX was secretly owned by Defendant Tsao and his brother-in-law, Defendant Shih.  The AMAX acquisition was *not* conducted at arm's-length among disinterested and non-related parties, but rather constituted an interested deal among friends and family;

(c)      Defendants hid the failing results and true financial condition of Pegasus and never disclosed "weaknesses in the design or operation of internal control over financial reporting" in order to facilitate the effectiveness of the sham;  and,

(d)      Pollard-Kelley omitted from its audit the true material facts that that the Company was not in compliance with GAAP, SEC, or FAS reporting rules or that defendants were involved in schemes that falsely inflated revenue while making materially false and

misleading statements to the contrary.  Instead, Pollard-Kelley certified only that the financial results "present fairly, in all material respects, the financial position of the Company".  Pollard-Kelley knew, or was severely reckless in not knowing, about the suspicious trading pattern at Wireless Frontier of experiencing unusual dramatic increases followed by sudden and dramatic price declines, all within a very compressed time frame, causing Wireless Frontier to fail.

53.     On March 10, 2006, Pegasus published a release announcing that it had signed a letter of intent to acquire the product line of MacControl, a Miami-based manufacturer of home entertainment system controllers and remote controls.   This release quoted defendant Knabb, as follows:

> "This is an extremely exciting way for Pegasus to begin branching out into the retail market. The ways that our streaming audio and video technologies can complement this already advanced system will allow our customers to control and manage content delivery within their homes like never before…. ***This acquisition will be the fourth for Pegasus in a one-year period, but the first that will couple another company's product with Pegasus' patented technology. This endeavor further solidifies the Company as the dominant force in an industry with ever-increasing demand.***"  [Emphasis added.]

54.     The statements made by defendants in the Company's March 10, 2006 press release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisition of MacControl (in addition to the acquisitions of AMAX, SKI, and CNet) was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The planned acquisition ("the fourth for Pegasus in a one-year period") was a part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…"; and,

(c)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price.

55.     On April 19, 2006, Pegasus published a release announcing that the Company had obtained approval to be listed for trading on the NASDAQ National Stock Market, under the symbol PGWC and that trading would commence April 21, 2006.  This release also quoted Knabb, as follows:

> *"The acceptance and approved listing of Pegasus Wireless to the NASDAQ National Market is a significant milestone in the development and future growth of our company. We are proud to have satisfied the strict standards of reporting and financial strength and viability required by the NASDAQ.* We believe our shareholders will greatly benefit from the advanced profile this listing provides and we are now squarely focused on executing our strategies to further establish Pegasus as a true leader in the wireless solutions industry." [Emphasis added.]

56.     The statements made by defendants in the Company's April 19, 2006 press release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)    The NASDAQ listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The NASDAQ listing was a part of defendants' scheme to gain exposure and respectability (by being listed in a reputable national exchange) in order to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)    Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)    At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)    Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "we are now squarely focused on executing our strategies to further establish Pegasus as a true leader in the wireless solutions industry.").

57.     On May 8, 2006, Pegasus published a release announcing "record" results for the first quarter ended March 31, 2006.  This release stated, in part, the following:

**--      Company Showcases Dramatic Growth in Q1 2006**

Pegasus Wireless Corporation (NASDAQ:PGWC), a leading provider of advanced wireless solutions, announced today the company's first quarter financial results for 2006:

*       First Quarter Revenue reported at a record $23 million, a 40% increase from Q4 2005

*       Gross Profit increased to $2.1 million, a 38.6% increase from Q4 2005

*       Operating Expense reported at a 15% increase to $1.8 million from $1.5 million in Q4 2005

*       Operating Income up to $300,000, jumping from a $40,000 loss in Q4 2005

*       Net Income $200,000, a 200% increase from a $200,000 loss in Q4 2005

*       Balance Sheet shows increase in Cash, Accounts Payable, Accounts Receivable, and Decrease in Accrued Expense

                              ***

**Jasper Knabb**, President of Pegasus Wireless Corporation, said of the financials, "We are extremely proud of our first quarter results, *as the company has transitioned into an exciting new growth initiative with the acquisitions in late 2005*, and most recently, the move to the NASDAQ National Market. These *components of our business plan have proven to be profitable for Pegasus as well as its shareholders, and we can only look forward to a bright future as a company in a revolutionary industry.*" [Emphasis added.]

58.     The statements made by defendants in the Company's May 8, 2006 press release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The NASDAQ listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The NASDAQ listing was a part of defendants' scheme to gain exposure and respectability (by being listed in a reputable national exchange) in order to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     The "acquisitions in late 2005" were not in the best interests of shareholders and were not part of a concerted business plan or legitimate growth strategy.  The acquisitions were a part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(c)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(d)     Defendants never revealed that they planned to voluntary delist the Company from NASDAQ within three months;

(e)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies

that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(f)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "strict standards of reporting and financial strength" or "transitioned into an exciting new growth initiative").

59.     On May 8, 2006, defendants filed with the SEC the Company's 1Q:06 Form 10-Q for the quarter ended March 31, 2006, signed and certified by defendants Tsao and Durland.  In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the Company's 1Q:06 Form 10-QSB also contained statements which attested that the Company's controls and procedures "are effective."  In addition, the 1Q:06 Form 10-QSB also contained the same statements that purported to disclose the complete nature and extent of any transactions that had occurred between the Company, its officers or directors, and any related third-parties and the Company that were included in the 2005 10-K.

60.     The Company's 1Q:06 Form 10-QSB also contained SOX Certifications by defendants Tsao and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures.

61.     The statements made by defendants contained in the Company's 1Q:06 Form 10-QSB and SOX Certifications, were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     Defendants failed to disclose "any fraud, whether or not material" relative to Knabb's prior history.  Knabb, as CEO of the Company, had a "significant role" in the "internal control over financial reporting" and at no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price;

(b)     The Company failed to disclose that AMAX appears to have been acquired primarily because AMAX was secretly owned by defendant Tsao and his brother-in-law, Jerry Shih.  The AMAX acquisition was *not* conducted at arm's-length among disinterested and non-related parties, but rather constituted an interested deal among friends and family; and,

(c)     Defendants hid the failing results and true financial condition of Pegasus and never disclosed "weaknesses in the design or operation of internal control over financial reporting" in order to facilitate the effectiveness of the sham.

62.     As shares of the Company traded from a Class Period high of $18.99 per share on May 5, 2006, to below $6.75 per share on June 14, 2006, defendants took further aggressive and affirmative steps to re-inflate the price of Pegasus shares by publishing even more false and misleading statements about the Company.  On June 16, 2006, *Dow Jones Newswire* reported that the Company's annual report for 2005, filed in March 2006, stated that Pegasus' two most recent acquisitions -- CNet and SKI -- would allow the Company to achieve revenues as high as

$650 million in the foreseeable near-term.  In addition, according to the *Dow Jones* report, defendants also stated that Pegasus was ready to begin manufacturing at its newly acquired facilities and would have its WiJET.e (formerly Cynalynx) wireless video presentation system available for sale by the end of the year.

63.     The statements made by defendants and contained in the June 16, 2006 report were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     There was no rational basis for defendants to claim that Pegasus would, or could, achieve revenues of $650 million in the foreseeable near-term as reported revenue because, as noted in the foregoing, revenue was only $17.6 million for the six months ending December 31, 2005 (based on the March 3, 2006 release) and $23 million for the first quarter of 2006 (based on the May 8, 2006 release);

(b)     The acquisitions of SKI and CNet were not in the best interests of shareholders and were not part of a concerted business plan or legitimate growth strategy.  The acquisitions were a part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(c)     Lim confirmed that WiJet.e (formerly known as the Cynalynx product), touted as a breakthrough and revolutionary product, had problems obtaining a certification from the Federal Communications Commission for sale in the United States because that product "leak[ed] radiation.";

(d)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…"; and,

(e)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price.

64.     In an effort to further artificially inflate the price of Pegasus stock, on June 28, 2006, defendants announced that Knabb had purchased 1.25 million shares of Pegasus stock at $8.00 per share, in a private placement, valued at $10 million.  At that time, defendants stated that the proceeds of this offering were *already* committed to pay for acquisitions, hiring sales and marketing staff, and for operational costs.  Defendants published a release that stated, in part, the following:

> *[T]he company has completed a private placement of its common stock that totals 10 million dollars. The Company's President, Jasper Knabb has purchased 1.25 million shares of Pegasus Wireless Corporation common stock at eight dollars per share, and plans to use the funds to continue the implementation of the Company's business plans.*
>
> Net proceeds from the private placement will go towards pertinent aspects of the company's plan to establish and maintain Pegasus' position at the pinnacle of the wireless industry. … Knabb said of the private placement, *"I am proud to be a part of such a dedicated team, and feel very strongly about the company's ability to do great things with this funding. Pegasus plans to put the proceeds of this*

*financing to immediate use, and I am thrilled to be able to facilitate the growth of such a powerful organization."* [Emphasis added.]

65.     The statements made by defendants and contained in the Company's June 28, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The private placement was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The private placement was part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)     Because defendant Knabb did not have any considerable assets, Knabb did not have the ability to purchase 1.25 million shares of Company stock, despite Defendants' representations that Knabb had made such purchases;

(c)     If payment was ever made by defendant Knabb for the $10 million in Pegasus stock referenced above, it was *not* fully committed at that time and it was *not* immediately available to the Company.  In fact, as investors would ultimately learn, all Knabb provided the Company for these shares was a "subscription receivable" and, later, almost $7 million in cash was paid back to Knabb after the Company revealed that he had never even purchased the shares;

(d)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(e)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price.  Moreover, defendants never disclosed why they allowed an individual with Knabb's past and involvement in numerous lawsuits bearing directly on integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities make an insider purchase when there is no indication Knabb had the funds to pay for such a purchase; and,

(f)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "feel very strongly about the company's ability to do great things with this funding").

66.     On July 5, 2006, Pegasus was added to the influential Russell 2000 Index.[2]  That day, defendants also published a release that quoted Knabb, as follows:

> "***We are extremely proud to be added to this list of prominent companies, and are excited as to the implications that it holds for the future. Being recognized by Russell is an honor and a privilege that we at Pegasus are prepared to uphold to the highest standards.***" [Emphasis added.]

---

[2]     The Russell Index captures the 3,000 largest U.S. stocks and ranks them by total market capitalization to create the Russell 3000 Index.  The largest 1,000 companies comprise the Russell 1,000 Index, and the remaining companies become the widely used Russell 2000 Index.

