**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| | ) |
| | ) |
| | )    CIVIL ACTION NO. 07-81113-CIV-MARRA |
| | ) |
| **IN RE PEGASUS WIRELESS CORP.** | ) |
| **SEC. LITIG.** | )  **LEAD PLAINTIFF'S MEMORANDUM OF** |
| | )  **LAW IN OPPOSITION TO DEFENDANT** |
| | )  **TSAO'S AND DEFENDANT PERATICOS'** |
| | )  **MOTIONS TO DISMISS THE** |
| | )  **CONSOLIDATED AMENDED CLASS** |
| | )  **ACTION COMPLAINT** |
| | )  **FOR VIOLATIONS OF** |
| | )  **FEDERAL SECURITIES LAWS** |
| | ) |
| | ) |

## PRELIMINARY STATEMENT

This securities fraud class action was first filed in federal court in the Northern District of California in November, 2006.[1] Thereafter, Lead Plaintiff ("Plaintiff") diligently attempted to serve all Defendants, including the Individual Defendants. Some Defendants–including co-CEO Jasper Knabb ("Knabb") and CFO Stephen Durland ("Durland")–have successfully avoided service the entire time. *See* Lead Plaintiff's Motion for an Order Permitting Alternative Means for Service of Process. Others at the center of the alleged fraud–co-CEO and Chairman Alex Tsao ("Tsao"), Board member Nicholas Peraticos ("Peraticos") and auditor Pollard-Kelley–have moved to dismiss the operative amended pleading.[2]

Defendants Tsao's and Peraticos' motions to dismiss consist mainly of an attempt to blame a single Defendant – Knabb – as somehow solely responsible for the securities fraud committed by them because they were blissfully ignorant of Knabb's serial pump-and-dump history and prior bad acts, arrests, and questionable connections, despite the fact they affirmatively vouched for Knabb and his business acumen and experience in public filings, and despite the fact that Tsao was intimately familiar with Knabb's shenanigans, as Tsao had spent years working with Knabb at prior pump-and-dump ventures. Defendants' efforts fail.

As described herein below, Defendants' attempts to claim that Plaintiff has not adequately pleaded falsity of the statements and omissions or these Defendants' scienter are contradicted by Tsao's own admissions in a complaint that he filed in September 2006 after he departed the Company and sued when Knabb failed to commence timely payments on a multi-million dollar "hush" payoff to Tsao in exchange for his silence and agreement to misrepresent the circumstances of his departure. In that filing, attached to the accompanying Request for Judicial Notice at Exhibit A ("Tsao Complaint"), Tsao admits he knew no later than February 2006 that statements being made by the Company, for which he and Peraticos were responsible, were false and misleading. Tsao Complaint at ¶¶ 14, 58-59. Peraticos, as a member of the Board who attended meetings regarding Tsao's departure, including the crucial meeting on June 19, 2006, after which Tsao was escorted from the building, cannot seriously contend that he was not

---

[1] The Action was transferred to this Court on or about September 24, 2007. This opposition addresses the motions of Defendants Tsao and Peraticos.

[2] Plaintiff's opposition to the Pollard-Kelley motion to dismiss will be filed no later than October 29, 2008.

1

at minimum severely reckless regarding the falsity of statements regarding Tsao's departure.

In addition, the Complaint alleges that Tsao's ownership of two AMAX entities acquired by the Company at inflated prices in an effort to line the pockets of Tsao and his brother-in-law Defendant Jerry Shih was not adequately disclosed in public filings. Similarly, the backgrounds and experience of Tsao and Peraticos and Tsao's connections to Knabb were not disclosed despite the fact that the Class Period filings affirmatively touted their business acumen and prior experiences – including Peraticos' experience as the head of a London shipping firm called Pegasus Ocean Services, Ltd. ("POS") a company that was bankrupt and in liquidation, a fate blamed squarely on Peraticos, who issued $150 million in junk bonds in the late 1990s and then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business.

On these motions, only the adequacy of scienter and falsity of the statements is challenged. For the reasons discussed in detail below, the Complaint complies with all applicable pleading requirements and Defendants' motions to dismiss should be denied in full.

## ARGUMENT

### I.    Applicable Legal Standards

On a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs v. Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2509 (2007). The Court must construe the complaint in the light most favorable to the plaintiff and accept the factual allegations as true. *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir. 1988). A complaint must merely allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

In order "to allege securities fraud under Rule 10b-5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Garfield v. NDC Health Corp*., 466 F.3d 1255, 1261 (11th Cir. 2006) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999)). Plaintiff here has adequately pled these elements.

### II.   Plaintiff Has Adequately Pleaded that Peraticos and Tsao Violated Section 10(b)

Defendants Tsao and Peraticos take issue with just two of the requirements necessary to

plead securities fraud under Section 10(b) and Rule 10b-5: whether misstatements or omissions of material facts were made, and whether they were made with scienter. As discussed in detail below, Plaintiff has adequately alleged that both Peraticos and Tsao made materially false and misleading statements and omissions knowingly and/or with severely reckless disregard to the undisclosed true facts.

### A.   The Complaint Adequately Alleges That Defendants Made Materially False and Misleading Statements and Omissions

This case alleges both misrepresentations and omissions. 15 U.S.C. § 78u-4(b)(1); ¶¶ 1, 156, 160, 162-65. Peraticos makes the sweeping assertion, however, that Plaintiff failed to identify a false or misleading statement.[3] Peraticos Br. at 11-13. Defendant's argument is both false and ignores the distinction between the two inquiries, focusing only on "misstatements." Peraticos Br. at 11. While material misstatements are alleged, it is of course more than sufficient to plead material omissions. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000) ("Our reading [of 15 U.S.C. § 78u-4(b)(1)] focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.").

A review of the Complaint demonstrates amply that every statement has an allegation detailing the omissions of material facts that render the statement materially false or misleading when made.[4] For example, the Complaint is replete with allegations that Defendants failed to disclose any information about Knabb's past. ¶¶ 21, 22 ("material omissions"), 23 ("at no time during the Class Period did Defendants ever disclose"), 24, 33. In fact, Defendants rested on grossly incomplete misrepresentations that made Knabb wrongly appear more like a seasoned, successful businessman than a serial pump-and-dump con artist with a fraudulent past. ¶¶ 22, 84;

---

[3] In a section titled "Defendants' Materially False and Misleading Statements and Omissions during the Class Period," ¶¶ 37-83 of the Complaint set forth the actionable statements and omissions with bold language for emphasis and ease of reference. *See, e.g., In re Synovis Life Techs., Inc. Sec. Litig.* No. 04-3008, 2005 U.S. Dist. LEXIS 18187, at *19 (D. Minn. Aug. 25, 2005) (noting that the complaint sufficiently identified the false and misleading statements because they were contained in a section entitled "False and Misleading Statements" with bolded and italicized language to guide the reader).

[4] In *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1152-53 (C.D. Cal 2007), cited by Defendants, the complaint lumped together all the allegations and then stated in one conclusory paragraph that all the statements were false. By contrast here, the Complaint properly sets forth each statement and filing and states the particular reasons that specific statement was false and misleading when made in accordance with the requirements of Rule 9(b).

*see also* ¶ 21 (noting that Defendants made at least 15 years worth of Knabb's past material by touting that period of his experience). None of the alleged false and/or misleading statements identified ever spoke to Defendant Knabb's past association with known fraudsters, ¶¶ 21, 22, 86, 87, 90, 95, or the pump and dump schemes and defunct companies Defendants Knabb, Tsao, Peraticos, and Pollard-Kelley associated with prior to or while at Pegasus. ¶¶ 18, 33-35.

For example, while touting Peraticos' purported success at the head of Pegasus Ocean Services, Ltd., Defendants concealed the fact that that entity had been defunct for years, as a result of Peraticos' own handiwork. ¶¶ 13, 89. There was no disclosure that the entities purchased by the Company (including AMAX, which Defendants never disclosed was secretly owned and controlled by Tsao in addition to being owned by his brother-in-law Defendant Jerry Shih) were owned and controlled by Defendants and their cronies to whom money was funneled for near-worthless acquisitions at the expense of shareholders and the Company. ¶¶ 39(c), 52(b), 85. In addition, Defendants failed to disclose "any fraud, whether or not material," ¶¶ 49, 73, as related to the experience and backgrounds of Defendants Knabb, Tsao, Peraticos, and Durland, as well as the prior direct connections of Pollard-Kelley to Knabb and Tsao. ¶ 52(a).

Although the Company issued a statement regarding the supposed "resignation" of Defendant Tsao, ¶ 83, the statement was false and misleading when made because it was a termination and failed to disclose the circumstances of Tsao's departure, which would have been material to any investor in light of the charges levied by Tsao and Knabb, among others. ¶¶ 10, 83. *See In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005) (noting that it is not appropriate to "speak partial truths" and finding that plaintiffs sufficiently pled falsity).

Defendant Peraticos argues in conclusory fashion, "[a]nd the past history of Knabb, which is completely unrelated to Pegasus, does not demonstrate that the acquisitions were not made, that the financials were inaccurate, or that the stock was not listed on NASDAQ and the Russell 2000 index." Peraticos Br. at 13. Putting aside the fact that the Complaint does not allege that the acquisitions were not made or that the stock was not listed on NASDAQ and Russell 2000, Peraticos' argument misses the point entirely: these statements were materially false and misleading when made because they omitted to disclose that the acquisitions were grossly overvalued if not worthless and designed to funnel money and stock to Defendants and their

friends and families at the expense of shareholders and the Company[5]; the stock is alleged to have been listed only briefly on NASDAQ as a marketing ploy to gain exposure to more potential investor victims – a typical pump-and-dump tactic – with no intention to maintain the Company at a level that it could continue to qualify for NASDAQ listing; and the financials are alleged to have violated GAAP and SEC rules but were nevertheless rubber stamped by auditor Defendant Pollard-Kelley, which had extensive prior dealings with Defendants Knabb and Tsao regarding earlier pump-and-dump scams at prior companies controlled by them.