67.     The statements made by defendants and contained in the Company's July 5, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The Russell 2000 Index listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy, and defendants never sought to remove the Company from the listing.  The Russell 2000 Index listing was part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock; and,

(b)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(c)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "implications that it holds for the future" and "prepared to uphold to the highest standards").

68.     On July 20, 2006, Pegasus published a release announcing that Knabb would be ringing the ceremonial opening bell at the NASDAQ.  This release quoted Knabb, as follows:

> "It is a tremendous honor to be ringing the opening bell, and *a privilege to celebrate the success of Pegasus Wireless with an opportunity such as this*," said Knabb of the upcoming ceremony. "Since coming to the public arena, *we have enjoyed remarkable growth in size as well as in our technological capabilities and I would like to thank our employees, customers and shareholders for their continued support of the Pegasus Wireless vision*."  [Emphasis added.]

69.     The statements made by defendants in the Company's July 20, 2006 press release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The NASDAQ listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The NASDAQ listing was a part of defendants' scheme to gain exposure and respectability (by being listed in a reputable national exchange) in order to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     Defendants never revealed that they planned to voluntary delist the Company from NASDAQ within three months;

(d)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties,

and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(e)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "remarkable growth in size as well as in our technological capabilities").

70.     On July 25, 2006, Pegasus published a release announcing purported "record" setting results for the second quarter ended June 30, 2006.  This release stated, in part, the following:

**Pegasus Wireless Corporation Reports Second Quarter 2006 Financial Results; Company Demonstrates Extraordinary Growth With Record-High Revenue**

…Pegasus Wireless is proud to report that revenue for the second quarter of 2006 was a Company *record* $25.4 million, representing a 10% revenue growth as compared to the $23 million in revenue that was generated for the first quarter of 2006. Gross profit for the second quarter totaled $2.5 million, a 21% increase from the $2.1 million gross profit that was reported for the first quarter. The Company also reported a net profit increase of 8% over the first quarter of this year.

**Jasper Knabb**, President of Pegasus Wireless Corporation, commented, "*We are thrilled with our second quarter results, particularly the 10% quarter-over-quarter revenue growth. The financials for this quarter are a direct result of the organic growth that Pegasus has seen over the last three months*. During the quarter, we achieved many important milestones such as commencing trading on the NASDAQ, *showcasing ground-breaking products that will soon be available through our retail channels,* and streamlining our management structure to better fit the needs that were created by our recent expansions. *The growth that we have*

*enjoyed this quarter has set a new standard for us here at Pegasus and we anticipate continuing on our record-setting pace, as we will soon be generating substantial revenue from retail sales of our innovations."* [Emphasis added.]

71.     The statements made by defendants and contained in the Company's July 25, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The NASDAQ listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The NASDAQ listing was a part of defendants' scheme to gain exposure and respectability (by being listed in a reputable national exchange) in order to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     Defendants never revealed that they planned to voluntary delist the Company from NASDAQ within three months;

(d)     The Company did not have "ground-breaking products" because, as Lim testified, the press releases issued by the Company were "erroneous, I think is a nice word to use."  Lim added, "[t]hey were funny, because anybody that knows – of anybody who knows anything about high tech read them, they would be laughing, too, like, for instance, to claim that we invented the 802.11 standard.";

(e)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(f)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "anticipate continuing on our record setting pace").

72.     The same day, July 25, 2006, defendants filed with the SEC the Company's 2Q:06 Form 10-Q for the quarter ended June 30, 2006, signed and certified by defendants Knabb and Durland.  In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the Company's 2Q:06 Form 10-QSB also contained statements which attested that the Company's controls and procedures "are effective."  The Company's 2Q:06 Form 10-QSB also contained Sox Certifications by defendants Knabb and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures.

73.     The statements made by defendants contained in the Company's 2Q:06 Form 10-QSB and SOX Certifications were materially false and misleading and were known by

defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     Defendants failed to disclose "any fraud, whether or not material" relative to Knabb's prior history.  Knabb, as CEO of the Company, had a "significant role" in the "internal control over financial reporting" and at no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price;

(b)     The Company failed to disclose that AMAX appears to have been acquired primarily because AMAX was secretly owned by defendant Tsao and his brother-in-law, Jerry Shih.  the AMAX acquisition was *not* conducted at arm's-length among disinterested and non-related parties, but rather constituted an interested deal among friends and family;

(c)     Defendants hid the failing results and true financial condition of Pegasus and never disclosed "weaknesses in the design or operation of internal control over financial reporting" in order to facilitate the effectiveness of the sham;

(d)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted

felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(e)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, attesting to the effectiveness of the Company's controls and procedures).

74.     On August 3, 2006, Defendants published a release announcing Pegasus' purported "***commitment to corporate governance and compliance with Sarbanes-Oxley***." This release again quoted Knabb as follows:

> "Due to their strategic relationship with the NASDAQ, we selected MetricStream's software solutions and ComplianceOnline.com as the foundation for all of our compliance initiatives. Regulatory compliance affects every aspect of our business, and we wanted to ensure that we have a mechanism to meet our immediate Sarbanes-Oxley 404 and ISO compliance requirements. This will also support future compliance initiatives in an integrated manner." [Emphasis added.]

75.     The statements made by defendants and contained in the Company's August 3, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The NASDAQ listing was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy. The NASDAQ listing was a part of defendants' scheme to gain exposure and respectability (by being listed in a reputable

national exchange) in order to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     Defendants never revealed that they planned to voluntary delist the Company from NASDAQ within three months;

(d)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(e)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, meeting "compliance requirements").

76.     On August 4, 2006, defendants published a release announcing that the Company had retired 13 million shares of company stock, bringing the balance of issued and outstanding shares to 65.68 million.  This release again quoted defendant Knabb as follows:

> **Jasper Knabb**, President and CEO of Pegasus Wireless Corporation, commented, ***"Shareholder value is of the utmost importance to us at Pegasus, and we are dedicated to ensuring that our shareholders get the most out of their investment in our company.*** We have the ability to continue to retire shares of our common stock, and will do so in a strategic manner that will benefit our investors." [Emphasis added.]

77.     The statements made by defendants and contained in the Company's August 4, 2006 release announcing the retirement of 13 million shares were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The retirement of shares was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  The retirement of shares was a part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted

felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "shareholder value is of the utmost importance").

78.     The same day, August 4, 2006, defendants also announced the issuance of a special dividend to shareholders of record as of August 11, 2006, whereby they:

> will be entitled to receive one common stock purchase warrant at a strike price of $8.00 for every ten shares of Pegasus Wireless common stock owned." …. Eligible shareholders will have 15 days from the above-mentioned date of record to receive their warrants. … ***Those shareholders who possess common stock certificates are required to physically present the certificate to Pegasus' transfer agent in order to receive their warrants. Shareholders whose common shares of Pegasus stock are held in a brokerage account must contact their brokerage firm to ensure that the warrants are processed correctly. Any beneficial stockholder who has difficulty with their brokerage house should email the Company at warrants@pgwc.com immediately.*** [Emphasis added.]

79.     In addition to the foregoing, this release also quoted Knabb, as follows:

> ***"We are issuing this dividend to demonstrate our long-term dedication to those shareholders that have remained loyal and committed to Pegasus, and I trust that every eligible shareholder will enjoy the benefits of the dividend."*** [Emphasis added.]

80.     The statements made by defendants and contained in the Company's August 4, 2006 release announcing the special dividend were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in

not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The highly unusual "share dividend" was not offered to reward the long-suffering shareholders of the Company, but rather constituted an ill-conceived scheme to further manipulate the price of Pegasus stock by eliminating phantom "short-sellers," who Knabb repeatedly but baselessly claimed had sold stock in the Company that did not exist (also known as "naked shorts").  Despite the fact that no accepted evidence exists to support Knabb's theory that Pegasus shares were oversold by tens of millions of shares, and despite evidence that supports the proposition that managers who lose focus over their business and choose to pursue phantom short sellers tend to underperform in the market, defendant Knabb engineered this manipulative offering.  The offering resulted in a loss of corporate focus and waste of corporate assets, and, as investors ultimately learned, this offering did little or nothing to reduce the justifiably large short term-interest in Pegasus stock;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies

that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "demonstrate our long-term dedication to those shareholders that have remained loyal and committed to Pegasus").

81.     On August 14, 2006, the Company published a release announcing that defendants had acquired another "innovative" product line from MacControl, LLC, for stock consideration then valued at almost $5.0 million.  This release stated, in part, the following:

> *The acquisition was funded by the issuance of 833,333 restricted shares of Pegasus Wireless Corporation stock to MacControl. The product line that Pegasus has acquired from MacControl is to be used in conjunction with the Company's recently introduced solution, wireless cables. The MacControl line features a remote and a connector that will complement the ease of use that wireless cables offers by controlling all components of the home entertainment system with one remote*.
>
> *"We are thrilled to be taking on the MacControl line as a Pegasus venture*," said Jasper Knabb, President and CEO of Pegasus Wireless Corporation. "We are placing a huge emphasis on the retail consumer with our home entertainment solutions; and *by combining our technology with the advanced applications that the MacControl products have to offer, Pegasus will establish an entirely new level of wireless technology that can be used in the home*." [Emphasis added.]

82.     The statements made by defendants and contained in the Company's August 14, 2006 release were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     The acquisitions of MacControl, LLC was not in the best interests of shareholders and was not part of a concerted business plan or legitimate growth strategy.  This

acquisition was part of defendants' scheme to artificially inflate the price of the Company's stock, manipulate the market, and to create the appearance that Pegasus was growing to fraudulently induce investors to purchase the Company's stock;

(b)     Furthermore, as noted above, Lim confirmed that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing…";

(c)     At no time during the Class Period did defendants ever disclose any adverse information about Knabb's past, including: (i) involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities; (ii) any adverse information about Knabb's associations with convicted felons, securities fraudsters, and the like; and (iii) any adverse information Knabb's history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price; and,

(d)     Because Knabb has been involved in lawsuits that bear directly on his honesty and financial background, full disclosure, especially because Knabb is quoted in the release, would have been material for a reasonable investor to consider the accuracy or truthfulness of any representation made by or attributed to Knabb (*e.g.*, "Pegasus will establish an entirely new level of wireless technology that can be used in the home").