Plaintiff has alleged materiality of the statements and omissions.[6] "A false statement or omission is considered 'material' if its disclosure would alter the total mix of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important" to an investment decision.'" *In re Sci. Atlanta*, 239 F. Supp. 2d at 1359 (citation omitted). For example, Defendants' failure to disclose that Knabb lacked financial assets made the Company's press releases regarding at least two of the Company's acquisitions materially false and misleading because the Company reported that the acquisitions were financed through Knabb. ¶¶ 23, 37. In addition, Defendants' failure to state that Pegasus would voluntarily delist itself from NASDAQ within three months of its debut on the exchange made the press release praising its move to the NASDAQ materially false and misleading when made. ¶¶ 58(d), 68. Furthermore, the Complaint alleges that the Company's statements in its year-end report for

---

[5] The acquisitions of AMAX, SKI, or CNET were also alleged to be part of a scheme to create the appearance that Pegasus was growing. ¶¶ 39(a), 42(a), 45(a). This increase in growth and capitalization led to the Company's listing on the NASDAQ and Russell 2000. ¶¶ 66 and n.2, 67, 68, 69. Such prominent listings were part of Defendants' concerted effort to seek respectability and greater access to more markets to allow Defendants the opportunity to artificially inflate Company stock.

[6] Defendant Tsao's attempt to argue that Plaintiff attacks non-actionable puffery in the press releases must fail. Tsao Br. at 14. "A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available. Statements that do more than offer rosy predictions when a defendant knows that the statements are false can be the basis of a securities fraud action." *In re Sci. Atlanta*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) (internal citations omitted). Further, as the court notes, just like here, "in the present case, Plaintiffs have alleged that Defendants made statements about the Company's success, its customers' confidence and growing needs for S-A products, the success of the Company's business strategies, and the good economic success of the Company's customers. Such statements were not so exaggerated or vague that the Court can find as a matter of law that the statements were not material." *Id.*

2005 that Pegasus would have a new "revolutionary" product available for sale at the end of the year (¶ 62) were rendered materially false and misleading by Defendants' failure to disclose that the Company was having problems obtaining the certification from the FCC for its sale (¶ 63(c)).

Defendant Tsao claims that he is not liable for any misstatements or omissions made after he left the Company. Tsao Br. at 11. Plaintiff does not contest this obvious point. Defendant Tsao is alleged to have made numerous materially false and/or misleading statements and omissions *prior* to his resignation. Though the Board voted on June 19, 2006 to suspend Defendant Tsao pending an investigation[7] (¶¶ 10, 83(c)), his "retirement" from the Company and his positions was not effective until August 8, 2006. *Id.* ¶¶ 10, 83(e). Tsao's alleged false and misleading statements were made on June 28, 2006 (¶ 64), July 5, 2006 (¶ 66), July 20, 2006 (¶ 68), July 25, 2006 (¶ 70), August 3, 2006 (¶ 74), August 4, 2006 (¶¶ 76, 78), August 14, 2006 (¶ 81), and August 18, 2006 (¶ 83). All of these statements were made after Tsao – by his own admission in his complaint – knew that the Company's statements regarding Knabb's finances and Company stock were untrue. Of course, Tsao also knew at this time about his own undisclosed connections to Knabb and Pollard-Kelley and his concealed profiteering from the AMAX acquisition. Tsao was still an officer and a director of the Company until August 8, 2006, when his "retirement" became effective, and is liable for all statements made before that date, which include the majority of the alleged false and misleading statements in the Complaint.[8]

## B. Plaintiff's Allegations Concerning Defendants' False and Misleading Statements Were Pled With Particularity

Defendants argue that the Complaint does not allege materially false and misleading

---

[7] No facts are alleged that Tsao's suspension was permanent or that he would not be reinstated pending an investigation.

[8] The cases cited by Defendant Tsao (Br at 11-12) are irrelevant to all six of the misstatements alleged prior to Tsao's retirement. In *Berry v. Valence Tech., Inc.,* 175 F.3d 699, 706-07 (9th Cir. 1999), none of the alleged misstatements were made until after the CEO defendant resigned. In *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1078 (N.D. Cal. 2002), plaintiffs conceded that the "group published information doctrine does not apply" to the defendant because he was fired well before any of the statements were made. The case *D.E. & J Limited P'ship v. Conaway*, 284 F. Supp. 2d 719, 733 n.14 (E.D. Mich. 2003), which Tsao claims does not allow the plaintiffs to rely on the group pleading doctrine for misstatements made after the director "left the company's employ" does not apply. Regardless of the applicability of the group pleading doctrine, the Complaint adequately alleges that Tsao personally made at least six allegedly false and misleading statements before he "left the company's employ."

statements with the level of particularity required by Fed. Rule Civ. P. 9(b) and the PSLRA. Tsao Br. at 10-11, 16, Peraticos Br. at 11-13. Contrary to Defendants' arguments, Plaintiff has specified precisely what statements and omissions were made and in what documents, the time and place of each statement and the person(s) responsible for making them, the content of the statements, the manner in which they misled investors, and what Defendants obtained as a consequence of the fraud. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). This level of factual detail and exacting specificity is sufficient to pass muster under the falsity pleading standards of the PSLRA and Fed. R. Civ. P. 9(b).

The Complaint alleges a statement by Defendants in a December 22, 2005 press release, for example, that "the cash portion [of the purchase of AMAX Engineering Corp.] was partially financed by 571,429 shares of [Pegasus'] common stock by Jasper Knabb[.]" ¶ 37; *see also* ¶¶ 39(d), 42(b). As Plaintiff alleges, that statement was false and misleading because Knabb did not have sufficient assets to give him the ability to make such a purchase. ¶ 38; *see also* ¶¶ 23, 24, 29, 30, 32, 91. These allegations represent "'contemporaneous statements or conditions' that are 'inconsistent' with the challenged statement so as to demonstrate that it was false when made." *In re Tibco Software Sec. Litig.*, No. 05-2146, 2006 U.S. Dist. LEXIS 36666, at *67 (N.D. Cal. May 25, 2006) (citations omitted). The Company also touted in a June 28, 2006 release that Defendant Knabb "purchased" 1.25 million shares of Pegasus stock. ¶ 64. The Complaint alleges that this was done to artificially inflate the Company's stock. ¶ 65(a). But, again, Knabb also had insufficient assets to make such a purchase, ¶ 65(b); *see also* ¶¶ 23-24, 29, 30, 32, and both the Company and Tsao have admitted that Knabb never purchased such shares. ¶¶ 65(c), 97, 98.

As to the March 3, 2006 SEC filing, the Complaint alleges that the Company filed this Form 10-KSB for the year ending December 31, 2005 and that it was signed and certified by Defendants Knabb and Durland and also contained certifications from Defendants Tsao and Durland. ¶¶ 48, 49. The Complaint adequately alleges that Defendants "specifically attested to the purported accuracy and completeness of the Company controls and procedures," and that they have disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting." ¶ 49. Further, the Complaint alleges that both Tsao and Durland signed SOX certifications stating that "the information contained in the Report fairly presents, in all

material respects, the financial condition and results of operations of the Company." ¶ 50. The SEC filing included statements that "purported to disclose the complete nature and extent of any transactions between the Company, its executives and directors, and any related third-parties." ¶ 51. The Complaint goes on to allege the reasons these statements were false and misleading. The Complaint alleges that the Company failed to disclose Knabb's prior history,[9] that AMAX was secretly owned by Defendant Tsao,[10] the true financial condition of Pegasus, and that the Company was not in compliance with GAAP, SEC, or FAS reporting rules. ¶ 52.

The allegations about the May 8, 2006 SEC filing satisfy the standard as well. The Complaint properly alleges on that date, Defendants filed a Form 10-Q for the quarter ending March 31, 2006, which was signed and certified by Tsao and Durland. ¶ 59. The Complaint then states exactly what statements were made (¶ 59) and the reasons they were false and misleading ((¶ 61). The Complaint also states that Tsao and Durland filed SOX Certifications with this Form 10-Q "that specifically attested to the purported accuracy and completeness of the Company's controls and procedures," (¶ 60), while failing to disclose the same facts they failed to disclose in the March 3, 2006 SEC filing.[11] ¶ 61.

---

[9] Tsao argues that not disclosing Knabb's history was not an omission that made the certifications by Tsao and Durland—that they had disclosed all known fraud—false when made because one of the lawsuits against Knabb that alleged securities fraud was settled. Tsao Br. at 16 n.9. Even if this factual inquiry were not premature, which it is, the certification is adequately alleged to be false regardless, because even if the case settled, Defendants still had to disclose "any fraud, whether or not material." There are many other instances in which the Complaint alleges that Knabb was involved in fraudulent conduct that Defendants had to disclose, but instead concealed. Significantly, Tsao does not even attempt to argue the point that omissions regarding his own fraudulent connections and schemes and those of other officers and directors and the auditor—including Peraticos, Durland, and Pollard-Kelley—also rendered the certifications false. *See* ¶¶ 22-35

[10] Although the Company disclosed that Tsao was the brother-in-law of AMAX's president Jerry Shih, **it did not reveal that Tsao was also the secret owner of AMAX**. ¶¶ 309(c), 52(b), 61(b), 73(b), 108(c). Furthermore, the Company's filing revealed the Tsao/Shih relationship for the portion of the filing that required the disclosure of "family relationships between or among the executive officers and directors of the Company," but then failed to reveal that information in the portion of the filing requiring the disclosure of related third party transactions and instead stated that there were no such transactions. *See* Dkt. No. 141-15, at 26 and F-12.

[11] Unlike the March 3, 2006 SEC filing, the Form 10-Q does not disclose that the AMAX president is related to Tsao, and it fails to disclose the related party transactions, as well.

**C.    Defendants Had a Duty to Disclose Information Regarding the Background, Experience, and Associations of Knabb, Tsao, Peraticos, Durland, and other Defendants Necessary To Make Statements Touting Their Experience and Background Not Materially False and Misleading**

Contrary to Defendants' contentions (Tsao Br. at 17 n. 10, Peraticos Br. at 13-16), Defendants had a duty to disclose Knabb's "involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities," "associations with convicted felons, securities fraudsters, and the like," and his "history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experience irregular and suspicious trading activity." *See, e.g.*, ¶ 52(a).

Defendants acknowledge that "disclosure is necessary to make statements that have been made not misleading, when disclosure is mandated by statute or regulation, or when there is inside trading." Peraticos Br. at 14. Specifically, Regulation S-K required that Defendants disclose their business experience during the past five years and "[d]escribe [certain] events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director . . . or executive officer . . ." 17 C.F.R. 229.401(e) and (f). Those events include: petitions under the Federal bankruptcy laws or any state insolvency laws; criminal convictions or pending criminal charges; any restrictions on engaging in any type of business practice, engaging in any activity in connection with the purchase or sale of a security or a security violation; violations under the securities laws; and violations under the Federal commodities laws. 17 C.F.R. 229.401(f).