83.     On August 18, 2006, the Company filed Form 8-K, signed by Defendant Durland, announcing that the "Board [] accepted the retirement of Chich-Hsing 'Alex' Tsao, which included his resignation from all positions as officer and director."  The statements made by defendants and contained in the Company's August 18, 2006 Form 8-K were materially false and

misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, because of the Company's failure to reveal the following adverse information related to Tsao:

(a) Defendants failed to identify or state the true cause of Tsao's "retirement" as Tsao did not voluntarily retire, but forced to leave the Company;

(b) Defendants failed to state that (pursuant to a June 19, 2006 conference call with the Board) Tsao borrowed, used, pledged, signed, transferred out of his name, or hypothecated his personal stock – received from the Pegasus and Blue Industries, Inc. merger, in violation of the merger agreement – to the Granite Investor Group;

(c) Defendants never mentioned that the Board suspended Tsao by voice vote on June 19, 2006 pending an investigation of his stock action;

(d) Defendants failed to mention that Tsao raised questions prior to the June 19, 2006 Board conference call about $1 million owed by Knabb to the Company, according to a complaint filed on September 8, 2006 by Tsao in the Superior Court of California, Santa Clara County, Docket no. 1-06-cv-070797; and,

(e) Defendants never revealed that in exchange for Tsao's "retirement" from the Company, pursuant to the Non-Compete and Retirement Agreement, effective August 8, 2006, the Company would give Tsao a payout of $2,810,000 over a five year period.

## <u>THE TRUTH BEGINS TO EMERGE</u>

84.    On August 24, 2006, investors were shocked and alarmed by a report published by *The MotleyFool.com*, entitled "*Don't Bet on This Horse.*"  This report portrayed Knabb as a serial penny stock manipulator and stated, in part, the following:

> *In Pegasus' filings, of course, Knabb is portrayed as a successful tech businessman, but I think the record of his last publicly traded enterprise,*

***Wireless Frontier Internet, proves otherwise.*** At this company…Knabb was president and director…The story at Wireless Frontier was rolling up rural Internet service providers. The company bought more than a dozen of them. But what rolled up for shareholders, mostly, were losses.

But not before the stock soared, helped along (I have no doubt) by the usual types of penny-stock pumps. (The latter, by the way, looks like it came from a Florida stock tout who had already been nailed by the SEC for fraudulently promoting a stock, working directly with the president of the company.)

I've seen nothing to indicate Knabb had any direct relationship to any of this paid touting -- although believe me, I'm continuing to dig. ***But then, Knabb did plenty of PR of his own, such as proclaiming his company to be "quickly emerging as the leading resource of wireless broadband Internet," touting Wireless Frontier's application to list on the Amex, and splitting the sub-two-dollar stock in early 2004.***

***But in reality, Wireless Frontier was not really doing so hot***. Its 10-K from the period shows a balance sheet loaded up with goodwill and a couple years of losses. The cash burn was even less impressive. ***The 10-Q corresponding directly to the period of Knabb's early 2004 enthusiasm shows a widening loss. The stock kept cratering, and by October, only half a year after the (in)glorious run-up, Knabb had resigned. … In August 2005, judgments were being entered against the firm, resulting in forced auction of assets***. [Emphasis added.]

85.     The August 24, 2006 *MotleyFool.com* report also exposed the myriad of undisclosed related party transactions between the Company and parties with current or former associations to Knabb.   In this regard, the report stated the following:

**The friends and family plan**

One thing that has always disturbed me about Pegasus is the acquisition binge. If the company has such great wireless technologies, why would it need to diversify into other businesses? (***Remember the fate of Knabb's last wireless acquisition machine.***)

***But things look even odder when you look at some of the details in these acquisitions.***

In December 2005, the company paid $8 million (half cash, half stock) for a 51% interest in two California computer sales and service companies called AMAX Engineering and AMAX Information Technologies. ***If you're wondering why a company trying to position itself as a Wireless developer and manufacturer***

*would be interested in a pair of businesses in the cutthroat computer-hawking market, so am I.*

*Perhaps this has something to do with it? AMAX was owned by Jerry Shih, brother in-law to Pegasus founding CEO Alex Tsao. Are we to believe that shareholders are well served when companies are buying from their inlaws?* I've got my doubts.

But family members aren't the only ones who seem to be getting in on the game. *Friends and associates -- some with absolutely worthless businesses -- are fair game, too. Why else would Pegasus have agreed to acquire CEO-channel.com on April, 4, 2005, for 3 million shares of stock* (worth about $0.25 each at that time, according to the historical prices at Yahoo!)?

Whole lotta nothin'

*What did Pegasus get for that $750,000 worth of stock? Close to nothing.* Wait, less than nothing. As of the 10-K filed on April 6, 2005, only two days after that acquisition announcement, *CEO-channel.com had $15,000 in cash but $18,200 in liabilities.* Take a look for yourself. *The company didn't even have an operating business,* seriously.

So, why the buy? Who knows*. As far as I've seen, it wasn't explained in any of Pegasus' later 10-Ks or noted in a press release at the time.* Pegasus shareholders, however, might be interested to know **that** *CEO-channel's owner, Lawrence Creeger, the majority owner, sole director, and officer, just happened to be involved (since at least 2003) with Pegasus CFO Stephan Durland in a venture called Global Event Makers,* formerly "Pro Celebrity Caribbean Tour Inc.," and another called Global Equity, formerly "Eventmakers-Caribbean Corp." [Emphasis added.]

86.     The August 24, 2006 *MotleyFool.com* report (the "*MF* Report") into defendant Durland did not stop there.  The *MF* Report also exposed a host of undisclosed material adverse information about defendant Durland, including a history of involvement with failed and suspect ventures, such as that he was CFO and then acting CEO of a company called Medical Makeover Corporation of America, which appears to have shared an office with DP Martin and Associates, which paid penny-stock promoters to "fluff" Medical Makeover's shares.  Both firms were represented by an attorney named Donald Mintmire, who was "disbarred following a federal conviction on obstruction related to a Florida pump and dump scheme."

87.     Specifically, the August 24, 2006 *MF* Report also noted with respect to Durland:

While we're here, ***let's take a deeper look at CFO Durland's past***. You can't argue that he doesn't know the ground. He's been with Pegasus -- at least the flop predecessor, Blue Industries - - since his firm was hired as auditor in March of 2003.

*     *     *

Kind of makes you wonder what sort of delights you'd find by skimming the history of the firms where Durland has been a director or CFO, no?

Knock yourself out. There are plenty in the 10-K, which you can get here. There are some real winners in the crowd - - and by winners, I mean losers. How about Safe Technologies International? Or - - this is a hoot - - a company that was going to make waves salvaging sunken World War I and II-era boats, Ocean Resources? American Ammunition, anyone? If you're hungrier, the 10-K left out a few of Durland's other prior affiliations: ElectraCapital, for instance, and Diversified Product Inspections.

***But to me, the most interesting  -- and by interesting, I mean horrifying -- has got to be Medical Makeover Corporation of America, a penny stock Durland was involved with from June 2004***, and whose business is described in its latest 10-K as follows: "With the failure of the Company's last two business plans, it has reverted to the development stage. Management is currently evaluating several opportunities." ***Durland was a director, then acting CEO, until July of this year***.

I'm not surprised he finally fled this disaster; after all, we're talking about a company that pretty much does nothing, by its own admission. It reports no cash and no revenues, and one employee. ***This is what Durland took public? No wonder the share price has cratered since the reverse merger he is credited with orchestrating***.

Not that there weren't penny-stock hypesters out trying to keep Medical Makeover floating. For instance, take a look at this March 1, 2005 "alert" on the company. Note that the fine print discloses it's a paid pump job*: **Some outfit called DP Martin and Associates shelled out $20,000 to get this load of tripe sent out***.

***Who is DP Martin and Associates***? That's not entirely clear to me yet, but maybe Durland could fill us all in. After all, it appears they may have been neighbors, or even ***shared the same office***.

***Florida business records show a DP Martin and Associates located at 500 Australian Avenue, No. 619, West Palm Beach, Fla., an address that just happens to look like the same one address occupied by Medical Makeover's predecessor company, Cactus New Media***. Strangely enough, they seem to have

changed their addresses to that office within a week of each other. (Medical Makeover's current address is listed in the same building, but in No. 700.)

> *Finally, … the firms also share the same registered agent, an attorney named Donald Mintmire who was disbarred following a federal conviction on obstruction related to a Florida pump and dump scheme….Something smells here, people, and it's not the West Palm Beach breeze.*

88.     The revelation of these adverse facts and circumstances caused shares of the Company to immediately decline.  On August 24, 2006, Pegasus stock plummeted -- falling from a closing price of $7.60 per share on August 22, 2006, only two trading days before the *MF* Report was widely circulated, to a close of $5.82 per share on August 24, 2006.  Thus, within only two trading days, shares of the Company declined almost 25% on high volume of almost 2 million shares traded over that period.

89.     Following the *MF* Report, on August 28, 2006, *The New York Post* published a story about the Company titled "*Horse Feathers.*"  This report expanded on the issues exposed previously by the *MF* Report and stated, in part, the following:

> *OVER the years this one time Vancouver- based penny stock has accumulated one of the most convoluted and confusing corporate pedigrees imaginable* - including two reverse mergers as well as a failed attempt at a third reverse merger.
>
> Much of the action revolves around the firm's CEO - an attention-hungry self-promoter from South Carolina named Jasper Knabb, who once appeared as an extra in an episode of "CSI: Miami."
>
> In 1998 Knabb set out to make a name for himself in the red-hot dot-com space, launching a small scale Internet service provider called Beach Access, buying what he needed for the enterprise from an obscure West Coast supplier called OTC Telecom.
>
> Knabb claimed Beach Access could provide connection services that ran 100 times faster than rivals. *But the business never got off the ground and in early 2000 he sold it to Biofiltration Systems, a Florida-based penny-stock concern*.
>
> *Biofiltration had no business operations or revenues of its own at the time*, so to stir some interest in itself as a stock play, the company had already hired a

convicted sex offender named Orville Baldridge to pump up its stock on the Over The Counter market.

Thinking he saw an opportunity for himself in the run-up that followed, Knabb offered to swap ownership of Beach Access for 12 million shares of Biofiltration stock, agreeing to stay on as head of what would now become a Biofiltration subsidiary.

*Yet not many months passed before Biofiltration fired Knabb and sued him to recover those shares, claiming Knabb was full of bull about Beach Access and had actually never owned the operation to begin with.*

*The court agreed with about half of what Biofiltration claimed, and ruled it had the right to fire Knabb but not to force him to hand back his stock. Next, Biofiltration collapsed and in 2003 the Securities and Exchange Commission delisted its shares.*

Unfazed by his firing, Knabb landed on his feet with a new job as an aide to the top man at OTC Telecom, **Alex Tsao**, who had recently changed the company's name to **OTC Wireless** to reflect the boom in orders that he had been expecting to receive from Knabb and Beach Access.