Going beyond the regulations' requirements, "it has been recognized that shareholders are entitled to information impugning the honesty, loyalty or competency of directors in their dealings with the corporation to which they owe a fiduciary duty." *Krauth v. Executive Telecard*, No. 94 Civ. 7337 (RWS), 1994 U.S. Dist. LEXIS 15255, at *17-21 (S.D.N.Y. Oct. 21, 1994) (finding that disclosure was necessary of the officers' consultation with a someone who had been a defendant in numerous criminal, civil and administrative hearings because that information

---

Furthermore, the filing, like the first SEC filing, fails to disclose that Tsao is the secret owner of AMAX. However, Section 230.01 of the Compliance and Disclosure Interpretations of Regulation S-K, which governs disclosures in forms filed under the securities laws, states that Item 404 regarding transactions with related persons includes brothers-in-law.

"would be material [since] their loyalty and competency is per force an issue" and because they are "facts which must be considered material with respect to the actions and competence of several of the directors. . .").[12]

Here, the Complaint includes allegations that bear "directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities" (¶¶ 21-35, 47(c)), information that investors would plainly find significant, and which was required to be disclosed. For example, the Complaint alleges several incidents that bore directly on Knabb's honesty: in 2000, a suit was filed against Knabb for misrepresenting ownership of a company (¶ 27); in 2001, Knabb filed a false insurance claim (¶ 25) and had securities fraud and RICO claims filed against him and his company (¶ 26); in 1990, a company Knabb reported he sold was actually part of a bankruptcy proceeding (¶ 31). Further, the Complaint also alleges instances that bore directly on Knabb's credibility: in 2003, there was a breach of contract claim filed against Knabb (¶ 29); in 2002, Knabb was sued for failure to pay for a car (¶ 30); and in 1999 there was default judgment on a commercial note and a promissory note (¶ 28). The Complaint also alleges eight other judgments against Knabb, including judgments brought by the IRS and people who invested in a fake Company that was supposedly owned by Knabb (¶ 32). As the Complaint alleges, the companies that Knabb was involved in were actually penny stock companies that had very suspicious trading patterns (¶¶ 33-35). This information was material for an investor to have in considering Knabb's honesty, competence, and experience, and should have been disclosed.

Furthermore, Regulation S-K's guidelines are intended only to describe the minimum of what must be disclosed.[13] In fact, the catch-all provision of SEC Regulation C, Rule 408, 17

---

[12] *See also SEC v. TLC Invs. and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (granting summary judgment for the SEC where defendant failed to disclose a prior conviction for tax fraud); *Pahmer v. Greenberg*, 926 F. Supp 287, 298 (E.D.N.Y. 1996) (investors satisfied scienter requirement where defendant failed to state that he was a convicted felon).

[13] *See, e.g., Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ("Although Regulation S-X specifically sets forth circumstances under which stale financial information must be updated with interim data, see 17 C.F.R. § 210.3-12, it is not the only operative SEC regulation …. Accordingly, in evaluating whether defendants were under a duty to disclose interim financial information in the prospectus, we must determine whether the March 1999 information was material in light of the financial information already disclosed to investors.")

C.F.R. § 230.408, provides that: "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, **not misleading**." (emphasis added).[14] The information that the Company did disclose, pursuant to 17 CFR 229.401(e), touting Knabb's past experience, had to be supplemented with the true undisclosed facts alleged in the Complaint in order to make the statements not misleading. Therefore, Defendants' disclosure of Knabb's experience in managing and directing multiple companies without disclosing the true nature of these companies and his roles was a

---

[14] *See also SEC v. Fehn*, 97 F.3d 1276, 1290 n. 12 (9th Cir. 1996) (holding that although the specific regulation may not have required disclosure of certain information, Rule 10b-5 imposes a duty to disclose all material facts to make disclosed statements not misleading and therefore a separate duty rises requiring disclosure); *Calderon v. Tower Assocs. Int'l, Inc.*, No. 88-1240-FR, 1989 U.S. Dist. LEXIS 3243, at *4-8 (D. Or. Mar. 27, 1989) (finding that the nature of the charge and disposition of the charge of every arrest since the age of majority, any investigations of the person or any entity he directly or indirectly controls by any state or federal agencies, and information about the allegations and disposition of every lawsuit in which the person was a defendant is all information a reasonable investor would consider important.). *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983), cited by Defendant Peraticos (Br. at 15 n. 10) for the proposition that directors have no duty under Item 410 to disclose unrelated and unadjudicated lawsuits is not to the contrary. *GAF Corp.* was a very limited ruling, holding that on the unique facts of that case, information that a defendant was being sued by his sister for breaching his fiduciary duty in the management of her business affairs was not material and failing to disclose that information was not a violation. In fact, the court expressly stated that "we do not mean to suggest that pending litigation against a director-nominee based on state law and involving a family or other non-public business can never be material," but that "actions of that nature are less likely to be matters of importance to public shareholders." *Id*. at 740. By contrast, here Plaintiff is not alleging that Knabb was once sued by a sibling in an isolated family incident, but that he was involved in a series of pump-and-dump schemes and other fraudulent conduct. *N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1137 (D. Kan. 2004), another case cited by Defendant Peraticos (Br. at 15 n. 10), is distinguishable. The Court stated in *N.J.* that Item 401(e)(1) did not require the disclosure of financial affairs of the Defendants. *Id*. at 1137. In *N.J.*, however, Defendants had not put the officers' finances at issue by partially discussing them in public statements. Furthermore, Knabb's financial affairs are not part of his past history that Plaintiff alleges must be disclosed. Plaintiff alleges that Knabb's current finances at the time the statements were made during the Class Period made the statements false because they affirmatively stated that Knabb had purchased shares when he did not have the assets to do so. ¶ 23. In fact, Knabb had had no identifiable source of income that could have allowed him to purchase $26 million in Pegasus shares. *Id*.

violation of the Exchange Act and the SEC regulations.[15]

Furthermore, although Defendants only argue against the need to disclose Knabb's past, they ignore other allegations in the Complaint involving the disclosures necessary by Defendants regarding Tsao, Peraticos, Durland and other individual Defendants to meet the requirements under 17 C.F.R. § 230.408 and make statements regarding those individuals not materially false or misleading.

With regard to Defendant Tsao, the filings and the press releases, in disclosing information about the acquisition of AMAX, failed to disclose that AMAX was co-owned by Defendant Tsao. Furthermore, although Defendant Tsao revealed his experience back to 1991 in Form 10-KSB, he conveniently left out that he was the founder of OTC Wireless, a company in which Defendant Knabb served as both a Managing Director and the President,[16] ¶¶ 21, 89, and which later became part of Pegasus.[17] ¶ 22. All these omissions were material and necessary to make the statements made not false and misleading and to ensure compliance with 17 C.F.R. § 230.408.

A now-familiar tale regarding omitted, material background information may also be told

---

[15] The Second Circuit's decision in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F. 3d 87 (2d Cir. 2001), is instructive with regard to materiality of Defendants' omissions. In *Suez*, defendants, in soliciting plaintiffs' investment, provided plaintiffs with an "edited version of a background report on one of the company's principal executives." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F. 3d 189, 198 (2d Cir. 2003) (citing *Suez*, 250 F.3d at 93-94). The report failed to disclose negative events in the executive's financial and business history, "such as multiple tax liens, delinquent credit accounts, and involuntary bankruptcy proceeding, and pending lawsuits." *Id.* (citing *Suez*, 250 F.3d at 94). Thereafter, the company filed for bankruptcy, and plaintiffs' investment became worthless. Then, the executive's true, poor management experience came to light, and was alleged by plaintiffs to have been a material omission from the initial report. Plaintiffs claimed that the executive's concealed "inability to manage debt and maintain adequate liquidity" were the proximate cause of the company's bankruptcy. *See id.* (citing *Suez*, 250 F.3d at 94). The Second Circuit in *Suez* (and *Emergent*) agreed. *See id.* at 197-99 (quoting *Suez*, 250 F. 3d at 98-99).

[16] Defendant Knabb did note his association with OTC Wireless in Form 10-KSB as part of his "15 years of experience," but failed to disclose that that company was founded by Defendant Tsao. Form 10-KSB, Dkt. No. 141-15, at 27.

[17] According to a news report referenced in the Complaint, Knabb and Tsao were both significant players in merging OTC Wireless and Homeskills, "a defunct Florida-based penny-stock" company. After the merger, the company began trading under the name of Pegasus. ¶ 89.

about Defendant Durland, yet another Pegasus director/officer with associations with earlier pump and dump schemes. In the Form 10-KSB, Defendants touted that Defendant Durland was the "president of Durland & Company, CPAs, PA, since he founded it in 1991" and lauded the company's accomplishments. Dkt. No. 141-15, at 27. The filing also stated that Defendant Durland "has been a CPA in 14 states." *Id.* Defendant Durland's experience as the Director of Medical Makeover Corporation of America was also touted. *Id.* However, the filings omitted to disclose that Durland had "a history of involvement with failed and suspect ventures, such as that he was CFO and then acting CEO of a company called Medical Makeover Corporation of America, which appears to have shared an office with DP Martin and Associates, which paid penny stock promoters to 'fluff' Medical Makeover's shares." ¶¶ 86, 87. Both of the firms were also represented by an attorney disbarred due to a conviction for a "pump and dump" scheme. *Id.* Further, the Complaint alleges that twenty-seven companies that were audited by Durland's accounting firm were represented by the same convicted felon. ¶ 94. Durland also lost his CPA license in North Carolina because "his firm was cited by the Public Accountancy Oversight Board for failure in the Review of Audit Engagements." *Id.* In fact, the Oversight Board "identified deficiencies 'of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements." *Id.* ¶ 9. All these omissions were material to make the statements made not false and misleading and to ensure compliance with 17 C.F.R. § 230.408.

Indeed, the similarity of the pattern of concealed but material background information about the various directors and officers of the Company and their prior bad acts and involvement in prior schemes shines a bright light on the alleged scheme in the case at bar.