The orders, of course, failed to materialize and before long *Knabb and Tsao began looking elsewhere for opportunities, hooking up finally in late 2004 with what looked to be their meal ticket - a defunct Florida-based penny-stock outfit called Homeskills.*

*In early November 2004, OTC Wireless and Homeskills merged in a share exchange and began trading on the Over The Counter market under the name of Pegasus Wireless.*

The name change reflected the arrival of a new player: a London-based Greek shipowner named Nicos Peraticos, who serves as Pegasus' chairman of the board.

*The company's SEC filings describe Peraticos as head of a London shipping firm called Pegasus Ocean Services, LTD. Yet that is hardly the whole story.*

U.K. corporate records show the Pegasus [Ocean Services, LTD.] operation to be bankrupt and in liquidation, while *sources in the closely knit Greek shipping community say Pegasus [Ocean Services, LTD.] has been out of business for years.*

British shipping industry trade publications place the blame for Pegasus [Ocean Services, LTD.]'s demise squarely on Peraticos himself.

Hoping to expand the family business, he had issued $150 million in late 1990s

junk bonds to a consortium of lenders that included Lazard Freres and Merrill Lynch, then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business.

***None of these things are even hinted at in Pegasus Wireless' SEC filings. And neither is there a coherent discussion of the company's allegedly cutting-edge technology.***  [Emphasis added.]

90.     The following day, August 29, 2006, Asensio Capital Management in New York, published a report on its Internet website titled, "***Yet Another PGWC Fraud-Laden Shareholder***," that exposed the history of fraud and market manipulation linked to another of the Company's investors, identified in Pegasus' SEC filings as Wire To Wire Inc. -- the former officers of which were found liable for civil fraud by the SEC.   The Asensio Capital report stated, in part, the following:

*A July 25, 2006 Form 144 filing reported a planned sale of 10,000 shares of Pegasus Wireless Corporation by Wire To Wire, Inc ("Wire"). In 1999, Wire was implicated in, and subsequently Wire's former officers were found liable for fraud in a Wire-related entity, in a civil case brought forth by the Securities and Exchange Commission* ("SEC").

On September 28, 1999, the SEC filed a complaint against Gerald H. Levine, Marie A. Levine, and CEC Industries Corporation ("CEC"). The complaint charged the Levines and CEC with fraud violation, falsifying books and records, and accounting violations during fiscal years ending on March 31, 1996 and March 31, 1997.

*          *          *

CEC settled the SEC's financial fraud charges without admitting or denying the allegations, and on September 11, 2001 accepted a permanent injunction barring CEC from violating certain antifraud, record-keeping and internal control provisions. Subsequent to an acquisition in August 2004, CEC changed its name to Advantage Capital Development Corp. (OTHER OTC: AVCP $0.01). On October 16, 2003, Gerald and Marie Levine were found liable for financial fraud by a jury in the US District Court of the District of Columbia ("D.C.").

*          *          *

***Gerald and Marie Levine are just the latest piece in the puzzle of fraud and deception surrounding PGWC, joining the company of felonious attorney***

***Donald Mintmire and accused Taiwanese embezzler Hung Chiu-Hu.***
[Emphasis added.]

91.     Friday, September 1, 2006, is the final day of the Class Period.  The weekend following that Friday was Labor Day weekend, and the markets were closed for trading on Monday, September 4, 2006.  Over that long weekend, however, leading financial media outlet *Barron's* published a very widely-circulated report about Pegasus that raised additional questions as to where Knabb received the funds to reportedly buy tens of millions of dollars of Company stock and ***reported that Knabb had previously been arrested for possible insurance fraud***.  The *Barron's* report stated, in part, the following:

> ***SEC filings by Pegasus show that Knabb has purchased about $18 million of Pegasus stock this year, even though he doesn't draw a salary from Pegasus, values of houses in the South Carolina area he lists as his home typically are lower than $350,000 and he's had some history of financial difficulty.***
>
> ***In 1990, his first company, Software Exchange, filed for bankruptcy in North Carolina. Later, Knabb's boat was repossessed after John Weible, a self-described Myrtle Beach, S.C., mortgage lender, sued him in U.S. District Court of South Carolina for nonrepayment of a loan. …***
>
> ***During this period, Knabb was arrested for possible insurance fraud, according to police in North Myrtle Beach, though the case eventually was dropped.***
> [Emphasis added.]

92.     In addition to the foregoing, the *Barron's* report also highlighted the fact that, in the past, shares of two Knabb companies -- BIFS Technologies, formerly Biofiltration Systems, and Wireless Frontier -- ballooned, then collapsed, evidencing suspected stock and market manipulation.  *Barron's* also questioned the veracity and completeness of defendants' statements concerning the novelty and uniqueness of the Company's products and Pegasus' foreseeability to compete in the current marketplace.

93.     Also on September 1, 2006, the *New York Times* reported the following in an article entitled, *"A Bet Against Those Who Bet Against the Company"*:

IMAGINE if a company said it would give you a dividend but would make you do cartwheels to get it.

Pegasus Wireless, a technology company in Nevada, announced an unusual plan on Aug. 4 to reward loyal shareholders. For every 10 shares of stock, investors would receive a "property dividend" which the company described as a stock warrant.

But there was a catch. The warrants would be issued only to shareholders whose stock was held in "beneficial name" — in other words, in the name of the shareholder. ***Pegasus would not issue any warrants to brokerage firms to be passed on to clients, which is what normally happens when dividends are paid.***

The warrant, as explained in the Pegasus news release, appeared to suggest that brokers — who can lend out stock they hold in certain client accounts — might have to recall the shares so that investors could prove they were the owners. Such action would require those who sell short to give the stock back to the brokers, pushing the price up and creating a short squeeze.

Pegasus said it was only trying to reward investors, but regulators, back-office officials and traders saw another possible motive — to punish short sellers. (Short sellers bet that a company's stock price will fall, selling shares, usually borrowed from a brokerage firm, and later buying them back at a lower price and pocketing the difference. If the price rises, the plan backfires.)

"It squeezes the shorts, but it also squeezes the brokers," said David A. Garcia, a principal at the Nevada-based law firm of Hale Lane.

*          *          *

Whatever the goal of the warrant, the impact was clear. Pegasus's stock rose almost 30 percent after the warrant was announced, reaching a high of $7.60 on Aug. 22 — bad news for any short seller who expected shares to fall. The stock since has fallen again and closed yesterday at $3.43.

Yesterday, the stock fell 33 percent on volume of 4.6 million. The company usually trades about 130,000 shares a day.

***Whatever the reason it was released, such a warrant is highly unusual. Lawyers at the Securities and Exchange Commission could not recall any other such warrant.*** "It's an odd situation," Mr. Garcia said. "Ultimately with the logistics they've proposed, a refusal by the company to issue the distribution to a stockholder of record of the company could be problematic under Nevada law."

94.     On September 3, 2006, Defendant Durland's ties to Donald Mintmire, the attorney that Asensio Capital labeled "felonious," were also exposed in another Asensio Capital report that was posted on the Yahoo.com Pegasus message board.  This report stated, in part, the following:

> *Twenty-seven companies that have been audited by Durland & Company, CPAs, a firm run by Stephen Durland, who is Pegasus Wireless Corporation's Chief Financial Officer ("CFO") and whose company served as PGWC's former auditor, have also been legally represented by convicted felon Donald F. Mintmire, Esq., or his law firm, Mintmire & Associates.*
>
> *Mr. Durland also served as a CFO, a Director, or a Chief Executive Officer in 6 firms that were represented by Mintmire & Associates.…*
>
> Mr. Durland has had regulatory brushes of his own. He lost his CPA license in the State of North Carolina and his firm was cited by the Public Accountancy Oversight Board for failure in the Review of Audit Engagements.
>
> *In 2005 Mr. Mintmire was found guilty of obstruction of justice in a federal grand jury investigation and also of conspiracy to obstruct justice in an SEC probe, for concealing documents from the SEC regarding one of his shell companies.*
>
> *Mr. Mintmire was sentenced to 21 months in federal prison and an-$80,000 fine, and was prohibited from engaging in any business that offers securities, investments or business opportunities. He was also disbarred from The Florida Bar. Mr. Mintmire was to report to prison on May 30, 2006,* but is currently out on bond, pending appeal.  [Emphasis added.]

95.     The same day, September 3, 2006, the same Pegasus Yahoo.com message-board user also posted another Asensio report titled, *"PGWC Links To The Corporate Scandal of the Century."*   This report documented the relationship of Pegasus and Knabb to a notorious Taiwanese stock manipulator named Hung Chiu-Hu, and to one of the Company's major investors, Vision 2000 Ventures, run by Chiu-Hu.  This report stated, in part, the following:

> *"PGWC's Links To The "Corporate Scandal Of The Century."*
>
> *…  The shareholding company is the same company that owns an interest in a Pegasus subsidiary, and which had dealings with PGWC's President and newly*

*announced Co-CEO, Jasper Knabb, since at least 2001. The Taiwanese connection continues with PGWC's involvement with a Taiwanese national who stands accused of using over 100 bogus companies to embezzle in excess of $525 million from three different companies and who is a director of one of Pegasus' major shareholders.*   Mr. Knabb has seen legal and financial controversies of his own.

According to Securities and Exchange Commission filings, *Vision 2000 Ventures, Ltd ("Vision") owns approximately 13% of PGWC. Vision is a Taiwanese based corporation also incorporated in the Cayman Islands whose director is Taiwanese citizen Hung Chiu-Hu.*

*Mr. Hu was arrested on May 18, 2005 for his involvement in what is notoriously referred to by the Taiwanese press as the "corporate scandal of the century."*

*Mr. Hu was arrested, along with two co-conspirators, in connection with the embezzlement of over $456 million from the Taiwan-based Pacific Electric Wire and Cable, Co. Ltd* ("Pacific Electric").

*…According to the Taipei Times, during the investigation of the Pacific Electric, investigators also found evidence that Mr. Hu had embezzled in excess of $68 million from two more Taiwanese companies where he had served as a board member.*

As of July, 2005 Mr. Hu was awaiting trial and prosecutors were seeking a 20 plus year jail term.

The ties between Mr. Hu and Mr. Knabb existed prior to Vision acquiring shares of PGWC. Mr. *Knabb's dealings with Mr. Hu goes back at least to 2001, when both were involved in OTC Wireless ("OTC").*

*Vision's PGWC stock holding resulted from Pegasus' acquisition of OTC in November, 2004. Mr. Knabb served as OTC's Managing Director from 2001-2002.*   [Emphasis added.]