    **D.**    **The Group Pleading Doctrine Applies**

Defendants argue that they made no statements to investors and no statements can be attributed to them under the group pleading doctrine. Tsao Br. at 12-15, Peraticos Br. at 8-9. In fact, Defendant Peraticos made statements to investors in the 10-KSB which bears his signature. ¶ 13. The 10-KSB contained false and misleading statements regarding: performance and operations, and internal controls (¶ 48); and the complete nature and extent of any transactions that had occurred between the Company, its executives and directors, and any related third-parties (¶ 51). Likewise, Defendant Tsao signed and certified the Company's Form 10-KSB and certified Form 10-QSB (¶¶ 49, 50, 59, 60). The group pleading doctrine is therefore not

necessary for Plaintiff's claims against to survive.

Numerous cases have recognized the legal significance of a director's signature on documents filed with the Commission:

> [J]ust what is a signature on an SEC filed document meant to represent if it does not represent a degree of responsibility for the material contained in that document? The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.

*In re WorldCom*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003); *see also In re Enron, Corp. Sec. Derivative & ERISA Litig.,* 258 F. Supp. 2d 576, 587-88 (S.D. Tex. 2003) ("SEC has attempted to make signatures on corporate documents that are filed with the SEC **carry significant weight**") (emphasis added). As such, the group pleading doctrine needs not apply to these statements, made directly by Defendants Tsao and Peraticos.

Nevertheless, Defendants are also liable for the false and misleading group-published statements. Contrary to Defendant Tsao's contention (Br. at 12 n.5), the "group pleading" doctrine has survived the passage of the PSLRA[18] and Defendants are liable for those misleading statements issued in the name of the Company in each of the press releases (*See, e.g.*, ¶¶ 37-47, 53-58), as each of those statements were "group-published" information.[19] "Identifying the

---

[18] *See, e.g.*, *Bruhl v. Conroy*, No. 03-23044, 2007 U.S. Dist. LEXIS 21886, at *11-12 (S.D. Fla. Mar. 27, 2007); *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1357-58 (N.D. Ga. 2000); *In re World Access, Inc., Sec. Litig.*, 119 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1998); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999).

[19] Defendant Tsao argues (Br. at 15) that the group pleading doctrine should not apply to the June 16, 2006 *Dow Jones Newswire* report of Pegasus's annual report for 2005 because it was "prepared by individuals not associated with the corporation." (citing *Bruhl*, 2007 WL 983228, at *3). The Complaint alleges that the statements contained *within* this article, which were "made *by* Defendants," were materially false and misleading. ¶¶ 62-63 (emphasis added). Specifically, that article contained representations made by Defendants in the Company's 10-K and statements by Defendants ("the Company") updating the K and reaffirming that "Pegasus was ready to begin manufacturing at its newly acquired facilities and would have its WiJET.e (formerly Cynalynx) wireless video presentation system available for sale by the end of the year." ¶ 62. As noted in the Complaint (¶ 62), the Company's annual report for 2005 stated that the Company could achieve revenue as high as $650 million in the foreseeable near-term and that the WiJet.e

individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *World Access*, 119 F. Supp. 2d at 1357 (citation omitted); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987) (prospectuses, registration statements, annual reports, press releases, or other "group published information" are presumed collective actions).[20] The Company's allegedly materially false and misleading press releases and the SEC filings are exactly the type of group-published documents that collectively involve the actions of the corporate directors and officers.

Defendant Tsao argues that the Complaint lacks the requisite allegations that he was directly involved in controlling the content of the statements at issue or that he had any role in drafting and dissemination of press releases issued by Pegasus and therefore is not liable under the group pleading doctrine. Tsao Br. at 13. Given Tsao's role as Chairman of the Board and co-CEO, Tsao's argument borders on the absurd. In addition, that is not the standard for the group pleading doctrine. Under the doctrine:

> allegations of securities fraud based upon statements in group published information are **presumed to be the collective information** of corporate officers involved in the day-to-day management of the corporation . . . Thus, **Plaintiffs need not set forth a specific connection between each individual corporate defendant and every alleged omission or misrepresentation** when the allegedly misleading information is contained in group published information.

---

system would be available at year's end. On June 16, 2006, a *Dow Jones Newswire* included statements from the annual report and updated guidance from the Company. There was no rational basis to claim, however, that the Company could earn revenues of $650 million for the foreseeable near-term because revenue for the six months ending December 31, 2005 was only $17.6 million and $23 million for the first quarter of 2006. ¶ 63(a). The *Dow Jones* article not only quoted the Company's annual report but cited the Company as "pleased to update" that the product WiJet.e was in the manufacturing stage. In addition, a former Pegasus customer service representative and operations manager, who was in charge of reading Company-issued press releases, confirmed in sworn testimony that the WiJet.e system had problems obtaining government certification, leaked radiation, and it was not a "breakthrough" product. ¶¶ 8, 20; *see also,* ¶ 89. These allegedly false and misleading statements were prepared and made by the Company and its representatives, not *Dow Jones Newswire*. Plaintiff has adequately pleaded this statement is attributable to Tsao and Peraticos under the group pleading doctrine.

[20] "At this stage, it is enough that Plaintiffs have alleged that Defendants made misleading statements to analysts and those allegations meet the specificity requirements described herein." *World Access*, 119 F. Supp. 2d at 1357.

*In re Smith-Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1299-1300 (S.D. Fla. 2002) (emphasis added).[21] Even *Bruhl*, 2007 U.S. Dist. LEXIS 21886, a case cited by Defendant Tsao, states that to attribute misstatements to individual defendants, plaintiffs only need to allege "that the each of the individual Director Defendants, due to their high ranking positions and direct involvement in the everyday business of the company" would be involved in controlling the content of the statements. *Id.* at *11-13. In *Bruhl*, the court found that the directors were liable for the statements because of their high ranking positions on the board of the Company. *Id.* Defendant Tsao held an even higher position than the defendants in *Bruhl* (who were all board members): he was CEO and Chairman of the Board of the Company. ¶ 10. In addition, the Complaint alleges that he signed SEC filings (¶ 10) and also certified the SEC filings (¶¶ 49, 50, 59, 60). Therefore, Defendant Tsao's position and his alleged participation in the day-to-day control as CEO and Chairman of the Board make him liable for all of the misleading press releases and SEC filings.[22]

Furthermore, even if the group pleading doctrine were not to apply, senior officers may be liable under Rule 10b-5(b) for statements made by others. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (finding that a vice president for finance and investor relations may be primarily liable for false and misleading statements even though the statements were not publicly attributable to him); *In re CV Therapeutics Sec. Litig.*, No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419, at *30 n.7 (N.D. Cal. Aug. 5, 2004) ("Even assuming arguendo that the group-published information doctrine failed to survive the PSLRA, [the defendant

---

[21] Officers and directors, including Peraticos, are presumed to have knowledge of and involvement in the day-to-day activities of a company. *In re Sensormatic Elecs. Corp. Sec. Litig.,* No. 018346, 2002 U.S. Dist. LEXIS 10715, (S.D. Fla. 2002) (group pleading is allowed to impute liability on corporate officers and directors, who are presumed to have knowledge of and involvement in the day to day affairs of the company); *In re PSS World Med., Inc., Sec. Litig.,* 250 F.Supp.2d 1335, 1347 (M.D. Fla. 2002)(the group pleading doctrine applies to officers "in the day-to-day management and control of the company.") A co-CEO and chairman of the board, such as Tsao, can be presumed to have such knowledge and involvement.

[22] According to Form 10-KSB, Dkt. No. 141-15, at 30, Tsao was not only the CEO; he also held 10.5% of the common stock, significantly more than any other director or officer, evidencing significant control at Pegasus. Defendants' contention that he lacked control because he could not even retain his position flatly ignores liability for statements made prior to his departure from the Company, ¶ 10, and constitutes a premature factual inquiry that contradicts the well-pleaded allegations of the Complaint.

Company's CEO and CFO] were presumably directly responsible for the SEC filings and press releases and their liability for any misrepresentations in these documents would not depend on the doctrine."); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996) ("Primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" (citation omitted)). Therefore, with or without the application of the group pleading doctrine, Defendant Tsao would be liable for the false and misleading press releases and SEC filings.

   **E.       Plaintiff Has Adequately Alleged Scienter**

   The scienter allegations of a 10(b) claim will survive a motion to dismiss "if a reasonable person would deem the inference cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 127 S. Ct. at 2510.[23] Thus, if the inferences properly drawn from the facts are in "equipoise," (*id.* at 2514), the allegations will survive a 12(b)(6) motion. In *Tellabs,* the Court reiterated the established principle that when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs,* 127 S. Ct. at 2510.

   A showing of severe recklessness can satisfy the scienter requirement. *Ziemba*, 256 F.3d at 1202 (citing *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)). The "severe recklessness" standard is satisfied when, as here, defendants make highly unreasonable omissions or misrepresentations (an extreme departure from ordinary care), these omissions or misrepresentations risk misleading buyers, and this risk is known by or should be obvious to the defendants. *Id.*

   **1.       Plaintiff Has Adequately Alleged Scienter of Tsao and Peraticos**

   The Complaint alleges that Defendants engaged in a systematic and pervasive fraud from the very inception of the Company. Pegasus, a shell company formed in a reverse merger with other defunct shell companies, was founded and run by a group of Directors who had suspicious backgrounds with other pump-and-dump schemes. They allegedly engaged in a scheme to artificially increase the value of the Company's stock through a series of materially false and misleading statements and omissions as well as a series of acquisitions and transactions which

---

[23] In this Circuit, to adequately plead the scienter, allegations that defendants were severely reckless suffice. *Ziemba v. Cascade Intern, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

made little financial sense except to those few whom those transactions surreptitiously benefited from the "friends and family plan." To carry it all off, Defendants engaged an auditor who had a history of merely rubber stamping the financials of Knabb's and Tsao's earlier companies, without regard to GAAP, internal controls, or even whether the Company had a business plan or was just a transparent pump-and-dump scheme with no meaningful business or prospects. After making numerous false and misleading statements during the Class Period, Defendant Tsao raised issues at a board meeting in April and May 2006 regarding Knabb's finances and purported stock purchases and managed to secure for himself a handsome, multi-million dollar departure package in exchange for his silence. It was only after it became clear to Tsao that Knabb and the Company were reneging on the multi-million dollar "hush" payments to Tsao that he made the spat public by filing a complaint in California state court seeking to recover his hush money. Tsao's attempts to portray himself in this motion as some sort of pseudo-whistle blower are consistent with his prior alleged behavior of misrepresenting his past bad acts to investors, and contrary to the well-pleaded allegations in the Complaint, which detail Tsao's and Knabb's history of working together in prior businesses with Pollard-Kelley and others to engage in a variety of nefarious pump-and-dump schemes.