96.     Following the first day of trading after the publication of the widely-circulated

*Barron's* report, on September 5, 2006, shares of Pegasus again plummeted -- falling over 36.5%

on huge volume of over 17.9 million shares traded.    Investors speculated that shares would have

fallen more, except that many traders had *already* liquidated their shares on August 31 and

September 1, 2006, as Pegasus shares were removed from the Russell 2000.   On August 30,

2006, shares of the Company closed at $5.15 per share.  Thereafter, as index traders liquidated their Pegasus shares, the stock traded to $3.43 per share on August 31, 2006, and then to $2.38 the next trading day.  Following the publication of the *Barron's* report, on September 5, 2006, Pegasus shares closed at an anemic $1.51 per share -- a new 52-week trading low.

    97.    By September 20, 2006, shares of the Company traded just over $1.00 each. That day, defendants published a release that revealed that Pegasus Board of Directors had "decided to amend" the previously announced sale of shares of common stock to defendant Knabb.   The Company stated that it would return to Knabb almost $7 million that was previously reported to have been paid to Knabb by Pegasus to cover the cost of the sale of these shares to Knabb.   This release stated, in part, the following:

> FREMONT, Calif.--(BUSINESS WIRE)--Sept. 20, 2006--Pegasus Wireless Corporation (NASDAQ:PGWC - News), a leading provider of advanced wireless solutions, **today announced that the Company has decided to amend a previously announced sale of shares of common stock to its Chief Executive Officer Jasper Knabb.** The decision was approved today by the Pegasus Wireless board of directors, with Mr. Knabb abstaining from the vote.
>
> **In June 2006, Mr. Knabb agreed to purchase shares of Pegasus Wireless Corporation common stock in a private placement totaling $10 million. In connection with the sale, Mr. Knabb placed $10 million in an escrow account. The agreement provided that the shares would be sold at the trading price as the Company withdrew funds from the escrow account.** At the time of the announcement, the Company was contemplating a strategic transaction that required much of the $10 million from the stock sale. The Company was unable to come to terms on that transaction, decreasing the capital required by the Company.
>
> The Company sold 379,625 shares of common stock at $8 per share for an aggregate of $3.04 million to Mr. Knabb, who is restricted from selling those shares for five years. The balance of the private placement has been cancelled by agreement between the Company and Mr. Knabb. Among other things, those funds were used to hire sales and marketing staff. **The remaining $6.96 million in the escrow account is being returned to Mr. Knabb.**
>
> **Since May 2005 Mr. Knabb has invested more than $16.5 million in the Company including more than $12 million in placements and more than $4.5**

*million in the open market for shares. He currently holds 3,969,056 shares.*
[Emphasis added.]

98.    Despite the Company's willingness to give Knabb almost $7 million in cash*, it does not appear that Pegasus received any consideration for this valuable concession*.   In addition, a review of the Company's 2Q:06 Form 10-QSB, filed with the SEC on or about July 25, 2006, appears to show that Knabb had never even paid the original $10 million -- the majority of which the Company now claims it is "returning" to Knabb.  As evidence of this, the Company's 2Q:06 Form 10-QSB stated, in part, that:

> On June 28, 2006**, the Company issued 1,250,000 shares of restricted common stock to the President of the Company in exchange for $10,000,000 in cash** <u>**subscription receivable,**</u> **valued at $8.00 per share**. On June 28, 2006, the President and CFO of the Company exercised their options, (granted in June 2004), for shares amounting to 1,200,000 and 1,080,000, respectively. The cash exercise price of these options was $0.325 per share, for a total of $390,000 and $351,000, respectively.  [Emphasis added.]

99.    Within days, Pegasus shares would be trading even lower after the Company announced on September 25, 2006, after defendants removed Pegasus from the NASDAQ Market Exchange.  While Knabb described this move as being in the "best interests" of the Company's shareholders, analysts were not convinced, stating, "why Knabb, or anyone else for that matter, believes that moving the stock to a less liquid market can possibly help with volatility is beyond comprehension."

100.    Throughout the Class Period, the market for Pegasus' common stock was open, well-developed and efficient at all relevant times.   As a result of the materially false and misleading statements and failures to disclose detailed herein, Pegasus common stock traded at artificially-inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Pegasus common stock relying upon the integrity of the market

price of Pegasus common stock and market information relating to Pegasus, and have been damaged thereby.

101.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Pegasus common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, management, and operations, as alleged herein.

102.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Pegasus' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Pegasus and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially-inflated prices, thus causing the damages complained of herein.

## POST-CLASS PERIOD DEVELOPMENTS

103.    On September 8, 2006, Defendant Tsao filed suit against Co-Defendants Knabb and Pegasus in the Superior Court for Santa Clara County, California, Docket no. 1-06-cv-070797, and later lodged an appeal on April 6, 2007 with the California Court of Appeal, Sixth

District, Docket no. HO 31438.  Tsao asserted causes of action for breach of contract, fraud, negligent misrepresentation, and wrongful termination, among other things.  Tsao was allegedly removed from his employment at Pegasus after raising questions about $1 million owed by Knabb to the Company.  Moreover, in exchange for his formal resignation from the Company, defendants contracted to pay Tsao $2.8 million, but failed to make the required payments.  The attorney representing Knabb and the Company filed a motion to withdraw on August 23, 2007.  The appellate court issued an order to Pegasus to obtain counsel in the representation; having failed to do so, the appeals court dismissed the appeal of Pegasus on November 28, 2007, although it retained jurisdiction over Knabb's appeal.

104.    During the fourth quarter of 2006, the Company decided to relocate the final manufacturing operation for the CynaLynx and other products from California to Freeport, Grand Bahamas.  The Company held the grand opening ceremony on February 22, 2007 with Prime Minister Perry Christie attending.  Much like any business that falls into Knabb's hands, however, the factory was merely a sham.  *The Freeport News* (Grand Bahamas) reported on May 8, 2007 that the factory had experienced problems and the news article ("Former Employee Claims Pegasus is a Sham") cited an employee as saying:

> According to Carey, the employees never built any of the CynaLynx boxes from scratch and it was simply a few pieces brought in, put together in about two weeks and shipped out.
>
> Afterwards, he said the staff sat at the plant for weeks with nothing to do.
>
> He noted that Knabb promised the staff that the parts were on their way and it was not until the day he decided to send the staff home and close did he tell them that the "mystery ship" carrying the parts had sank.

*The Freeport News* (Grand Bahamas) reported on July 31, 2007 ("It's Official: Pegasus Board Confirms Closure of Freeport Plant") that the Company closed the factory's doors "two weeks

ago" and the "remaining employees were eventually told that they no longer had a job and now the facility is locked down with no visible activity taking place.

105.    On January 28, 2008, the Company filed a Chapter 11 voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Florida, Docket no. 08-10924.

## ADDITIONAL ALLEGATIONS AGAINST POLLARD-KELLEY

106.    Pollard-Kelley, by virtue of its relationship with Pegasus and Knabb and the nature of the auditing and consulting services rendered to the Company, had full, complete, and intimate knowledge of Pegasus's information.  Furthermore, Pollard-Kelley or its personnel had intimate knowledge of Pegasus's financial reporting practices based on access to confidential internal corporate, financial, operating and business information and knew or disregarded, or were severely reckless in not knowing or disregarding, the following adverse facts concerning the Company's improper financial reporting and corrupt internal controls during the Class Period, including the Company's Form 10-KSB of March 3, 2006, and December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's, and Pollard-Kelley's unqualified audit opinions thereon.  By failing to fully disclose material information about Pegasus, Pollard-Kelley contributed, continued, and advanced defendants' scheme.

107.    Pollard-Kelley issued its audit opinion, dated October 31, 2005, on Pegasus's December 23, 2005 Form 8-K regarding the acquisition of AMAX.  Pollard-Kelley's opinion stated that AMAX's financial statements were presented in conformity with GAAP and that Pollard-Kelley's audit was performed in accordance with GAAS:

> The Board of Directors and Stockholders
> AMAX Engineering Corp. and AMAX Information Technology, Inc.
> Fremont, California

We have audited the accompanying combined balance sheets of AMAX Engineering Corp. and AMAX Information Technology, Inc., (the "Companies") as of September 30, 2005 and 2004 and the related combined statements of operations and comprehensive income (loss), stockholders' equity (deficiency) and cash flows for the two years in the period ended September 30, 2005. These combined financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these combined financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of the Companies as of September 30, 2005 and 2004 and the results of their operations and their cash flows for the two years in the period ended September 30, 2005, in conformity with U.S. generally accepted accounting principles.

/s/Pollard-Kelley Auditing Services, Inc.
----------------------------------------
Pollard-Kelley Auditing Services, Inc.

Fairlawn, Ohio
October 31, 2005

108.    Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, the following:

(a)    The financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of

AMAX as of September 30, 2005 and 2004 and the results of its operations and cash flows for the two years in the period ended September 30, 2005;

(b)     Pollard-Kelley had not audited AMAX's year ended 2004 and 2005 financial statements in accordance with GAAS; and,

(c)     Pollard-Kelley violated GAAP and SEC Rules by: (i) failing to disclose "any fraud, whether or not material" relative to Knabb's prior history; (ii) failing to disclose that AMAX appears to have been acquired primarily because AMAX was secretly owned by defendant Tsao and his brother-in-law, Jerry Shih, clearly *not* conducted at arm's-length among disinterested and non-related parties, but rather constituting an interested deal among friends and family; (iii) failing to disclose the true financial condition of Pegasus; and, (iv) failing to establish and maintain adequate internal accounting controls.

109.     Pollard-Kelley also issued its audit opinion, dated December 13, 2005, on Pegasus's January 9, 2006 Form 8-K regarding the acquisition of CNet Technology.  Pollard-Kelley's opinion stated that CNet Technology's financial statements were presented in conformity with GAAP and that Pollard-Kelley's audit was performed in accordance with GAAS:

> The Board of Directors and Stockholders
> CnetTechnology, Inc. (Cayman)
>
> We have audited the accompanying consolidated balance sheets of Cnet Technology, Inc., (Cayman), (the "Companies") as of December 31, 2004 and 2003 and the related consolidated statements of operations and comprehensive income (loss), stockholders' equity (deficiency) and cash flows for the two years in the period ended December 31, 2004.  These combined financial statements are the responsibility of the Companies' management. Our responsibility is to express an opinion on these combined financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Companies as of December 31, 2004 and 2003 and the results of their operations and their cash flows for the two years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

/s/Pollard-Kelley Auditing Services, Inc.
Pollard-Kelley Auditing Services, Inc.