Defendants also failed to maintain internal controls, manipulated the Company's NASDAQ listing as a stock inflation ploy, and engaged in baffling financial arrangements with Knabb, all the while filing numerous SEC documents, including Sarbanes-Oxley Certifications, attesting virtuously to their ability, integrity, and sound "business plan." The Complaint is rife with specific and detailed factual allegations which, taken together, support a strong inference that Defendants Tsao and Peraticos knew *exactly* what was going on at the Company; and if they did not, the numerous red flags that should have repeatedly alerted them to their ignorance constituted severe reckless.

### 2.   Defendants' Ties To Pump and Dump Schemes, Defunct Companies, and Companies Accused of Securities Fraud Support a Strong Inference of Scienter

While the Company publicly touted the fact that Pegasus was run by management with credibility and a high standard of ethics, the Complaint alleges that in truth Defendants knew or were severely reckless in disregarding the fact that Defendant Knabb had a long and colorful history of associating with convicted felons and securities fraudsters (¶ 9), managing and serving as corporate officer or director of companies that have consistently experienced irregular and

suspicious trading activity leading to a sudden rise and precipitous collapse of stock price (*Id.*), and entanglements with the law on a variety of fronts (¶¶ 25-32). It was Defendants who made the deliberate decision to make at least 15 years' worth of Knabb's past material, including references to such entities as Wireless Frontier, OTC Wireless, and Beach Access. ¶ 22. By expressly choosing to speak about Knabb's past, Defendants had a duty of full disclosure regarding that past. For example, as detailed in a *New York Post* article, ¶ 89:

> Knabb claimed Beach Access could provide connection services that ran 100 times faster than rivals. ***But the business never got off the ground and in early 2000 he sold it to Biofiltration Systems, a Florida-based penny-stock concern***.
>
> ***Biofiltration had no business operations or revenues of its own at the time***, so to stir some interest in itself as a stock play, the company had already hired a convicted sex offender named Orville Baldridge to pump up its stock on the Over The Counter market.
>
> Thinking he saw an opportunity for himself in the run-up that followed, Knabb offered to swap ownership of Beach Access for 12 million shares of Biofiltration stock, agreeing to stay on as head of what would now become a Biofiltration subsidiary.
>
> ***Yet not many months passed before Biofiltration fired Knabb and sued him to recover those shares, claiming Knabb was full of bull about Beach Access and had actually never owned the operation to begin with.***

Defendants saw fit to conceal all of the above information. In addition, Defendants also made at least 25 years of Defendant Peraticos' history material when Defendants described him (rather sanguinely) as having been "employed by POS since 1980 and has been Managing Director since 1992." Respecting Defendants' duty of disclosure, they should have revealed that Peraticos "issued $150 million in late 1990s junk bonds to a consortium of lenders that included Lazard Freres and Merrill Lynch, then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business." ¶ 89. Defendants also never revealed the prior relationship between Defendants Knabb and Tsao, ¶ 89.

The Complaint alleges that Defendants Knabb and Tsao had a prior involvement with Hung-Chiu-Hu, who was arrested on May 18, 2005 for allegedly embezzling US $456 million (NT $17 billion) from the Taiwan-based Pacific Electric Wire and Cable Co., Ltd., (¶ 22) in what is notoriously referred to in the Taiwanese press as the "corporate scandal of the century." ¶ 95. Hung also allegedly embezzled over $68 million from other companies where he served as a

board member. ¶ 22.

The Complaint also alleges a variety of other lawsuits in Knabb's past. He was arrested for filing a false insurance claim. ¶ 25. He was sued along with BIFS Technologies Corp. ("BIFS") for securities fraud pursuant to Section 10 of the Exchange Act and Sections 5 and 12(a)(1) of the Securities Act of 1933, violations of the Racketeer Influenced and Corrupt Organizations Act, and various violations of North Carolina state law related to deceptive trade practices. ¶ 26. He allegedly misrepresented his ownership of a company which BIFS had attempted to purchase from him, for which BIFS filed suit to void Knabb's employment contract and rescind the option share grant that had been part of their arrangement (¶ 27); he was sued for recovery of Promissory Note monies in default on which he had provided personal guarantees (¶ 28); he was sued in Admiralty for breach of contract, default, and foreclosure of a lien (¶ 29); and he was ordered to turn over his Mercedes for failure to pay the car note (¶ 30). In addition, in Moore County, North Carolina, alone, the Complaint alleges eight judgments against Knabb, totaling $418,449.05 and, for some judgments, attorneys' fees. ¶ 32.

In addition to his legal problems, the Complaint alleges in great detail that Knabb has a history of association with companies engaging in classic pump-and-dump schemes. ¶¶ 34-35. The checkered past of Knabb—the CEO, President, and member of the Board of Directors of the Company—supports a strong inference of scienter. *See Pahmer* 926 F.Supp at 298 (investors satisfied scienter requirement where defendant failed to state that he was a convicted felon).

Crucially, Knabb is not the only director-Defendant whose history and associations should have caused eyebrows to be raised. Defendant Tsao also has extensive prior ties to Knabb, Durland, Pollard-Kelley and Knabb's prior pump and dump schemes and other questionable and secretive associations, including AMAX.

Tsao co-founded OTC Telecom in 1993, which changed its name to OTC Wireless in 2000. ¶ 10. This gives him close ties to Defendant Knabb, who joined OTC Wireless as Managing Director, left in April 2003 to join Frontier Wireless, and returned to OTC Wireless as President in 2004. ¶ 8. (As discussed below, Pollard-Kelley, who audited Pegasus, also served as the accountant and/or auditor of both OTC Wireless and Wireless Frontier during the time that Knabb was involved with them.) In 2004, Knabb and Durland orchestrated a reverse merger via share exchange between OTC Wireless and a shell company called Homeskills, Inc. (in which Durland served as CFO). The surviving company was renamed Pegasus Wireless Corporation. ¶

19. The direct lineage from OTC Wireless, co-founded by Tsao, to Pegasus, as well as Knabb's high-level positions at OTC, belie any assertion that Tsao was not intimately connected with Knabb, and was or should have been acutely aware of his past bad acts.

With regard to other Defendants' prior bad acts, the Complaint alleges that Stephen Durland, CFO and member of the Board of Directors during the Class Period, ran an accounting firm called Durland & Company. On March 9, 2006, the Public Company Accounting Oversight Board ("PCAOB") issued a report on its inspection of Durland & Company. PCAOB identified deficiencies "of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements." ¶ 9. Durland also served as CFO, Director, of CEO in six firms which were associated with and represented by an attorney (Donald Mintmire) who was found guilty of obstruction of justice and conspiracy to obstruct justice. ¶ 94. Durland was also involved in Medical Makeover Corporation of America ("Medical Makeover"), a penny stock whose business plan failed twice, and who reported no cash, no revenues, and one employee. Durland took Medical Makeover public, and apparently was assisted by DP Martin and Associates, who paid $20,000 to issue an "alert" on Medical makeover—and who also incidentally shared an office suite with Medical Makeover and the previously-mentioned attorney, Mintmire. ¶ 87.

The Complaint alleges that Defendant Peraticos was touted by the Company in its SEC filings[24] simply as the head of a London shipping firm called Pegasus Ocean Services, Ltd. ("POS"). ¶¶ 13, 89. What the Company did not say, but what Peraticos knew and the other Defendants knew or were severely reckless in disregarding, is that POS was bankrupt and in liquidation, and "sources in the closely knit Greek shipping community say [POS] has been out of business for years." ¶ 13. POS' demise is blamed on Peraticos, who issued $150 million in junk bonds in the late 1990s. *Id*. He then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business. *Id*. Peraticos' own questionable past supports a strong inference of scienter.

Across the board, Pegasus was created under suspicious circumstances and run by

_____

[24]     The Company's Form 10-KSB, signed by Peraticos, notes: "NICOLAS PERATICOS, Chairman of the Compensation Committee Managing Director of Pegasus Ocean Services, LTD, a London, England based ocean shipping agency. Mr. Peraticos has been employed by POS since 1980 and has been Managing Director since 1992. Mr. Peraticos attended the City of London Polytechnic, majoring in Business Administration and is a citizen of Great Britain."

suspect people. Most of them knew each other of old, had other close business ties, and hopped on and off the boards of each others' Companies, as with OTC Wireless, Pegasus, and Frontier Wireless. Such close connections, intermingling, and relationships were necessary ingredients to further the scheme that ultimately defrauded investors.

In addition, the acquisitions of AMAX, CNet, and SKI were not in the best interests of shareholders, were not part of a concerted business plan or legitimate growth strategy, and were designed uniquely to manipulate the market and funnel money directly into the pockets of Defendants and their buddies, including Defendants Tsao (under whom Knabb previously worked) and Shih. Furthermore, as alleged in the Complaint, the design or operation of internal controls at Pegasus suffered from fatal weaknesses in light of the failure of Defendants to live up their disclosure obligations. Defendants ignored, or were severely reckless in disregarding, the material facts about the past histories and associations of their principals. Defendants also ignored, or were severely reckless in disregarding, that full disclosure of material aspects of the underlying nature of the numerous corporate transactions alleged in the Complaint was of utmost importance so as not to mislead investors.[25] When viewed holistically, the allegations of the Complaint readily withstand Defendants' broadside attacks and do support a strong inference of scienter. Defendants, including Peraticos and Tsao, knew or were severely reckless in not knowing the truth about the Company, its principals' backgrounds, operational and growth tactics, and a host of other material information. Rather than make disclosure, however, Defendants simply ignored the truth.

### 3. Auditor Defendant Pollard-Kelley's Rubber Stamping of Financials for Knabb's and Tsao's Earlier Fraudulent Companies Supports a Strong Inference of Scienter

Plaintiff's allegations against Pollard-Kelley support a strong inference of scienter.