Fairlawn, Ohio
December 13, 2005

110.     Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, the following:

(a)     The financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of CNet Technology as of December 31, 2004 and 2003 and the results of its operations and cash flows for the two years in the period ended December 31, 2004;

(b)     Pollard-Kelley had not audited CNet Technology's year ended 2003 and 2004 financial statements in accordance with GAAS; and,

(c)     Pollard-Kelly violated GAAP and SEC Rules by: (i) failing to disclose "any fraud, whether or not material" relative to Knabb's prior history; (ii) failing to disclose the

true financial condition of Pegasus; and, (iii) failing to establish and maintain adequate internal accounting controls.

111.     Pollard-Kelley also issued its audit opinion, dated January 13, 2006, on Pegasus's January 25, 2006 Form 8-K regarding the acquisition of SKI Technologies.  Pollard-Kelley's opinion stated that SKI Technologies' financial statements were presented in conformity with GAAP and that Pollard-Kelley's audit was performed in accordance with GAAS:

> The Board of Directors and Stockholders
> SKI Technology, Inc.
>
> We have audited the accompanying balance sheets of SKI Technologies, Inc., (the *"Company"*) as of December 31, 2004 and 2003 and the related statements of operations and comprehensive income (loss), stockholders' equity (deficiency) and cash flows for the two years in the period ended December 31, 2004.  These financial statements are the responsibility of the Companies' management.  Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and  perform  the  audit  to obtain  reasonable  assurance  about  whether  the consolidated financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion,  the financial  statements  referred to above present fairly,  in  all  material  respects,  the  financial  position of the Company as of December 31, 2004 and 2003 and the results of its operations and cash flows for the two years in the period ended December 31, 2004, in  conformity  with U.S. generally accepted accounting principles.
>
>                         /s/Pollard-Kelley Auditing Services, Inc.
>                         ----------------------------------------
>                         Pollard-Kelley Auditing Services, Inc.

Fairlawn, Ohio
January 13, 2006

112.     Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, the following:

(a)     The financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of SKI Technologies as of December 31, 2004 and 2003 and the results of its operations and cash flows for the two years in the period ended December 31, 2004;

(b)     Pollard-Kelley had not audited SKI Technologies' year ended 2003 and 2004 financial statements in accordance with GAAS; and,

(c)     Pollard-Kelley violated GAAP and SEC Rules by: (i) failing to disclose "any fraud, whether or not material" relative to Knabb's prior history; (ii) failing to disclose the true financial condition of Pegasus; and, (iii) failing to establish and maintain adequate internal accounting controls.

113.     During the course of Pollard-Kelley's audits of Pegasus, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter.  In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU § 326.01. Pollard-Kelley served as auditor for Wireless Frontier, Inc. during Knabb's tenure as President of Wireless Frontier.  Ironically, both left Wireless Frontier at the same time, in September 2004. While serving as auditor of Wireless Frontier, Pollard-Kelley observed suspicious trading patterns -- unusual dramatic increases followed by sudden and dramatic price declines, all within

a very compressed time frame.  Pollard-Kelley's involvement with a former Knabb-operated company, as well as its knowledge of Wireless Frontier's suspicious trading and Knabb's troublesome past and financial woes is evidence that Pollard-Kelley could not have fulfilled the foregoing responsibilities of AU § 326.01.

114.    Pollard-Kelley ignored that evidence of "[m]anagement failing to correct known reportable conditions on a timely basis as a risk factor" or "red flag," because a Company's "failure to perform tasks that are part of internal control, such as reconciliations not prepared or not timely prepared" could "adversely affect [a Company's] ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements."  AU § 316.85; AU § 325.21.  Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, the lack of integrity of management, including Knabb, Tsao, and Durland.  Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, that Durland, whose own CPA firm was investigated and rebuked by the PCAOB, attested to developing (along with Tsao) the Company's internal financial controls and Pollard-Kelley should have known, or was severely reckless in not knowing, that its audits should not have relied on such internal controls.

115.    Pollard-Kelley issued its audit opinion, dated February 24, 2006, on the Company's Form 10-KSB of March 3, 2006, regarding the Company's financial statements ending December 31, 2005.  Pollard-Kelley's opinion stated that the financial statements were presented in conformity with GAAP and that Pollard-Kelley's audit was performed in accordance with GAAS:

> The Board of Directors and Stockholders
> Pegasus Wireless Corp.
> Fremont, California

We have audited the accompanying consolidated balance sheets of Pegasus Wireless Corp., (the "Company") as of December 31, 2005 and June 30, 2005 and the related consolidated statements of operations and comprehensive income (loss), stockholders' equity (deficiency) and cash flows for the one year and six months in the period ended December 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

We believe that our audits provide a reasonable basis for our opinion.

* * *

/s/Pollard-Kelley Auditing Services, Inc.
Pollard-Kelley Auditing Services, Inc.

Fairlawn, Ohio
February 24, 2006

116.    The statements made by Pollard-Kelley and contained in the audit opinion were materially false and misleading and were known by defendants to be false and misleading at that time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)    Pollard-Kelley violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP.

AU § 508.04.  Pollard-Kelley's opinions falsely represented that Pegasus's December 31, 2005 year-end financial statements were presented in conformity with GAAP, when they were not;

(b)   The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.  The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS, which Pollard-Kelley failed to do,  AU § 508.07; and,

(c)   Pollard-Kelley excluded from its audit that the Company was not in compliance with GAAP, SEC, or FAS reporting rules or that defendants were involved in schemes that falsely inflated revenue while making materially false and misleading statements to the contrary.  Instead, Pollard-Kelley certified only that the financial results "present fairly, in all material respects, the financial position of the Company".  Pollard-Kelley was well aware or knew, or severely reckless in not becoming aware or knowing, about the suspicious trading pattern at Wireless Frontier of experiencing unusual dramatic increases followed by sudden and dramatic price declines, all within a very compressed time frame, causing Wireless Frontier to fail.

117.   Furthermore, Pollard-Kelley issued the following opinion on the Company's Form 10-KSB, filed on March 3, 2006:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and June 30, 2005 and the results of its operations and its cash flows for the one year and six months in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

118.   The statements made by Pollard-Kelley and contained in the audit opinion were materially false and misleading and were known by defendants to be false and misleading at that

time, or they were severely reckless in not knowing, due to the following adverse facts concealed from investors during the Class Period:

(a)     Pollard-Kelley violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. AU § 508.04.  Pollard-Kelley's opinions falsely represented that Pegasus's financial statements were presented in conformity with GAAP, when they were not;

(b)     The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.  The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS, which Pollard-Kelley failed to do,  AU § 508.07;

(c)     Pollard-Kelley did not render an accurate audit report and thus did not exercise due professional care because Pegasus's financial statements were not in conformity with GAAP, and because Pollard-Kelley failed to perform sufficient procedures to audit Pegasus's financial statements, as well as the financial statements of its acquisitions – AMAX, CNet, and SKI – in accordance with GAAS; and,

(d)     Pollard-Kelley excluded from its audit that the Company was not in compliance with GAAP, SEC, or FAS reporting rules or that defendants were involved in schemes that falsely inflated revenue while making materially false and misleading statements to the contrary.  Instead, Pollard-Kelley certified only that the financial results "present fairly, in all material respects, the financial position of the Company".  Pollard-Kelley was well aware or knew, or severely reckless in not becoming aware or knowing, about the suspicious trading pattern at Wireless Frontier of experiencing unusual dramatic increases followed by sudden and

dramatic price declines, all within a very compressed time frame, causing Wireless Frontier to fail.

119.    Management's lack of integrity should, in all instances noted above, have caused Pollard-Kelley to re-evaluate its risk assessments.  GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors.  *See* AU §§ 316.12, 316.14.  The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present."  AU § 316.25.  One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is a "[k]nown history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws."  AU § 316.16.  In this regard:

(a)    Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, any aspect of Knabb's past history, including the securities fraud and RICO lawsuit in which Knabb was named a defendant;

(b)    Pollard-Kelley also failed to disclose, or was severely reckless in not disclosing, that twenty-seven companies audited by Defendant Durland's company -- Durland & Company -- were represented by convicted felon Donald Mintmire, Esq., who was convicted in 2005 for obstruction of justice in an SEC probe.  Durland served as a CEO, CFO, or Director in six firms that were represented by Mr. Mintmire; and,

(c)    Pollard-Kelley also failed to disclose, or was severely reckless in not disclosing, that defendants had connections to the Taiwanese "corporate scandal of the century," when Hung Chiu-Hu (who was involved in OTC Wireless with Knabb dating back to 2001) was arrested in connection with the embezzlement of over US $456 million (NT $17 billion) from the

Taiwan-based Pacific Electric Wire and Cable, Co. Ltd.   Hung Chiu-Hu was the director of Vision 2000 Ventures, Ltd., a major shareholder of Pegasus, holding 13% of Pegasus' shares.

120.    Pollard-Kelley was well aware of the strategies, methods, and procedures required by GAAS to conduct a proper audit.  Also, Pollard-Kelley knew of the audit risks inherent at Pegasus and the industry in which Pegasus operated because of its past connection to former Knabb-run Wireless Frontier.  Pollard-Kelley's intentional failure to comply with GAAS and its performance on the Pegasus audit rose to the level of severe recklessness and/or knowing fraud.

121.    Auditors must exercise due professional care in performing the audit and preparing the audit report.  AU § 230.01.  Due professional care concerns what the auditor does and how well he does it.  AU § 230.04.  Pollard-Kelley did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and, render an accurate audit report on behalf of Pegasus.

122.    Pollard-Kelley violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.  Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, that Pegasus' disclosures were not reasonably adequate:

(a)    Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, any aspect of Knabb's past history, including the securities fraud and RICO lawsuit in which Knabb was named a defendant;

(b)    Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that twenty-seven companies audited by Defendant Durland's company -- Durland &

Company -- were represented by convicted felon Donald Mintmire, Esq., who was convicted in 2005 for obstruction of justice in an SEC probe.  Durland served as a CEO, CFO, or Director in six firms that were represented by Mr. Mintmire;

(c)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that defendants had connections to the Taiwanese "corporate scandal of the century," when Hung Chiu-Hu (who was involved in OTC Wireless with Knabb dating back to 2001) was arrested in connection with the embezzlement of over US $456 million (NT $17 billion) from the Taiwan-based Pacific Electric Wire and Cable, Co. Ltd.  Hung Chiu-Hu was the director of Vision 2000 Ventures, Ltd., a major shareholder of Pegasus, holding 13% of Pegasus' shares;

(d)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that the PCAOB had investigated or issued a scathing notice of deficiency in relation to the CPA firm run by Durland which, in light of Durland's position as CFO with Pegasus, constituted material information; and,

(e)     Pollard-Kelley ignored the fact that Pegasus failed to make adequate disclosures concerning its acquisitions of AMAX, CNet Technology, and SKI Technologies. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company.  FASB Concepts Statement No. 6, ¶ 9.  Accordingly, because Pegasus "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Pollard-Kelley] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [its] report."  AU § 431.03.