---

[25]    Other examples of Defendants' complicity to further the fraudulent scheme, which Defendants never disclosed, include that achieving a NASDAQ and Russell 2000 listing were not in the best interests of shareholders but a short-term scheme to increase stock value (¶¶ 56(a), 58(a), 69(a), 71(a), 75(a), 99); and the Company planned to remove the Company from NASDAQ listing only three months after it first obtained a NASDAQ listing (¶¶ 58(d), 69(c), 71(c), 79(c), 99). There was no rational basis for the claim that Pegasus would achieve the significant near-term revenues claimed in the Company's SEC filings. ¶ 63(a). And finally, Defendant Knabb did not have the ability to purchase 1.25 million shares of Company stock, despite Defendants' continual iteration that Defendant Knabb financed part of numerous corporate acquisitions through his purchase of stock. ¶¶ 64, 65(b).

Beyond their checkered pasts and the intricately woven relationships between the Directors themselves, the Company's auditor, Defendant Pollard-Kelley, was no stranger to Knabb, Tsao, or Pegasus. In fact, Pollard-Kelley served as the accountant and/or auditor of both OTC Wireless, a company that Tsao headed and in which Knabb was employed, and Wireless Frontier, a company headed by Knabb. ¶¶ 8, 18, 22, 89. Pollard-Kelley saw first-hand the effect of the pump-and-dump scheme at Wireless Frontier. In 2004, when Knabb was CEO of Wireless Frontier, between January 2004 and March 2004, shares of Wireless Frontier increased from $0.15 to $0.90 per share – a gain of over 500%. ¶ 35. Almost as quickly as these shares increased in value, however, by June 2004, shares of Wireless Frontier collapsed back to $0.13 per share – an 86% loss compared to March 2004. ¶¶ 35, 113. Fully familiar with the pump-and-dump tactics of Knabb, Tsao, and Defendants, Pollard-Kelley also audited the balance sheets of AMAX, CNet, and SKI, the entities acquired by Pegasus during the Class Period. ¶¶ 18, 106. Rather than comply with its duties, Pollard-Kelley violated generally accepted accounting principles ("GAAP") and did nothing, except to issue unqualified opinions in full disregard of the truth. *See, e.g.,* ¶¶ 106, 107, 109, 111, 115, 117, 129.

"[C]ourts have held that allegations of violations of GAAP, coupled with ignoring red flags or warning signs of improprieties, can be sufficient to state a claim of securities fraud." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1302 (S.D. Fla. 2002). "Although GAAP violations alone insufficiently support an inference of scienter, violations of GAAP plus other averments of fraud, including a profound financial overstatement, create a strong inference of scienter." *Reina v. Tropical Sportswear Int'l*, No. 8:03-cv-1958-T-23TGW, 2005 U.S. Dist. LEXIS 6129, at *19 (M.D. Fla. Apr. 4, 2005) (citing *In re AFC Enters., Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1371 (N.D. Ga. 2004)); *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *33-34 (E.D. Tex. Mar. 30, 2001) (GAAP violations may be significant to "scienter calculus"). Thus, alleged violations of GAAP are themselves indicia of scienter that are ultimately analyzed in their totality with all the other allegations of the Complaint to determine whether a strong inference of scienter is created.

Management's lack of integrity should have caused Pollard-Kelley to re-evaluate its risk assessments. ¶¶ 114, 119. Similarly, Pollard-Kelley's prior suspect associations with Knabb, Tsao, and other Defendants with respect to a number of companies that ultimately failed or were involved in pump-and-dumps should have provided a red flag to all Defendants that Pollard-

Kelly was in no way an "independent" auditor that could be trusted to fairly and impartially evaluate the Company's financials and certify them as GAAP and GAAS compliant. Defendant Tsao's knowledge of these prior associations and Defendant Peraticos' reckless disregard (at minimum) support a strong inference of scienter.

> **4.    Acquisitions of Companies Secretly Owned and Controlled by the Defendants – including the Acquisition of AMAX, Co-Owned by Tsao – Support a Strong Inference of Scienter**

The Complaint alleges in great detail that Defendant Tsao had concealed, very close ties to one of the companies acquired by Pegasus during the Class Period. Tsao is Defendant Shih's brother-in-law, and Defendants Shih and Tsao were co-owners of AMAX. ¶¶ 39(c), 52 (b), 61(b), 73(b), 85. At the time that Pegasus acquired AMAX Technologies, Inc. and AMAX Information Technologies, Inc., Shih served as the Chairman and CEO of both. At that time, Tsao served as Chairman and CEO of Pegasus. ¶ 12. The Company touted the AMAX acquisition as an "excellent fit" and that it would "solidify its place as a significant force." ¶¶ 37-38. In fact, Pegasus specifically stated that "The acquisition of the company and its distribution facility will allow Pegasus to expedite its wireless products domestically, therefore increasing the company's revenue, as well as profit." *Id*. But, the key material information to make these statements not misleading was omitted – that this acquisition funneled $8 million (financed half in cash and half by the issuance of over 571,000 shares of Pegasus stock) into the hands of Defendants Tsao and Shih (¶ 85), and that in fact the AMAX acquisition added nothing to Pegasus's growth as AMAX was not involved in development and manufacture. *Id*. Furthermore, the acquisition of AMAX was specifically designed to create the appearance that Pegasus was growing to fraudulently induce investors to purchase stock. ¶ 39(a).

Defendants Tsao and Shih directly profited from the sale of AMAX to Knabb and the Company, contrary to Defendants' assertion that there were no stock sales. Peraticos Br. at 20-21 (citing cases). At a minimum, Defendants were severely reckless if they did not know of any blatant conflict of interest. The Complaint adequately alleges that Tsao and Peraticos, along with the other Defendants, knew or were severely reckless in not knowing that the statements made regarding AMAX were false and/or misleading because they omitted to disclose the true facts that: the transaction was not conducted arm's-length, ¶¶ 12, 37-39, 85; the transaction funneled money and stock to Tsao and Shih who owned AMAX to line their pockets at the expense of the Company and its shareholders, ¶¶ 12, 85; that AMAX offered little value to the Company

because AMAX was involved in the "computer hawking market," not development and manufacture, which was Pegasus' business, ¶ 85; and that the acquisition of AMAX was part of Defendants' scheme to create the appearance that the Company was growing to induce investors to purchase stock. ¶ 39(a). The close relationship between Tsao, Shih, AMAX, and Pegasus supports a strong inference of scienter with regard to all Defendants, but with respect to Defendant Tsao, there can be no doubt that he had actual knowledge that the statements made regarding AMAX were materially false and misleading when made.

The AMAX acquisition was not one of a kind but rather part of a pattern to acquire entities owned by Defendants or their affiliates, as described by *MotleyFool.com,* on August 24, 2006, as "The friends and family plan," ¶ 85, in order to funnel money to associates and family and create an illusion of Pegasus's growth. Defendants Tsao and Peraticos knew of these shenanigans, or they were severely reckless in disregarding the truth. In another example, on April 2005, Pegasus agreed to acquire CEO-channel.com in exchange for 3 million shares of stock valued at $750,000, despite the fact that the company's liabilities ($18,200) outpaced assets (cash on hand totaling $15,000). ¶ 85. CEO-channel.com, which had no operating business and a negative value, was of no possible worth to Pegasus or Pegasus shareholders. It was, however, owned by Lawrence Creeger, an associate of Defendant Durland's who was involved with him in a venture called Global Event Makers. ¶ 85. As reported, "Creeger, the majority owner, sole director, and officer, just happened to be involved (since at least 2003) with Pegasus CFO Stephan Durland in a venture called Global Event Makers, formerly 'Pro Celebrity Caribbean Tour Inc.,' and another called Global Equity, formerly 'Eventmakers-Caribbean Corp.'" ¶ 85. Yet, despite this association Defendants never revealed in its Class Period statements the true facts about the CEO-channel.com acquisition, not even in any of the public statements when discussing Durland's background. This pattern of acquisitions and transactions which deposited cold hard cash into the pockets of Defendants Tsao, Shih, Knabb, Durland and their associates supports a strong inference of scienter.

> **5.** **Tsao's Own Allegations in His California State Court Lawsuit Against Knabb and Pegasus Amply Demonstrate His Knowledge Prior to the Issuance of the False and Misleading Statements or Omissions**

As alleged in the Complaint, Tsao filed a lawsuit in California state court against Knabb and the Company, asserting counts for breach of contract, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, retaliation, wrongful termination, intentional

and negligent infliction of emotional distress, and various other state causes of action. Importantly, Tsao admits that he knew as of February 2006 that Knabb, who had purportedly purchased $8 million worth of Pegasus stock, had yet to pay for at least $1 million worth of stock. ¶ 10 (*see also*, Tsao Complaint at ¶¶ 13-15). Nevertheless he signed off on a financial quarterly in the Company's Form 10-Q, filed on May 8, 2006, and signed and certified by Tsao. ¶¶ 59-61. Tsao also signed certifications to the Company's Form 10-KSB, filed on March 3, 2006. ¶¶ 48-52. Therefore, by Tsao's own admission, he well knew that the statements in the Company's filings were false when made. Indeed, ¶ 59 of the state court complaint specifically asserts that SOX affords "whistleblower protection to employees such as Dr. Tsao who report fraudulent activity that can damage investors in publicly traded companies." Tsao Complaint at ¶ 59. It is clear Defendant Tsao recognized as early as February 2006 that what had been taking in the place in the Company was fraudulent. Tsao Complaint at ¶¶ 58-59. He admits so, yet he failed to reveal any facts about the fraudulent activity during the Class Period. Defendant Tsao is no whistle-blower. He did not "report" the fraudulent activity, but rather agreed to a phony "retirement" package and only revealed his knowledge about the fraud when he later filed suit against the Company and other Defendants for failure to make the "hush" payments they had agreed to make in exchange for his silence and continued furtherance of the fraud.