123.    Pollard-Kelley violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.  Pollard-Kelley should have stated that no opinion could be issued by it on Pegasus's Form 10-KSB of March 3, 2006, or the December 23, 2005, January 9, 2006 and January 25, 2006 8-K's, or issued an adverse opinion stating that the these financial statements were not fairly presented in light of the material omissions detailed above, including:

(a)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, any aspect of Knabb's past history, including the securities fraud and RICO lawsuit in which Knabb was named a defendant;

(b)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that twenty-seven companies audited by Defendant Durland's company -- Durland & Company -- were represented by convicted felon Donald Mintmire, Esq., who was convicted in 2005 for obstruction of justice in an SEC probe.  Durland served as a CEO, CFO, or Director in six firms that were represented by Mr. Mintmire;

(c)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that defendants had connections to the Taiwanese "corporate scandal of the century," when Hung Chiu-Hu (who was involved in OTC Wireless with Knabb dating back to 2001) was arrested in connection with the embezzlement of over US $456 million (NT $17 billion) from the Taiwan-based Pacific Electric Wire and Cable, Co. Ltd.  Hung Chiu-Hu was the director of Vision 2000 Ventures, Ltd., a major shareholder of Pegasus, holding 13% of Pegasus' shares;

(d)     Pollard-Kelley failed to disclose, or was severely reckless in not disclosing, that the PCAOB had investigated or issued a scathing notice of deficiency in relation to the CPA firm run by Durland which, in light of Durland's position as CFO with Pegasus,

constituted material information; and,

(e)     Pollard-Kelley ignored the fact that Pegasus failed to make adequate disclosures concerning its acquisitions of AMAX, CNet Technology, and SKI Technologies. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company.  FASB Concepts Statement No. 6, ¶ 9.  Accordingly, because Pegasus "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Pollard-Kelley] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [its] report."  AU § 431.03.

124.    Pollard-Kelley violated GAAS General Standard No. 2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.  Pollard-Kelley's failure to issue no opinion or to issue an adverse opinion in light of the material omissions detailed above reveals Pollard-Kelley's lack of independence in auditing the books and records of Pegasus.

125.    Pollard-Kelley violated SAS No. 99 in that it failed to adequately consider the risk that the audit financial statements of Pegasus were free from material misstatement, as noted herein, whether caused by errors or fraud.  Pollard-Kelley knew or ignored, or was severely reckless in not knowing or ignoring, numerous material risks relevant to financial reporting including events and circumstances that occurred or existed at Pegasus during the Class period, which adversely affected Pegasus's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.  These events or circumstances include, but are not limited to:

(a) Rapid growth.   Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

(b) New technology.   Incorporating new technologies into production processes or information systems may change the risk associated with internal control.

(c) New business models, products, or activities.   Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

(d) Corporate restructurings.   Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

126.   Pollard-Kelley violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements, such as the PCAOB investigating or issuing a scathing notice of deficiency in relation to the CPA firm run by Durland which, in light of Durland's position as CFO with Pegasus, constituted material information.   Durland, *inter alia*, attested to designing "such internal control over financial reporting, or caused such internal control over financial reporting to be designed".   Pollard-Kelley should not have relied on any financial guidance from Durland, whose CPA firm was being investigated and received a rebuke from the PCAOB, to the extent Pollard-Kelley's audits did rely on such guidance.

127.   Pollard-Kelley violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.   The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be

performed.   AU § 150.02.   In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:   the control environment, the accounting system, and control procedures.   AU § 319.02.   Durland, *inter alia*, attested to designing "such internal control over financial reporting, or caused such internal control over financial reporting to be designed".   Pollard-Kelley should not have relied on any financial guidance from Durland, whose CPA firm was being investigated and received a rebuke from the PCAOB, and so should have publicly stated.

128.   As a result of its failure to accurately report on Pegasus's Form 10-KSB of March 3, 2006, as well as the December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's, Pollard-Kelley utterly failed in its role as an auditor as defined by the SEC.   SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting.   An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.   The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.   Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.   The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

129.   Pollard-Kelley's opinions, which represented that Pegasus's December 31, 2005 year end financial statements, Form 10-KSB, and December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's were presented in conformity with GAAP, were materially false and misleading because Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, that Pegasus's December 31, 2005 year end financial statements, Form

10-KSB, and December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's violated the principles of fair reporting and GAAP.   In the course of rendering its unqualified audit certification on Pegasus's December 31, 2005 year end financial statements, Form 10-KSB, and December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's, Pollard-Kelley knew or disregarded, or was severely reckless in not knowing or disregarding, that it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP.  Pollard-Kelley, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or disregarding, or being severely reckless in not knowing or disregarding, that GAAS had been violated.

130.   Pollard-Kelley knew or was severely reckless in not knowing, or disregarding, facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Pegasus's December 31, 2005 year end financial statements, Form 10-KSB, and December 23, 2005, January 9, 2006 and January 25, 2006 form 8-K's; or, (b) withdrawn, corrected or modified its opinion for those financial statements to recognize Pegasus's improper accounting and financial reporting stated above.

## CAUSATION AND ECONOMIC LOSS

131.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Pegasus' stock price and operated as a fraud or deceit on Class Period purchasers of Pegasus' stock by misrepresenting the Company's business, operations, management and the intrinsic value of Pegasus stock.  Over a period of approximately nine months, defendants purposefully issued materially false and

misleading statements about the Company and omitted to disclose material information necessary to make defendants' statements true and accurate.   Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, the price of Pegasus stock declined precipitously – evidence that the prior artificial inflation in the price of Pegasus shares was eradicated.   As a result of their purchases of Pegasus' stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

132.   By improperly characterizing the Company and its officers and directors, and by omitting to disclose the true histories and relationships to the third parties associated with or related to the Company and by misrepresenting the Company prospects, defendants presented a materially false and misleading image of Pegasus' business and future growth prospects.   During the Class Period, defendants repeatedly emphasized the ability of the Company to increase revenues through organic and acquired growth, and consistently reported results within or above the range of guidance sponsored or endorsed by the Company.   These claims caused and maintained the artificial inflation in Pegasus' stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

133.   It was only beginning in late-August and early-September 2006 that investors began to learn the truth about the Company after a string of shocking research reports surfaced in the market.   Following the publication of this first report, on August 24, 2006, shares declined almost 25% from its recent trading levels.   Later, on September 1, 2006, following the publication of a highly-critical, widely-circulated *Barron's* report, Pegasus shares collapsed to a trading low of $1.10 per share, on enormous volume of almost 18 million shares traded.   This

dramatic share price decline eliminated much of the artificial inflation from Pegasus' share price, causing real economic loss to investors who purchased this stock during the Class Period.

134.    In sum, as the truth about defendants' fraud and illegal course of conduct became known to investors, and as the artificial inflation in the price of Pegasus shares was eliminated, plaintiff and the other members of the Class were damaged, suffering an economic loss of at least several dollars and as much as $18.00  per share.

135.    The decline in Pegasus' stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Pegasus' stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which Pegasus' share price fell over 80% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

136.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Pegasus stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and omissions and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

137.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Moreover, as set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Pegasus, their control over, and/or receipt and/or modification of Pegasus' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pegasus, participated in the fraudulent scheme alleged herein.

138.    Defendants were motivated to materially misrepresent to investors the true financial condition of the Company because by deceiving the investing public regarding Pegasus' business, operations, management and the intrinsic value of Pegasus common stock, defendants were able to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus.  Defendants were also able to secure millions of dollars in payments to Knabb by the Company in exchange for no apparent valuable consideration by purporting to reimburse Knabb for payments made that had in fact not been made.  By engaging in this scheme, defendants were also able to make deals to benefit their close friends and family at the expense of the Company and its shareholders.

139.    In addition to the foregoing, false statements and omissions related to the purported purchase of Company shares by Defendant Knabb is further evidence of defendants' scienter.  The uncertain and suspicious financial condition of Defendant Knabb as well as his failure to disclose the source of funds used to purchase $26 million in Pegasus stock, and other statements concerning the actual legitimacy of those purchases -- which now appear, in substantial part, not to have occurred -- are evidence of defendants' acting with knowledge or with deliberate disregard for the truth about Pegasus.    As defendants have now essentially

conceded, at all times during the Class Period, defendants knew and/or deliberately disregarded Knabb could not and did not purchase $10 million of company stock for payment of cash, or anything of value.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

140.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Pegasus during the Class Period, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

141.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Pegasus common stock was actively traded on NASDAQ.  As of June 30, 2006, the Company had over 78.683 million shares of common stock issued and outstanding.[3]  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pegasus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

---

[3]    On or about August 4, 2006, approximately 13 million shares of Company stock were reportedly "retired" by defendants, lowering the total number of shares outstanding to approximately 65.68 million shares.

142.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

143.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

144.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Pegasus; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

145.     At all relevant times, the market for Pegasus common stock was an efficient market for the following reasons, among others:

(a)     Pegasus stock met the requirements for listing, and was listed and actively traded on the NASDAQ national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Pegasus filed periodic public reports with the SEC and the NASDAQ;

(c)     Pegasus regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)     Pegasus was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

146.     As a result of the foregoing, the market for Pegasus securities promptly digested current information regarding Pegasus from all publicly-available sources and reflected such information in Pegasus stock price.   Under these circumstances, all purchasers of Pegasus common stock during the Class Period suffered similar injury through their purchase of Pegasus common stock at artificially-inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

147.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pegasus who knew that those statements were false when made.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL ALLEGATIONS AGAINST INDIVIDUAL DEFENDANTS

149.    Because of the Individual Defendants' positions with the Company, they had access to adverse, undisclosed information about each officer's background, business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

150.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly-defined group of defendants identified above.  Each of the

above officers of Pegasus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its officers' background, business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Defendants were involved in drafting, producing, reviewing and/or disseminating false and misleading statements and information, and were aware or knew and/or were severely reckless in not becoming aware or knowing that false and misleading statements were being issued regarding the Company and its officers' background, business, operations, products, growth, financial statements, and financial condition, and approved or ratified these statements, in violation of the federal securities laws.