On August 18, 2006, the Company officially announced that the Company's CEO and Chairman of the Board, Defendant Tsao, was retiring and would be resigning from all positions as officer and director. ¶ 10. The circumstances of Tsao's departure support a strong inference of scienter as to Tsao and Peraticos. First, after determining that representations about Knabb's finances and stock purchases were suspect, Tsao, in April and May of 2006, confronted Defendant Knabb about money Knabb owed to the Company. *Id*. Knabb told Tsao that he was in the process of providing the funds, which came to $1 million. On June 19, 2006, a telephonic board meeting was held, attended at the Pegasus office by Tsao and Durland (and, as the state court complaint reveals, Tsao Complaint at ¶ 17, Defendant Peraticos). *Id*. Knabb questioned Tsao regarding whether Tsao borrowed, used, pledged, signed, transferred out of his name, or hypothecated his personal stock—received from the Pegasus and Blue Industries, Inc. merger, in violation of the merger agreement between Blue Industries, Inc. and Homeskills, Inc.—to the Granite Investor Group. *Id*. The Board voice voted to suspend Tsao and he was escorted out of the building. *Id*. Tsao's attorney contacted the Company about the "highly suspect" actions of

Knabb, Durland, and the Board of Directors. *Id*. Pegasus acted quickly to resolve the issue and negotiated a generous "retirement" package with Tsao, which included a payout of $2,810,000 in hush money. *Id*. Tsao agreed to the bribe and kept his mouth shut. In fact, Tsao also agreed to characterize his wrongful termination as a "resignation," Tsao Complaint at ¶ 23, when he knew that it was in fact a "sham retirement," Tsao Complaint at ¶ 22. It was not until it became clear that Knabb and the other Defendants would not abide by the agreement and in fact had reneged that Tsao thereafter filed suit, demanding his multi-million dollar payout and suddenly crying fowl. Tsao's attempts to paint himself as a pseudo whistle blower after committing securities fraud are disingenuous at best and inappropriate for consideration on this motion.

All of the circumstances of Tsao's departure from the Company support a strong inference of scienter as to Tsao and Peraticos. As early as February 2006—and, based on his prior history as discussed above, probably much earlier—Tsao knew that there were problems with Knabb and the Company. Knabb and the Company, in turn, also accused Tsao of improper behavior, and the resulting agreement to pay hush money to Tsao was agreed to by the Board, including Peraticos, who was present at the Board meeting in June 2006 and who continued to commit securities fraud through the end of the Class Period.

### 6.    Additional Indicia Support a Strong Inference of Scienter

In addition to the tangled web of backgrounds, relationships, and enmities of the Defendants, there are other significant indicia in the allegations which support a strong inference of Defendants' scienter. Statements of a former Company employee, the voluntary removal of Pegasus from listing on the NASDAQ Exchange, the Defendants' signatures of Sarbanes-Oxley Certifications, the positions of the Individual Defendants, the suspicious timing of resignations at the Company, Defendants' motive and opportunity to commit the fraud, and the Company's failure to maintain adequate or even minimal internal controls all support an inference that Defendants knew, or were severely reckless in not knowing, that the statements made during the Class Period were materially false and misleading.

Sean Lim ("Lim"), a former Pegasus employee who worked as a customer service representative and operations manager during the Class Period, maintained the Company's website and, as part of his duties, read Company-issued press releases. Lim confirmed in sworn testimony that "Mr. Knabb made some public statements, press releases, that were, I suppose, contrary to what the company was really doing[.]" ¶ 8. Lim testified in a sworn deposition that

numerous press releases issued by the Company were "erroneous, I think is a nice word to use." ¶ 20. Lim added, "[t]hey were funny, because anybody that knows – of anybody who knows anything about high tech read them, they would be laughing, too, like, for instance, to claim that we invented the 802.11 standard." *Id.* Lim also confirmed that WiJet.e (formerly known as the Cynalynx product), touted as a breakthrough and revolutionary product, had problems obtaining a certification from the Federal Communications Commission for sale in the United States because that product "leak[ed] radiation." ¶ 20. That a former employee of the Company characterizes assertions of the Company's technological superiority as laughable gives rise to a strong inference that the Directors of the Company acted with scienter in falsely touting their business plan and ability to compete. Courts have held that particularized allegations of former employees, like the allegations contained in the Complaint, "add to the inference of scienter." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 16 (D. Mass. 2004), citing *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87 (D. Mass. 2002).

In an attempt to bolster the Company's credibility, on April 19, 2006, Pegasus published a release announcing that the Company had obtained approval to be listed for trading on the NASDAQ National Stock Market, under the symbol PGWC, and that trading would commence April 21, 2006. ¶ 55. Barely five months later, though, Defendants apparently voluntarily removed the Company from the NASDAQ Market Exchange. ¶ 99. This move, as a business strategy, was baffling. One analyst is quoted as saying "why Knabb, or anyone else for that matter, believes that moving the stock to a less liquid market can possibly help with volatility is beyond comprehension." *Id.* The abrupt delisting of the Company from the NASDAQ Exchange supports a strong inference of scienter because, as the Complaint alleges, Defendants used the listing as a manipulation to inflate stock price and gain exposure and respectability for the Company. ¶ 56(a).

In addition to the other false and misleading assurances of the Company's stability and integrity, Defendants signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX Certification"), certifying, *inter alia*, that *"the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."* ¶ 50. SOX Certifications were signed by Defendant Tsao in the Company's 2005 Form 10-KSB (¶ 50) and 1Q:06 Form 10-QSB (¶ 60).

Defendants' numerous SOX certifications during the Class Period – attesting that the

various false and misleading reports "fairly presents, in all material respects the financial condition and results of operations of the Company"– support a strong inference of scienter. *See, e.g., Commc'n Workers of Amer. Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp., No.* CV06-1503-PHX-DGC, 2007 U.S. Dist. LEXIS 22782, at *29 (D. Ariz. Mar. 28, 2007) ("Individual Defendants' Sarbanes-Oxley certifications and high-level positions at CSK raise some inference of scienter"). In *In re DCA, Inc.,* No. 05-2165, 2006 U.S. Dist. LEXIS 90854 (E.D. La. Dec. 14, 2006)*,* the court reasoned that a Sarbanes-Oxley certification can support at least some inference of scienter because it necessarily supports one of the alternative inferences that (a) the defendant was aware of the misconduct alleged (because, as the defendant certified, the company had effective disclosure controls), or (b) that the defendant knowingly misrepresented that the company's disclosure controls were adequate and effective. *Id.* at *72-73, (discussing *In re Lattice Semiconductor Corp. Sec. Litig.,* No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *46-51 (D. Or. Jan. 3, 2006)). Several commentators have similarly suggested that a corporate officer's SOX certification could be used as "circumstantial evidence to show that a defendant acted with scienter." *DCA,* 2006 U.S. Dist. LEXIS 90854, at *60, citing commentators Harold S. Bloomenthal, Steven J. Choi, and Kourtney T. Coward for the proposition that such certifications constitute evidence from which defendant's knowledge of the misrepresentations or reckless disregard of them could be inferred. *See also SEC v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 355 (S.D.N.Y. 2005). Defendant Tsao's signing of SOX Certifications supports a strong inference that he either knew or was severely reckless in not knowing the circumstances at the Company which made the statements affirmed by those Certifications materially false and misleading.

Furthermore, in addition to the intimate knowledge of each other some of the Defendants had through past dealings, each of the Individual Defendants was in such a position, by virtue of their roles and responsibilities, that if they did not know about the falsity of the statements being issued by the Company, they were severely reckless not to have known. In particular, Defendant Tsao was, during the Class Period, CEO and the Chairman of the Board of Directors of the Company (¶ 10), and Defendant Peraticos was, during the Class Period, a member of the Board of Directors of the Company (¶ 13). Cases cited by Defendants are not instructive for the point they wish to assert, that conclusory allegations regarding position do not support an inference of scienter. Peraticos Br. at 19. In *Bruhl*, 2007 U.S. Dist. LEXIS 21886, at *6, incidentally, a case

in which this Court applied the group pleading doctrine, the Court noted that plaintiffs in a prior complaint failed to plead scienter because the only allegation centered on the positions of the individual defendants. *Id.*, at *6-7; *Fidel v. Rampell*, No. 02-61258, 2005 U.S. Dist. LEXIS 45321, at *15-16 (S.D. Fla. Mar. 29, 2005). Furthermore, in *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1330 (M.D. Fla. 2002), the court found insufficient for pleading scienter the allegation of "mere status" as an outside director or committee member. Unlike these cases, the Complaint here is replete with factual indicia of scienter. For example, more than just "mere status" is alleged with respect to Defendant Peraticos. Material information related to his defunct company, POS, was never mentioned by Defendants. This allegation does not center on status but on Peraticos' knowledge whether he and the other Defendants properly characterized his past in public statements. Indeed, Peraticos signed the Company's Form 10-KSB which included his biography, *see ante* at p21, fn 24. This description plainly omitted any information regarding POS' bankruptcy and Defendant Peraticos' machinations to bring about that company's downfall.

There were also suspiciously-timed resignations from the Company, which support a strong inference of scienter against the Defendants. Defendants Shih (a member of the Board of Directors of the Company during the Class Period) and Lee (likewise a member of the Board of Directors of the Company during the Class Period) resigned from Pegasus at the same time as Defendant Tsao was "retired" for confronting Knabb and the Board with Knabb's financial shenanigans. ¶ 12. The Company falsely reported Lee's resignation as "due to his inability to attend board meetings because his work and travel schedule prevented him from attending[,]" despite the alleged fact that his resignation was due to the spat with Knabb and the other Defendants and the fact the Board also held meetings via conference call (¶ 11)—a fact highlighted by Tsao's initial suspension by means of a conference-call voice vote. Courts have found that suspiciously-timed resignations can contribute to an inference of scienter. *See, e.g.*, *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004)(finding "no allegations establishing scienter by virtue of 'red flags' such as a management shakeup."); *Hall*, 2008 U.S. Dist. LEXIS 54790 at * 40 (resignations, including forced resignations, considered to contribute to a strong inference of scienter); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (resignations can add to the overall pleading of circumstantial evidence of scienter); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1186

(C.D. Cal. 2007) (a resignation leaned "heavily towards a finding of scienter). *See also In re McKesson HBOC Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000) (termination of key personnel supports a finding of scienter). The timing of these resignations is particularly suspicious because it occurred at the same time as the "retirement" of Defendant Tsao, who in fact was forced to resign after confronting Knabb about Knabb's financial transactions with the Company. That both Shih and Lee resigned at a time when the Company was suspending and then "retiring" another Director in connection with his confrontation of Knabb gives rise to a strong inference of scienter.