151.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and, during the Class Period, was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

152.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, and other communications complained of herein and knew or were aware of, or were severely reckless in not knowing or becoming aware of, the materially false and misleading nature of misstatements contained therein and omissions therefrom.  Because of their Board membership and/or executive and managerial positions with Pegasus, each of the Individual Defendants had access to the adverse undisclosed information about Pegasus' business prospects and financial condition and performance as particularized herein and knew, or were severely reckless in not knowing, that these adverse facts rendered the positive representations made by or about Pegasus and its management, business, operations, products, operational trends, financial statements, markets, and present and future business prospects issued or adopted by the Company were materially false and misleading.

153.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein or omissions therefrom.

154.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Pegasus common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Pegasus' business, operations, management, and the intrinsic value of Pegasus common stock; (b) enabled defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus; and (c) caused plaintiff and other members of the Class to purchase Pegasus common stock at artificially-inflated prices and to be damaged thereby.

## BASIS OF ALLEGATIONS

155.    Lead Plaintiff has made allegations in this Complaint based upon the investigation of Lead Plaintiff's counsel, which included a review of SEC filings by Pegasus, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Pegasus
### and the Individual Defendants

156.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and did, throughout the Class Period: (a) deceive the investing public regarding Pegasus' business, operations, management and the intrinsic value of Pegasus common stock; (b) enable defendants to negotiate the acquisitions of several other smaller

companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus; and (c) cause Lead Plaintiff and all other members of the Class to purchase Pegasus common stock at artificially-inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

158.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Pegasus' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons.

159.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pegasus as specified herein.

160.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pegasus' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pegasus and its business operations and future prospects in the light of the circumstances under which they were made, not

misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pegasus common stock during the Class Period.

161.   Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading.

162.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe recklessness in disregarding the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately for the purpose and effect of concealing Pegasus' operating condition and future business prospects from the investing public and supporting the artificially-inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

163.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pegasus common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Pegasus' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and all other members of the Class acquired Pegasus common stock during the Class Period at artificially-high prices and were damaged thereby.

164.     At the time of said misrepresentations and omissions, Lead Plaintiff and all other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and all other members of the Class and the marketplace known the truth about Pegasus that were not disclosed by defendants, Lead Plaintiff and all other members of the Class would not have purchased or otherwise acquired their Pegasus common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

165.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

166.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and all other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Pollard-Kelley

167.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

168.     During the Class Period, Pollard-Kelley carried out a plan, scheme and course of conduct which was intended to and did, throughout the Class Period: (a) deceive the investing public regarding Pegasus' business, operations, financial condition, internal financial controls, management, and the intrinsic value of Pegasus common stock; (b) enable defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus and enable Pollard-Kelley to obtain fees in connection with its work for yet another sham public Company operated by Knabb and his cohorts, the Individual Defendants; and (c) cause Lead Plaintiff and all other members of the Class to purchase Pegasus common stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Pollard-Kelley took the actions set forth herein.

169.     Pollard-Kelley (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain artificially high market prices for Pegasus' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

170.   Pollard-Kelley, individually and in concert with defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pegasus as specified herein.

171.   Pollard-Kelley employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pegasus' value, financial condition, internal financial controls, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pegasus and its business operations, financial condition, internal financial controls, financial reporting, and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pegasus common stock during the Class Period.

172.   Pollard-Kelley had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe recklessness in disregarding the truth in that they failed to ascertain and to disclose such facts.  Such material misrepresentations and/or omissions were done knowingly or deliberately for the purpose and effect of concealing Pegasus' operating condition, financial condition, internal financial controls, financial reporting, and future business prospects from the investing public and supporting the artificially-inflated price

of its common stock.  As demonstrated by Pollard-Kelley's overstatements, misstatements, or omissions of the Company's business, financial condition, financial internal controls, financial reporting, operations, and earnings throughout the Class Period, Pollard-Kelley, if it did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

173.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pegasus common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Pegasus' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Pollard-Kelley, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by Pollard-Kelley but not disclosed in public statements by Pollard-Kelley during the Class Period, Lead Plaintiff and all other members of the Class acquired Pegasus common stock during the Class Period at artificially-high prices and were damaged thereby.

174.    At the time of said misrepresentations and omissions, Lead Plaintiff and all other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and all other members of the Class and the marketplace known the truth about Pegasus that was not disclosed by Pollard-Kelley, Lead Plaintiff and all other members of the Class would not have purchased or otherwise acquired their Pegasus common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

175.    By virtue of the foregoing, Pollard-Kelley has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

176.    As a direct and proximate result of Pollard-Kelley's wrongful conduct, Lead Plaintiff and all other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

177.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178.    The Individual Defendants acted as controlling persons of Pegasus within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

179.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

180.    As set forth above, Pegasus and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and all other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Lead Plaintiff and members of the Class pray for relief and judgment, as follows:

1.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

2.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees;

4.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and,

5.    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff and the Class hereby demand a trial by jury.


Dated: July 11, 2008

Respectfully submitted,


_____/s/ Julie Prag Vianale_____
Julie Prag Vianale (FBN 0184977)
VIANALE & VIANALE LLP
2499 Glades Road – Suite 112
Boca Raton FL  33431
Tel: (561) 392-4750
Fax: (561) 392-4775
jvianale@vianalelaw.com

*Liaison Counsel for Lead Plaintiff
and the Class*

-and-

Kim E. Miller (*pro hac vice*)
KAHN GAUTHIER SWICK, LLC.
12 E. 41st Street, 12th Floor
New York, NY 10007
Tel: (212) 696-3730
Fax: (504) 455-1498
Kim.Miller@kgscounsel.com

Lewis S. Kahn (*pro hac vice*)
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Ste. 2150
New Orleans, LA  70130
Tel:  (504) 455-1400
Fax:  (504) 455-1498
Lewis.kahn@kgscounsel.com

*Lead Counsel for Lead Plaintiff and the
Class*

-and-

David A.P. Brower (*pro hac vice*)
BROWER PIVEN
A Professional Corporation

488 Madison Avenue
Eighth Floor
New York, NY 10022
Tel: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

Mark P. Kindall (*pro hac vice*)
SCHATZ NOBEL IZARD, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Tel: (860) 493-6292
Fax: (860) 493-6290
mkindall@snilaw.com

*Additional Counsel for Lead Plaintiff
and the Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 9:07-cv-81113-KAM

MICHAEL MITCHELL, POURNARAS
GROUP, NICK POURNARAS, KATHLEEN
MURPHY,

        Plaintiffs,

vs.

PEGASUS WIRELESS CORPORATION,
JASPER KNABB, STEPHEN DURLAND,
ALEX TSAO, POLLARD-KELLY AUDITING
SERVICES, INC., et al,

        Defendants.

_____/

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>s/ Julie Prag Vianale</u>
Julie Prag Vianale

## <u>SERVICE LIST</u>

**Michael Mitchell versus Pegasus Wireless Corporation**
**Case No.: 9:07-cv-81113-KAM**

| | |
|---|---|
| Kim E. Miller<br>Kahn Gauthier Swick LLC<br>12 E. 41st Street<br>12th Floor<br>New York, New York 10017<br>Telephone:     212-696-3730<br>Lead Counsel for Lead Plaintiff<br>and the Class<br>[Electronic Mail Notice]<br><br>Lewis S. Kahn<br>Catherine Gauthier<br>Kahn Gauthier Swick, LLC<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130<br>Telephone:     (504) 455-1400<br>Facsimile:     (504) 455-1498<br>Lead Counsel for Lead Plaintiff<br>and the Class<br>[Electronic Mail Notice]<br><br>David A.P. Brower<br>Brower Piven, A Professional Corporation<br>8th Floor<br>488 Madison Avenue<br>New York, New York 10022<br>Telephone:     212-501-9000<br>Facsimile:     212-501-0300<br>Additional Counsel for Lead Plaintiff<br>and the Class<br>[Via Regular Mail]<br><br>Mark P. Kindall<br>Nancy Kulesa<br>Schatz Nobel Izard PC<br>20 Church Street<br>Suite 1700<br>Hartford, CT 06103<br>Telephone:     860-493-6292<br>Facsimile:     860-493-6290 | Jeffrey Robert Geldens<br>Daniel Stuart Newman<br>Jgeldens@BroadandCassel.com<br>Dnewman@broadandcassel.com<br>Broad and Cassel<br>2 South Biscayne Boulevard<br>21st Floor<br>Miami, Florida 33131-1811<br>Telephone:     305-373-9400<br>Facsimile:     305-373-9443<br>Attorneys for Defendant<br>Pollard-Kelly Auditing Services, Inc.<br>[Electronic Mail Notice]<br><br>Norman Malinski<br>nmpa@att.net<br>Norman Malinski<br>2875 NE 191st Street<br>Suite 508<br>Aventura, Florida 33180<br>Telephone:     305-937-4242<br>Facsimile:     305-937-4261<br>Attorney for Defendant Douglas Hirsch<br>[Electronic Mail Notice]<br><br>Louise McAlpin<br>louise.mcalpin@hklaw.com<br>Holland & Knight<br>701 Brickell Avenue<br>Suite 3000<br>Miami, Florida 33131<br>Telephone:     305-789-7715<br>Facsimile:     305-789-7799<br>Attorneys for Defendant Nicholas Peraticos<br> [Electronic Mail Notice]<br><br>Michael David Braun<br>mdb@braunlawgroup.com<br>Braun Law Group, P.C.<br>12304 Santa Monica Boulevard |

| | |
|---|---|
| Additional Counsel for Lead Plaintiff and the Class [Electronic Mail Notice]<br><br>Andrew Schatz<br>aschatz@snilaw.com<br>Schatz & Nobel<br>330 Main Street<br>Hartford, CT 06106-1851<br>Telephone:     860-493-6288<br>Facsimile:     860-493-6290<br>Attorneys for Plaintiff<br>Michael Mitchell<br>[Via Regular Mail]<br><br>Aaron H. Darsky<br>Robert C. Schubert<br>adarsky@schubert-reed.com<br>rschubert@schubert-reed.com<br>Schubert & Reed LLP<br>Three Embarcadero Center<br>Suite 1650<br>San Francisco, CA 94111<br>Telephone:     415-788-4220<br>Facsimile:     415-788-0161<br>Attorneys for Plaintiff<br>Michael Mitchell<br>[Via Regular Mail] | Suite 109<br>Los Angeles, CA 90025<br>Telephone:     310-442-7755<br>Facsimile:     310-442-7756<br>[Via Regular Mail]<br><br>Michael Robert Reese<br>Seth Adam Safier<br>michael@gutridesafier.com<br>Gutride Safier LLP<br>230 Park Avenue<br>Suite 963<br>New York, NY 10169<br>Telephone:     212-579-4625<br>Facsimile:     212-253-4272<br>Attorneys for Plaintiff |