In addition to the myriad other scienter allegations detailed in the Complaint, the Individual Defendants' motive and opportunity to inflate the price of Pegasus stock (¶ 138) gives rise to a strong inference of scienter. Although neither motive nor opportunity is required under *Tellabs*, such allegations greatly bolster and support a strong inference of scienter. *See In re AFC Enterprises, Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (evidence of motive and opportunity may contribute to an implication of intent to defraud). Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme enabled Defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus. Defendants were also able to secure millions of dollars in payments to Knabb by the Company in exchange for no apparent valuable consideration by purporting to reimburse Knabb for payments made that had in fact not been made. By engaging in this scheme, Defendants were also able to make deals to benefit their close friends and family at the expense of the Company and its shareholders. ¶¶ 138, 85.

The acquisitions of AMAX, CNet, and SKI are sufficient motive in and of themselves. *See, e.g.*, *Fox v. First BanCorp*, No. 05-2148 (GAG), 2006 U.S. Dist. LEXIS 95723, at *11 (D. P.R. Nov. 6, 2006) (scienter adequately alleged where plaintiff averred, among other things, that "during the time that First BanCorp reported improving financial results, it made three public offerings, which raised more than $350 million for the company"); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1097 (9th Cir. 2002) ("plaintiffs are correct that a desire to raise company financing can be probative of a motive to deceive investors"); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding scienter where complaint alleged that defendants knowingly made false statements in order to inflate its share price, which, in turn, allowed it to

acquire other companies it would not have otherwise been able acquire); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 411 (S.D.N.Y. 2005) (motive established where company "was motivated to artificially inflate the value of its shares in order to maximize the use of those shares as currency for acquisitions").

Furthermore—and despite assurances to the contrary in repeated filings with the SEC— the Company had no meaningful internal controls. As alleged in the Complaint, there were significant weaknesses in the design and operation of internal control over the Company's financial reporting. ¶¶ 52(b), 61(c), 73(c), 106. A failure to maintain sufficient internal controls to avoid fraud supports a strong inference of scienter. *See, e.g., In re Spear & Jackson Sec. Litig.,* 399 F. Supp. 2d 1350, 1362, 1364 (S.D. Fla. 2005) (courts within the Eleventh Circuit have held that lack of internal controls is a "red flag" contributing to scienter); *Hall v. Children's Place Retail Stores, Inc.,* No. 07 Civ. 8252 (SAS), 2008 U.S. Dist. LEXIS 54790, at *40 (S.D.N.Y. July 18, 2008) (weaknesses in internal controls probative of scienter).

Taken together, Plaintiff's scienter allegations are sufficient to support a cogent and compelling inference of scienter and readily meet the new Supreme Court construction, in *Tellabs,* of the "strong inference" standard as established in the PSLRA.[26] Furthermore, under both *Tellabs* and the law of the Eleventh Circuit, Plaintiff may aggregate facts to imply scienter as to each Defendant. *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1017 (11th Cir. 2004). The Complaint here pleads with particularity that the Individual Defendants were aware of, or at

---

[26] In the face of this avalanche of scienter allegations, Defendants meekly suggest that there can be no scienter here in the absence of insider sales. Tsao Br. at 18, Peraticos Br. at 20. Putting aside that such a contention contradicts the mandate of *Tellabs* to view scienter allegations holistically, discounting none, cases regularly find scienter in the absence of insider sales. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the sale of overvalued AMAX entities, a promise of multimillion dollar hush payments in exchange for lying about his departure). Of course, motive need not be alleged at all. *Tellabs,* 127 S. Ct. at 2511. With regard to Peraticos, Plaintiff has adequately alleged knowledge regarding, *inter alia,* the circumstances of Tsao's departure and Peraticos' own background regarding Pegasus Ocean Services, LTD. In this Circuit, severe recklessness suffices, and there are numerous detailed scienter allegations discussed herein with respect to which both Tsao and Peraticos were, at minimum, severely reckless.

least reckless disregarded, the Company's false public statements.

### III.   Plaintiff Has Adequately Pleaded Violations of 20(a) Against Defendants Peraticos and Tsao

Plaintiff has adequately alleged that, in addition to Defendants Tsao's and Peraticos' primary liability under Section 10(b), they are also liable for securities fraud under Section 20(a) as controlling persons of the Company. Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally…." 15 U.S.C. § 78t(a). "[A] controlling person's liability under section 20(a) is derived from the acts of its controlled person," in this case, the Company. *Laperriere v. Vesta Ins. Group, Inc.,* 526 F.3d 715, 722 (11th Cir. 2008). In addition to a primary violation of the securities laws (discussed in detail above), the Plaintiff must merely allege that the controlling Defendants had the power to control the business affairs of the Company and to directly or indirectly control the policy that resulted in the primary liability. *Theoharous v. Fong,* 256 F.3d 1219, 1227 (11th Cir. 2001).

As a preliminary matter, whether a Defendant is a control person is a fact-intensive inquiry that is not appropriate for a motion to dismiss. *See In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1368 n.23 (S.D. Fla. 2001) (citation omitted). In any event, Plaintiff has adequately alleged that each of the Defendants, through their positions and actions, had the power to direct management and policies of the Company. *See, e.g.,* ¶ 10 (Tsao was, during the Class Period, CEO and the Chairman of the Board of Directors of the Company); ¶ 13 (Peraticos was, during the Class Period, a member of the Board of Directors of the Company); ¶ 178 (By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading); ¶ 179 (Defendants had direct and supervisory involvement in the day-to-day operations of the Company).

Plaintiff has alleged that Defendants Tsao and Peraticos were both members of the Company's board of directors who also signed the Company's SEC filings. *See, e.g.,* ¶¶ 10, 13, 49, 50, 59, 60. Defendant Tsao's control over the Company is even more palpable given his

position as the founding CEO and Chairman of the Board of Directors during the Class Period and brother-in-law of another board member. ¶ 10.

Indeed, Defendants Tsao's and Peraticos' positions as members of the board of directors are sufficient alone to allege the requisite control. *See, e.g., In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-1360 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs . . . are sufficient to state a cause of action for controlling person liability." (citation omitted)). The additional allegations that Defendants Tsao and Peraticos also signed the Company's allegedly false and misleading SEC Filings during the relevant fiscal years bolsters their liability under 20(a). *See, e.g., N.J.,* 314 F. Supp. 2d at 1144-45 ("[A]n allegation that a board member signed an SEC filing that contains a misleading or fraudulent statement can raise a sufficient inference of control because it comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."); *Hayley v. Parker*, No. 01-0069 DOC (EEx), 2002 U.S. Dist. LEXIS 4849, at *29 (C.D. Cal. Mar. 15, 2002)(even if there are "no allegations of day-to-day oversight, the Director Defendants signed the 10-K form that allegedly reflects fraudulent accounting practices. This shows some involvement in the actions at issue").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Defendant Tsao's and Defendant Peraticos' motions to dismiss be denied in full.[27]

Dated this 20th day of October, 2008.

Respectfully submitted,

/s/ Julie Prag Vianale
Julie Prag Vianale (FBN 0184977)
VIANALE & VIANALE LLP
2499 Glades Road – Suite 112
Boca Raton FL 33431
Tel: (561) 392-4750

---

[27] In the event that this Court determines that all of any portion of this Complaint should be dismissed, Plaintiff respectfully requests leave to re-plead in accordance with Fed. R. Civ. P. 15(a).

Fax: (561) 392-4775
jvianale@vianalelaw.com
*Liaison Counsel for Lead Plaintiff and the Class*

-and-

Kim E. Miller (admitted *pro hac vice*)
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis S. Kahn (admitted *pro hac vice*)
**KAHN GAUTHIER SWICK, LLC**
650 Poydras St., Ste 2150
New Orleans, LA 70130
Telephone: (504) 455-1498
Facsimile: (504)455-1498

*Lead Counsel for Lead Plaintiff and the Class*

-and-

David A.P. Brower (*pro hac vice*)
BROWER PIVEN
A Professional Corporation
488 Madison Avenue Eighth Floor
New York, NY 10022
Tel: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

Mark P. Kindall (*pro hac vice*)
SCHATZ NOBEL IZARD, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Tel: (860) 493-6292
Fax: (860) 493-6290
mkindall@snilaw.com

*Additional Counsel for Lead Plaintiff and the Class*

35

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Julie Prag Vianale
Julie Prag Vianale (FBN 0184977)
**VIANALE & VIANALE LLP**
2499 Glades Road - Suite 112
Boca Raton, FL 33431
Tel: 561-392-4750
Fax:   561-392-4775
jvianale@vianalelaw.com

<u>**SERVICE LIST**</u>

**In re Pegasus Wireless Corporation Securities Litigation**

**Case No. 9:07-cv-81113-KAM**

**E-Mail Notice List:**

**Chalon Tamara Allen**
callen@astidavis.com,LNC@astidavis.com

**John Cooke**
jcooke@goodwinprocter.com

**Catherine Gauthier**
catherine.gauthier@kgscounsel.com

**Jeffrey Robert Geldens**
JGeldens@BroadandCassel.com

**Lewis Kahn**
lewis.kahn@kgscounsel.com

**Mark P. Kindall**
mkindall@izardnobel.com

**Nancy A. Kulesa**
nkulesa@izardnobel.com

**Norman Malinski**
nmpa@att.net

**Louise McAlpin**
louise.mcalpin@hklaw.com,angel.barber@hklaw.com

**Kim E. Miller**
kim.miller@kgscounsel.com

**Edward Maurice Mullins**
emullins@astidavis.com,lnc@astidavis.com

**Daniel Stuart Newman**
Dnewman@broadandcassel.com,bfradera@broadandcassel.com

**Jeffrey S. Nobel**
jnobel@izardnobel.com

**Michael A. Swick**
michael.swick@kgscounsel.com

**Lloyd Winawer**
Lwinawer@goodwinprocter.com

**Manual Notice List:**

**Michael David Braun**
Braun Law Group, P.C.
12304 Santa Monica Boulevard
Suite 109
Los Angeles, CA 90025

**David A.P. Brower**
Brower Piven, A Professional Corporation
8th Floor
488 Madison Ave
New York, NY 10022

**Aaron H. Darsky**
Schubert & Reed LLP
Three Embarcadero Center
Suite 1650
San Francisco, CA 94111

**Michael Robert Reese**
Gutride Safier LLP
230 Park Avenue
Suite 963
New York, NY 10169

**Seth Adam Safier**
Gutride Safier LLP
835 Douglass Street
San Francisco, CA 94111

**Robert C. Schubert**
Schubert & Reed LLP
3 Embarcadero Center
Suite 1650
San Francisco, CA 94111