**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

|  |  |
|---|---|
| | ) |
| | ) |
| | )     CIVIL ACTION NO. 07-81113-CIV-MARRA |
| | ) |
| **IN RE PEGASUS WIRELESS CORP.** | ) |
| **SEC. LITIG.** | )     **LEAD PLAINTIFF'S OPPOSITION TO** |
| | )     **DEFENDANT PERATICOS' MOTION TO** |
| | )     **DISMISS THE CONSOLIDATED** |
| | )     **AMENDED CLASS ACTION COMPLAINT** |
| | )     **FOR VIOLATIONS OF** |
| | )     **FEDERAL SECURITIES LAWS** |
| | ) |
| | ) |
| | ) |
| | ) |

## PRELIMINARY STATEMENT

Lead Plaintiff respectfully submits this opposition to Defendant Nicholas Peraticos' ("Peraticos") motion to dismiss.  Not unlike Defendant Tsao's motion, Defendant Peraticos' motion to dismiss is largely premised on an attempt to blame Defendant Jasper Knabb ("Knabb") for the entirety of this securities fraud, without regard to Peraticos' obligations under the Securities laws as a member of the Board of Directors during the Class Period.[1]  The Complaint adequately alleges that Peraticos violated these duties.

Among myriad detailed allegations of a wide-reaching securities fraud–including public statements made by Defendants that a former employee labeled as lies under oath—the Complaint alleges that the background and experience of Peraticos *himself* were not properly disclosed in public filings despite the fact that the Class Period filings affirmatively touted his business acumen and prior experiences – including his experience as the head of a London shipping firm called Pegasus Ocean Services, Ltd. ("POS") a company that was bankrupt and in liquidation, a fate blamed squarely on Peraticos, who issued $150 million in junk bonds in the late 1990s and then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business. In addition, the Complaint alleges that Peraticos was present at the June 19, 2008 board meeting at which Tsao was fired and therefore he had to have known of the circumstances of Tsao's departure, which were materially misrepresented in a Class Period press release for which Peraticos is responsible.

Plaintiff has adequately alleged that Peraticos made materially false and misleading statements with scienter and that he was a control person for purposes of 20(a).  Peraticos does not challenge any other aspect of Plaintiff's claims.  Peraticos' motion should be denied in full.

## ARGUMENT

### I.  Plaintiff Has Adequately Pleaded that Peraticos Violated Section 10(b)

#### A.  The Complaint Adequately Alleges That Peraticos Made Materially False and Misleading Statements

Defendant Peraticos argues that he made no misstatements or omissions of material fact, and that no such alleged misstatements or omissions were made with scienter. A review of the Complaint amply demonstrates, however, that every statement has an allegation detailing the

---

[1] The opposition to Defendant Tsao's motion to dismiss is incorporated herein by reference.

omissions of material facts that render the statement materially false or misleading when made. For example, the Complaint contains myriad allegations regarding Defendants' failure to disclose any information about Knabb's past. ¶¶ 21, 22 ("material omissions"), 23 ("at no time during the Class Period did Defendants ever disclose"), 24, 33. Peraticos rested on grossly incomplete misrepresentations that made Knabb wrongly appear more like a seasoned, successful businessman than a serial pump-and-dump con artist with a fraudulent past. ¶¶ 22, 84; *see also* ¶ 21 (noting that Defendants made at least 15 years worth of Knabb's past material by touting that period of his experience). The alleged false and/or misleading statements identified did not speak to Defendant Knabb's past association with fraudsters, ¶¶ 21, 22, 86, 87, 90, 95, or the pump and dump schemes and defunct companies Defendants Knabb, Tsao, Peraticos, and Pollard-Kelley associated with prior to or while at Pegasus. ¶¶ 18, 33-35. For example, although Defendants lauded Peraticos' "success" as the head of POS, they concealed the fact that that entity had been defunct for years, as a result of Peraticos' own actions. ¶¶ 13, 89. The acquisitions of AMAX, SKI, and CNET were also alleged to be part of a scheme to create the appearance that Pegasus was growing. ¶¶ 39(a), 42(a), 45(a). Defendants also failed to disclose "any fraud, whether or not material," ¶¶ 49, 73, as related to the experience and backgrounds of Defendants Knabb, Tsao, Peraticos, and Durland, as well as the prior direct connections of Pollard-Kelley to Knabb and Tsao. ¶ 52(a).

The Company issued a statement announcing the "resignation" of Tsao, ¶ 83, but the statement was false and misleading when made because the so-called "resignation" was a termination, and the statement failed to disclose the true circumstances of Tsao's departure, which would have been material to any investor in light of the charges levied by Tsao and Knabb, among others. ¶¶ 10, 83. *See In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005) (noting that it is not appropriate to "speak partial truths" and finding that plaintiffs sufficiently pled falsity).

Peraticos argues in conclusory fashion, "[a]nd the past history of Knabb, which is completely unrelated to Pegasus, does not demonstrate that the acquisitions were not made, that the financials were inaccurate, or that the stock was not listed on NASDAQ and the Russell 2000 index." Peraticos Br. at 13. Putting aside the fact that the Complaint does not allege that the acquisitions were not made or that the stock was not listed on NASDAQ and Russell 2000, Peraticos' argument misses the point entirely: these statements were materially false and

misleading when made because they omitted to disclose that the acquisitions were grossly overvalued if not worthless and designed to funnel money and stock to Defendants and their friends and families at the expense of shareholders and the Company; the stock is alleged to have been listed only briefly on NASDAQ as a marketing ploy to gain exposure to more potential investor victims – a typical pump-and-dump tactic – with no intention to maintain the Company at a level that it could continue to qualify for NASDAQ listing; and the financials are alleged to have violated GAAP and SEC rules but were nevertheless rubber stamped by auditor Defendant Pollard-Kelley, which had extensive prior dealings with Knabb and Tsao regarding earlier pump-and-dump scams at prior companies controlled by them.

"A false statement or omission is considered 'material' if its disclosure would alter the total mix of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important" to an investment decision.'" *In re Sci. Atlanta*, 239 F. Supp. 2d at 1359 (citation omitted). Plaintiff has alleged materiality of the statements and omissions. For example, Defendants' failure to disclose that Knabb lacked financial assets made the Company's press releases regarding at least two of the Company's acquisitions materially false and misleading because the Company reported that the acquisitions were financed through Knabb. ¶¶ 23, 37. In addition, Defendants' failure to state that Pegasus would voluntarily delist itself from NASDAQ within a few months of its debut on the exchange made the press release praising its move to the NASDAQ materially false and misleading when made. ¶¶ 58(d), 68. Furthermore, the Complaint alleges that the Company's statements in its year-end report for 2005 that Pegasus would have a new "revolutionary" product available for sale at the end of the year (¶ 62) were rendered materially false and misleading by Defendants' failure to disclose that the Company was having problems obtaining the certification from the FCC for its sale (¶ 63(c)).

**B.  Plaintiff's Allegations Concerning Peraticos' False and Misleading Statements Were Pled With Particularity**

Peraticos argues that the Complaint does not allege materially false and misleading statements with the level of particularity required by Fed. Rule Civ. P. 9(b) and the PSLRA. Peraticos Br. at 11-13. On the contrary, Plaintiff has specified with detail what statements and omissions were made, in what documents they were made, the time and place of each statement, the person(s) responsible for making them, the content of the statements, the manner in which they misled investors, and what Defendants obtained as a consequence of the fraud. *See Garfield*

*v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). This level of factual detail is sufficient to pass muster under the falsity pleading standards of the PSLRA and Fed. R. Civ. P. 9(b).

The Complaint alleges a statement by Defendants in a June 28, 2006[2] press release that Knabb "purchased" 1.25 million shares of Pegasus stock. ¶ 64. The Complaint alleges that this was done to artificially inflate the Company's stock, ¶ 65(a), and that Knabb had insufficient assets to make such a purchase, ¶ 65(b); *see also* ¶¶ 23-24, 29, 30, 32, and both the Company and Tsao have admitted that Knabb never purchased such shares. ¶¶ 65(c), 97, 98. These allegations represent "'contemporaneous statements or conditions' that are 'inconsistent' with the challenged statement so as to demonstrate that it was false when made." *In re Tibco Software Sec. Litig.*, No. 05-2146, 2006 U.S. Dist. LEXIS 36666, at *67 (N.D. Cal. May 25, 2006) (citations omitted).

The Complaint alleges that in a March 3, 2006 SEC filing, the Company filed its Form 10-KSB for the year ending December 31, 2005. The 10-KSB was signed by Peraticos. ¶ 13. The Complaint adequately alleges that Defendants "specifically attested to the purported accuracy and completeness of the Company controls and procedures," and that they have disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting." ¶ 49. The SEC filing included statements that "purported to disclose the complete nature and extent of any transactions between the Company, its executives and directors, and any related third-parties." ¶ 51. The Complaint goes on to allege the reasons these statements were false and misleading. The Complaint alleges that the Company failed to disclose Knabb's prior history, that AMAX was secretly owned by Defendant Tsao,[3] the true financial condition of Pegasus, and that the

---

[2] Peraticos is alleged to have made numerous materially false and/or misleading statements and omissions while he was on the Board, including in the Company's 10-KSB, which he signed. Peraticos points out that he is not liable for any misstatements or omissions made before he joined the Board on January 16, 2006. Peraticos Br. at 9, fn 8. Plaintiff does not contest this point.

[3] The Company disclosed that Tsao was brother-in-law to AMAX's president, Jerry Shih, but it did not reveal that Tsao was also the secret owner of AMAX. ¶¶ 309(c), 52(b), 61(b), 73(b), 108(c). Furthermore, the Company's filing revealed the Tsao/Shih relationship for the portion of the filing that required the disclosure of "family relationships between or among the executive officers and directors of the Company," but then failed to reveal that information in the portion

4

Company was not in compliance with GAAP, SEC, or FAS reporting rules. ¶ 52. The Complaint properly alleges on May 8, 2006, Defendants filed a Form 10-Q for the quarter ending March 31, 2006. ¶ 59. The Complaint then states exactly what statements were made (¶ 59) and the reasons they were false and misleading ((¶ 61).

### C.   Peraticos Had a Duty to Disclose

Peraticos contends, Peraticos Br. at 13-16, that Defendants had no duty to disclose Knabb's "involvement in numerous lawsuits bearing directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities," "associations with convicted felons, securities fraudsters," and his "history of associating, managing, and serving as a corporate officer or director with numerous companies that have consistently experience irregular and suspicious trading activity." *See, e.g.*, ¶ 52(a).

Peraticos acknowledges that "disclosure is necessary to make statements that have been made not misleading, when disclosure is mandated by statute or regulation, or when there is inside trading." Peraticos Br. at 14. Regulation S-K required Defendants to disclose their business experience during the past five years and "[d]escribe [certain] events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director . . . or executive officer . . ." 17 C.F.R. 229.401(e) and (f). Those events include: petitions under the Federal bankruptcy laws or any state insolvency laws; criminal convictions or pending criminal charges; any restrictions on engaging in any type of business practice, engaging in any activity in connection with the purchase or sale of a security or a security violation; violations under the securities laws; and violations under the Federal commodities laws. 17 C.F.R. 229.401(f).

Furthermore, "it has been recognized that shareholders are entitled to information impugning the honesty, loyalty or competency of directors in their dealings with the corporation to which they owe a fiduciary duty." *Krauth v. Executive Telecard*, No. 94 Civ. 7337 (RWS), 1994 U.S. Dist. LEXIS 15255, at *17-21 (S.D.N.Y. Oct. 21, 1994) (finding that disclosure was necessary of the officers' consultation with a someone who had been a defendant in numerous criminal, civil and administrative hearings because that information "would be material [since] their loyalty and competency is per force an issue" and because they are "facts which must be

---

of the filing requiring the disclosure of related third party transactions and instead stated that there were no such transactions. *See* Dkt. No. 141-15, at 26 and F-12.

considered material with respect to the actions and competence of several of the directors. . .").[4]

The Complaint alleges facts that bear "directly on Knabb's integrity, credibility, trustworthiness, abilities to carry out fiduciary duties, and financial abilities" (¶¶ 21-35, 47(c)), information that investors would certainly find significant, and which was required to be disclosed. For example, the Complaint alleges several incidents that bore directly on Knabb's honesty: in 2000, a suit was filed against Knabb for misrepresenting ownership of a company (¶ 27); in 2001, Knabb filed a false insurance claim (¶ 25) and had securities fraud and RICO claims filed against him and his company (¶ 26); in 1990, a company Knabb reported he sold was actually part of a bankruptcy proceeding (¶ 31). The Complaint also alleges instances that bore directly on Knabb's credibility: in 2003, there was a breach of contract claim filed against Knabb (¶ 29); in 2002, Knabb was sued for failure to pay for a car (¶ 30); and in 1999 there was default judgment on a commercial note and a promissory note (¶ 28). The Complaint also alleges eight other judgments against Knabb, including judgments brought by the IRS and people who invested in a fake Company supposedly owned by Knabb (¶ 32). As the Complaint alleges, the companies that Knabb was involved in were actually penny stock companies with very suspicious trading patterns (¶¶ 33-35). This information was material for an investor in considering Knabb's honesty, competence, and experience, and should have been disclosed.

In addition to which, Regulation S-K's guidelines only describe the ***minimum*** of what Defendants were required to disclose. The catch-all provision of SEC Regulation C, Rule 408, 17 C.F.R. § 230.408, provides that: "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, **not misleading**." (emphasis added).[5] The information that the Company did disclose,

---

[4] *See also SEC v. TLC Invs. and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (granting summary judgment for the SEC where defendant failed to disclose a prior conviction for tax fraud); *Pahmer v. Greenberg*, 926 F. Supp 287, 298 (E.D.N.Y. 1996) (investors satisfied scienter requirement where defendant failed to state that he was a convicted felon).

[5] *See also SEC v. Fehn*, 97 F.3d 1276, 1290 n. 12 (9th Cir. 1996) (holding that although the specific regulation may not have required disclosure of certain information, Rule 10b-5 imposes a duty to disclose all material facts to make disclosed statements not misleading and therefore a separate duty rises requiring disclosure); *Calderon v. Tower Assocs. Int'l, Inc.*, No. 88-1240-FR, 1989 U.S. Dist. LEXIS 3243, at *4-8 (D. Or. Mar. 27, 1989). *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983), cited by Peraticos (Peraticos Br. at 15 n. 10) for the proposition that directors

pursuant to 17 CFR 229.401(e), touting Knabb's past experience, had to be supplemented with the true undisclosed facts alleged in the Complaint in order to make the statements not misleading. Therefore, Defendants' disclosure of Knabb's experience in managing and directing multiple companies without disclosing the true nature of these companies and his roles was a violation of the Exchange Act and the SEC regulations.

Furthermore, though Peraticos argues against the need to disclose Knabb's past, he ignores allegations involving disclosures which Defendants were required to make regarding Tsao, Peraticos, Durland and other Defendants in order to meet the requirements under 17 C.F.R. § 230.408 and make statements regarding those individuals not materially false or misleading.

None of Defendants' filings and press releases disclosed that on of the Company's acquisitions, AMAX, in addition to being owned by Defendant Jerry Shih, was co-owned by Defendant Tsao[6]. Furthermore, although Defendants revealed Tsao's experience back to 1991 in Form 10-KSB (signed by Peraticos), they conveniently left out that he was the founder of OTC

---

have no duty under Item 410 to disclose unrelated and unadjudicated lawsuits is not to the contrary. *GAF Corp.* was a very limited ruling, holding that on the unique facts of that case, information that a defendant was being sued by his sister for breaching his fiduciary duty in the management of her business affairs was not material and failing to disclose that information was a not a violation. In fact, the court expressly stated that "we do not mean to suggest that pending litigation against a director-nominee based on state law and involving a family or other non-public business can never be material," but that "actions of that nature are less likely to be matters of importance to public shareholders." *Id.* at 740. By contrast, here Plaintiff is not alleging that Knabb was once sued by a sibling in an isolated family incident, but that he was involved in a series of pump-and-dump schemes and other fraudulent conduct. *N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1137 (D. Kan. 2004), another case cited by Peraticos (Peraticos Br. at 15 n. 10), is distinguishable. The Court stated in *N.J.* that Item 401(e)(1) did not require the disclosure of financial affairs of the Defendants. *Id.* at 1137. In *N.J.*, however, Defendants had not put the officers' finances at issue by partially discussing them in public statements. Plaintiff alleges that Knabb's finances at the time the statements were made during the Class Period made the statements false because they affirmatively stated that Knabb had purchased shares when he did not have the assets to do so. ¶ 23. In fact, Knabb had had no identifiable source of income that could have allowed him to purchase $26 million in Pegasus shares. *Id.*

   [6] Peraticos argues that because he did not join the board of the Company until January 16, 2006, he is not liable for statements made regarding the AMAX transaction. However, Peraticos signed the Company's 10-KSB. Peraticos is therefore liable for false and misleading statements and omissions regarding AMAX in this document and in any release published during his tenure on the Board.

Wireless, a company in which Knabb served as both a Managing Director and the President,[7] ¶¶ 21, 89, and which later became part of Pegasus.[8] ¶ 22. All these omissions were material and necessary to make the statements made not false and misleading and to ensure compliance with 17 C.F.R. § 230.408.

Much the same obfuscation was employed in Defendants' filings and statements regarding Defendant Durland. In Form 10-KSB, Defendants stated that Defendant Durland was the "president of Durland & Company, CPAs, PA, since he founded it in 1991" and lauded the company's accomplishments. Dkt. No. 141-15, at 27. The filing also stated that Defendant Durland "has been a CPA in 14 states." *Id.* However, the filings omitted to disclose that Durland had "a history of involvement with failed and suspect ventures, such as that he was CFO and then acting CEO of a company called Medical Makeover Corporation of America, which appears to have shared an office with DP Martin and Associates, which paid penny stock promoters to 'fluff' Medical Makeover's shares," ¶¶ 86, 87; that both those firms were represented by an attorney disbarred due to a conviction for a "pump and dump" scheme, *Id;* that twenty-seven companies audited by Durland's accounting firm were represented by the same convicted felon, ¶ 94; and that Durland lost his CPA license in North Carolina because "his firm was cited by the Public Accountancy Oversight Board for failure in the Review of Audit Engagements," *Id.* In fact, the Oversight Board "identified deficiencies 'of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements." *Id.* ¶ 9. All these omissions were material and required to ensure compliance with 17 C.F.R. § 230.408.

### D. The Group Pleading Doctrine Applies

In spite of the fact that Peraticos made statements to investors in the 10-KSB which bears his signature, ¶ 13, Peraticos contends that he made no statements to investors, and that no statements can be attributed to him under the group pleading doctrine. Peraticos Br. at 8-9. However, the 10-KSB contained false and misleading statements regarding: performance and

---

[7] Defendants did note Knabb's association with OTC Wireless in Form 10-KSB as part of his "15 years of experience," but failed to disclose that that company was founded by Tsao. Form 10-KSB, Dkt. No. 141-15, at 27.

[8] Knabb and Tsao were allegedly both significant players in merging OTC Wireless and Homeskills, "a defunct Florida-based penny-stock" company. After the merger, the company began trading under the name of Pegasus. ¶ 89.

operations, and internal controls (¶ 48); and the complete nature and extent of any transactions
that had occurred between the Company, its executives and directors, and any related third-
parties (¶ 51). The group pleading doctrine is therefore not necessary for Plaintiff's claims
against Peraticos to survive.

Numerous cases have recognized the legal significance of a director's signature on
documents filed with the Commission:

> [J]ust what is a signature on an SEC filed document meant to represent if it does
> not represent a degree of responsibility for the material contained in that
> document? The very fact that a director is required to sign these critical
> documents charges the director with power over the documents and represents to
> the corporation, its shareholders, and the public that the corporation's director has
> performed her role with sufficient diligence that she is willing and able to stand
> behind the information contained in those documents.

*In re WorldCom*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003); *see also In re Enron, Corp. Sec.
Derivative & ERISA Litig.,* 258 F. Supp. 2d 576, 587-88 (S.D. Tex. 2003). As such, the group
pleading doctrine needs not apply to these statements, made directly by Defendant Peraticos.

Peraticos is also liable for false and misleading statements published by the Defendants
as a group (so-called "group-published" statements). Peraticos does not even attempt to argue
that the group pleading doctrine has not survived the passage of the PSLRA—which it has[9]. And
under that doctrine, Peraticos is liable for those misleading statements issued in the name of the
Company in each of the press releases (*See, e.g.*, ¶¶ 37-47, 53-58), as each of those statements
were "group-published" information. "Identifying the individual sources of statements is
unnecessary when the fraud allegations arise from misstatements or omissions in group-
published documents such as annual reports, which presumably involve collective actions of
corporate directors or officers." *World Access*, 119 F. Supp. 2d at 1357 (citation omitted); *Wool
v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987).[10] The Company's allegedly
materially false and misleading press releases and the SEC filings are exactly the type of group-

---

[9] *See, e.g.*, *Bruhl v. Conroy*, No. 03-23044, 2007 U.S. Dist. LEXIS 21886, at *11-12 (S.D.
Fla. Mar. 27, 2007); *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1357-58 (N.D.
Ga. 2000); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1998); *In re
Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999).

[10] "At this stage, it is enough that Plaintiff has alleged that Defendants made misleading
statements to analysts and those allegations meet the specificity requirements described herein."
*World Access*, 119 F. Supp. 2d at 1357.

published documents that collectively involve the actions of the corporate directors and officers. Even *Bruhl*, 2007 U.S. Dist. LEXIS 21886, a case cited by Peraticos, states that to attribute misstatements to individual defendants, plaintiffs only need to allege "that the each of the individual Director Defendants, due to their high ranking positions and direct involvement in the everyday business of the company" would be involved in controlling the content of the statements. *Id.* at *11-13. In *Bruhl*, the court found that the directors were liable for the statements because of their high ranking positions on the board of the Company. *Id.*[11] Therefore, Peraticos' position and his alleged participation in the Board make him liable for all of the misleading press releases and SEC filings.

### E.  Plaintiff Has Adequately Alleged Scienter

#### 1.  Plaintiff Has Adequately Alleged Scienter of Peraticos

Plaintiff has alleged with specificity and detail circumstances which give rise to a strong inference that Defendant Peraticos knew of or was severely reckless in disregarding the materially false and misleading statements made by Defendants during the Class Period. In addition to the fact that Peraticos cannot reasonably claim to have been unaware that the statements regarding his own background and experience were incomplete and inaccurate, if he was unaware of the untruth of the other statements, it was reckless disregard verging on willful blindness. The circumstances were these: the Company was founded in a reverse merger with other shell companies, and then Defendants—who had histories with pump-and-dump schemes and otherwise suspicious backgrounds—allegedly engaged in a scheme to artificially increase the value of the Company's stock through a series of materially false and misleading statements and omissions as well as a series of acquisitions and transactions which made little financial sense except to those few whom those transactions surreptitiously benefited from the "friends and family plan." After a confrontation over one Defendant's—Knabb's—habit of playing fast and loose with the Company's finances, another Defendant—Tsao—was "retired" from the Company and promised a substantial sum of money, which was understood to be conditioned on

---

[11]Peraticos repeatedly attempts to excuse himself from liability for false and misleading statements and omissions he made during the Class Period by claiming to be an outside director. Peraticos Br. at *passim*. However, because he actually signed SEC filings and purported to attest to their accuracy, Plaintiff has alleged he made actionable statements. *See, e.g., Cabletron*, 311 F.3d at 41 (outside directors made material misrepresentations because "[e]ach signed the Form 10-K and accepted responsibility for its contents").

his silence and lies regarding his abrupt departure from the Company. After the Company failed to pay up, Tsao went public with the dispute and admitted in his own suit against the Company to having known about false and misleading statements made by the Company, the other Defendants and himself—and also by Defendant Peraticos, who was present at the Board meeting removing Tsao and either knew or should have known about the other garbage-in-garbage-out arrangements at the Company.

Defendants also failed to maintain internal controls, manipulated the Company's NASDAQ listing as a stock inflation ploy, and engaged in baffling financial arrangements with Knabb, all the while filing numerous SEC documents, including Sarbanes-Oxley Certifications, attesting virtuously to their ability, integrity, and sound "business plan." The Complaint is rife with specific and detailed factual allegations which, taken together, support a strong inference that Peraticos knew *exactly* what was going on at the Company; and if he did not, the numerous red flags that should have repeatedly alerted him to his ignorance constituted severe reckless.

## 2. Defendants' Ties To Pump and Dump Schemes, Defunct Companies, and Companies Accused of Securities Fraud Support a Strong Inference of Scienter

The Company repeatedly marketed Pegasus as run by management with credibility and a high standard of ethics: The Complaint alleges that, in truth, Peraticos and the other Defendants knew or were severely reckless in disregarding the fact that Defendant Knabb should have been better known for associating with convicted felons and securities fraudsters (¶ 9), managing and serving as corporate officer or director of companies that have consistently experienced irregular and suspicious trading activity leading to a sudden rise and precipitous collapse of stock price (*Id.*), and entanglements with the law on a variety of fronts (¶¶ 25-32). It was Defendants who made the deliberate decision to make at least 15 years' worth of Knabb's past material, including references to such entities as Wireless Frontier, OTC Wireless, and Beach Access. ¶ 22. By choosing to speak specifically about Knabb's past, Defendants triggered for themselves a duty of full disclosure regarding that past. For example, as detailed in a *New York Post* article, Knabb's Beach Access business "never got off the ground" and he sold it to a penny-stock concern which had "no business operations or revenues of its own at the time," and short months later that company fired Knabb and sued him to recover the shares they had paid him in exchange for Beach Access, "claiming Knabb was full of bull about Beach Access and had actually never owned the operation to begin with." ¶ 89

11

Defendants, including Peraticos, revealed **none** of the above information. In addition, Defendants made at least 25 years of Peraticos' history material by describing him (rather sanguinely) as having been "employed by POS since 1980 and has been Managing Director since 1992." Respecting Defendants' duty of disclosure, they also should have revealed that Peraticos "issued $150 million in late 1990s junk bonds to a consortium of lenders that included Lazard Freres and Merrill Lynch, then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business." ¶ 89. Defendants also never revealed the prior relationship between Defendants Knabb and Tsao, ¶ 89.

The Complaint also alleges a variety of other lawsuits, including securities fraud suits, judgments, liens, and even an arrest for filing a false insurance claim in Knabb's past.  ¶¶ 25, 27, 29, 30, 32. In addition to his legal problems, the Complaint alleges in great detail that Knabb has a history of association with companies engaging in classic pump-and-dump schemes. ¶¶ 34-35. The checkered past of Knabb—the CEO, President, and member of the Board of Directors of the Company—supports a strong inference of scienter. *See Pahmer* 926 F.Supp at 298 (investors satisfied scienter requirement where defendant failed to state that he was a convicted felon).

Knabb is not the only director-Defendant with a history and past associations that should have raised red flags in the minds of the other Defendants. Tsao also has extensive prior ties to Knabb, Durland, Pollard-Kelley and Knabb's prior pump and dump schemes and other questionable and secretive associations, including AMAX.

Tsao had close ties to Knabb: Tsao was the co-founder of OTC Telecom in 1993, a company which changed its name to OTC Wireless in 2000. ¶ 10. Defendant Knabb joined OTC Wireless as Managing Director, left in April 2003 to join Frontier Wireless, and returned to OTC Wireless as President in 2004. ¶ 8. In 2004, Knabb and Durland executed a reverse merger via share exchange between OTC Wireless and a shell company called Homeskills, Inc. (in which Durland served as CFO). The surviving company was renamed Pegasus Wireless Corporation. ¶ 19. The direct line from OTC Wireless, co-founded by Tsao, to Pegasus, as well as Knabb's high-level positions at OTC, belies any assertion that Tsao was not intimately connected with Knabb. These circumstances, relating directly to the formation of the Company, were known to Peraticos or should have been known to him, and support a strong inference of scienter.

Across the board, Pegasus was created under suspicious circumstances and run by suspect people. Most of them knew each other of old, had other close business ties, and hopped

on and off the boards of each others' Companies, as with OTC Wireless, Pegasus, and Frontier Wireless. Such close connections, intermingling, and relationships were necessary ingredients to further the scheme that ultimately defrauded investors.

The acquisitions, furthermore, of AMAX, CNet, and SKI did not serve best interests of shareholders, were not part of a legitimate business plan or growth strategy, and were designed uniquely to manipulate the market and funnel money directly into the pockets of Defendants and their associates. Furthermore, as alleged in the Complaint, the design or operation of internal controls at Pegasus suffered from fatal weaknesses in light of the failure of Defendants to live up their disclosure obligations. Peraticos ignored, or was severely reckless in disregarding, the material facts about the past histories and associations of the principals of a Company on whose Board he sat. Peraticos also ignored, or was severely reckless in disregarding, that full disclosure of material aspects of the underlying nature of the numerous corporate transactions alleged in the Complaint was of utmost importance so as not to mislead investors.[12] When viewed holistically, the allegations of the Complaint readily withstand Peraticos' attacks and support a strong inference of scienter. Defendants, including Peraticos, knew or were severely reckless in not knowing the truth about the Company, its principals' backgrounds, operational and growth tactics, and a host of other material information.

In addition, auditor-Defendant Pollard-Kelley's prior associations with Knabb, Tsao, and other Defendants concerning a number of companies that failed or were involved in pump-and-dumps should have provided a red flag to Peraticos that Pollard-Kelly was not an "independent" auditor that could be trusted to fairly and accurately evaluate the Company's financials and certify them as GAAP and GAAS compliant. Peraticos' scienter has been adequately pleaded.

### 3. Acquisitions of Companies Secretly Owned and Controlled by the Defendants Support a Strong Inference of Scienter

---

[12] Other examples of Defendants' complicity to further the fraudulent scheme, which Defendants never disclosed, include that achieving a NASDAQ and Russell 2000 listing were not in the best interests of shareholders but a short-term scheme to increase stock value (¶¶ 56(a), 58(a), 69(a), 71(a), 75(a), 99); and the Company planned to remove the Company from NASDAQ listing only a few months after it first obtained a NASDAQ listing (¶¶ 58(d), 69(c), 71(c), 79(c), 99). There was no rational basis for the claim that Pegasus would achieve the significant near-term revenues claimed in the Company's SEC filings. ¶ 63(a). And finally, Knabb did not have the ability to purchase 1.25 million shares of Company stock, despite Defendants' repeated statements that Knabb financed part of numerous corporate acquisitions through his purchase of stock. ¶¶ 64, 65(b).

Tsao had concealed, very close ties to AMAX, one of the suspect acquisitions made by Pegasus during the Class Period. Tsao is Defendant Shih's brother-in-law, and, though Defendants revealed only Shih's ownership, in fact Defendants Shih and Tsao were co-owners of AMAX. ¶¶ 39(c), 52 (b), 61(b), 73(b), 85. Shih also served as the Chairman and CEO of both AMAX Technologies, Inc. and AMAX Information Technologies, Inc. At that time, Tsao served as Chairman and CEO of Pegasus. ¶ 12. The close relationship between Tsao, Shih, AMAX, and Pegasus supports a strong inference of scienter with regard to all Defendants.

Much like the AMAX acquisition, as described by *MotleyFool.com,* on August 24, 2006, other acquisitions by the Company were part of what is called "The friends and family plan," ¶ 85, in order to funnel money to associates and family and create an illusion of Pegasus's growth. Peraticos knew of these arrangements, or was severely reckless in disregarding the truth. For example, on April 2005, Pegasus agreed to acquire CEO-channel.com in exchange for 3 million shares of stock valued at $750,000, despite the fact that the company's liabilities ($18,200) outpaced assets (cash on hand totaling $15,000). ¶ 85. CEO-channel.com, which had no operating business and a negative value, was of no possible worth to Pegasus or Pegasus shareholders. It was, however, owned by Lawrence Creeger, an associate of Defendant Durland's who was involved with him in a venture called Global Event Makers. ¶ 85. "Creeger, the majority owner, sole director, and officer, just happened to be involved (since at least 2003) with Pegasus CFO Stephan Durland in a venture called Global Event Makers, formerly 'Pro Celebrity Caribbean Tour Inc.,' and another called Global Equity, formerly 'Eventmakers-Caribbean Corp.'" ¶ 85. Despite this association, Defendants never revealed in Class Period statements the true facts about the CEO-channel.com acquisition, not even in any of the public statements when discussing Durland's background. This pattern of acquisitions and transactions which deposited cold hard cash into the pockets of Defendants Tsao, Shih, Knabb, Durland, and their associates supports a strong inference of scienter.

### 4. The Circumstances of Tsao's Departure from the Company Support a Strong Inference of Scienter

On August 18, 2006, the Company officially announced that the Company's CEO and Chairman of the Board, Defendant Tsao, was retiring and would be resigning from all positions as officer and director. ¶ 10. The circumstances of Tsao's departure support a strong inference of scienter as to Peraticos. First, after determining that representations about Knabb's finances and

14

stock purchases were suspect, Tsao, in April and May of 2006, confronted Knabb about money Knabb owed to the Company. *Id*. Knabb told Tsao that he was in the process of providing the funds, which came to $1 million. On June 19, 2006, a telephonic board meeting was held, attended at the Pegasus office by Tsao and Durland (and, as the state court complaint reveals, Tsao Complaint at ¶ 17, attended by Defendant Peraticos). *Id*. Knabb questioned Tsao regarding whether Tsao borrowed, used, pledged, signed, transferred out of his name, or hypothecated his personal stock—received from the Pegasus and Blue Industries, Inc. merger, in violation of the merger agreement between Blue Industries, Inc. and Homeskills, Inc.—to the Granite Investor Group. *Id*. The Board voice voted to suspend Tsao and he was escorted out of the building. *Id*. Tsao's attorney contacted the Company about the "highly suspect" actions of Knabb, Durland, and the Board of Directors. *Id*. Pegasus quickly negotiated a generous "retirement" package with Tsao, which included an agreed payout of $2,810,000 in hush money. *Id*.

Peraticos attended the meeting which concluded in Tsao's suspension and his escort off the premises. He heard Knabb accuse Tsao of improper behavior. He was therefore aware from his personal knowledge that Tsao's departure from the Company was ***not*** a resignation or retirement, but a forcible ejection. Any claim that Peraticos did not know that the Company's statement regarding Tsao's "retirement" was materially false and misleading is therefore completely without merit.

### 5. Additional Indicia Support a Strong Inference of Scienter

The Complaint alleges significant indicia—other than the complicated and concealed inter-relationships, transactions, and past associations of the Defendants—which support a strong inference of Peraticos' scienter. Statements of a former Company employee, the voluntary removal of Pegasus from listing on the NASDAQ Exchange, the positions of Peraticos on the Board of Directors, the suspicious timing of resignations at the Company, Defendants' motive and opportunity to commit the fraud, and the Company's failure to maintain adequate or even minimal internal controls all support an inference that Defendants, including Peraticos, knew, or were severely reckless in not knowing, that the statements made during the Class Period were materially false and misleading.

A former Pegasus customer service representative and operations manager during the Class Period, Sean Lim ("Lim"), maintained the Company's website and read Company-issued press releases as part of his responsibilities. Lim confirmed in sworn testimony that "Mr. Knabb

15

made some public statements, press releases, that were, I suppose, contrary to what the company was really doing[.]" ¶ 8. Lim also testified in a sworn deposition that numerous press releases issued by the Company were "erroneous, I think is a nice word to use." ¶ 20. Lim added, "[t]hey were funny, because anybody that knows – of anybody who knows anything about high tech read them, they would be laughing, too, like, for instance, to claim that we invented the 802.11 standard." *Id.* Lim also confirmed that WiJet.e (formerly known as the Cynalynx product), touted as a breakthrough and revolutionary product, had problems obtaining a certification from the Federal Communications Commission for sale in the United States because that product "leak[ed] radiation." ¶ 20. That a former employee of the Company characterizes assertions of the Company's technological superiority as laughable gives rise to a strong inference that the Directors of the Company acted with scienter in falsely touting their business plan and ability to compete. Courts have held that particularized allegations of former employees, like the allegations contained in the Complaint, "add to the inference of scienter." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 16 (D. Mass. 2004), citing *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87 (D. Mass. 2002).

On April 19, 2006, Pegasus announced the Company had obtained approval to be listed for trading on the NASDAQ National Stock Market, under the symbol PGWC, and that trading would commence April 21, 2006. ¶ 55. This was a clear attempt to bolster the Company's credibility, as a few months later Defendants apparently voluntarily removed the Company from the NASDAQ Market Exchange. ¶ 99. This move, as a business strategy, was baffling. One analyst is quoted as saying "why Knabb, or anyone else for that matter, believes that moving the stock to a less liquid market can possibly help with volatility is beyond comprehension." *Id.* The abrupt delisting of the Company from the NASDAQ Exchange supports a strong inference of scienter because, as the Complaint alleges, Defendants used the listing as a manipulation to inflate stock price and gain exposure and respectability for the Company. ¶ 56(a).

Furthermore, Peraticos was in such a position, by virtue of his role and responsibilities, that if he did not know about the falsity of the statements being issued by the Company, he was severely reckless not to have known. In particular, Peraticos was, during the Class Period, a member of the Board of Directors (¶ 13). Cases cited by Peraticos are not instructive for the point they wish to assert, that conclusory allegations regarding position do not support an inference of scienter. Peraticos Br. at 19. In *Bruhl*, 2007 U.S. Dist. LEXIS 21886, at *6, a case,

incidentally, in which this Court applied the group pleading doctrine, the Court noted that plaintiffs in a prior complaint failed to plead scienter because the only allegation centered on the positions of the individual defendants. *Id.*, at *6-7; *Fidel v. Rampell*, No. 02-61258, 2005 U.S. Dist. LEXIS 45321, at *15-16 (S.D. Fla. Mar. 29, 2005). Furthermore, in *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1330 (M.D. Fla. 2002), the court found insufficient for pleading scienter the allegation of "mere status" as an outside director or committee member. Unlike these cases, the Complaint here is replete with factual indicia of scienter. For example, more than just "mere status" is alleged with respect to Defendant Peraticos. Material information related to his defunct company, POS, was never mentioned by Defendants. This allegation does not center on status but on Peraticos' knowledge whether he and the other Defendants properly characterized his past in public statements. Indeed, Peraticos signed the Company's Form 10-KSB which included his biography. This description omitted any information regarding POS' bankruptcy and Peraticos' machinations to bring about that company's downfall.

In addition to Tsao's departure from the Company, there were also suspiciously-timed departures by Defendants Shih (a member of the Board of Directors of the Company during the Class Period) and Lee (likewise a member of the Board of Directors of the Company during the Class Period), who both resigned from Pegasus at the same time as Defendant Tsao was "retired" for confronting Knabb and the Board with Knabb's financial shenanigans. ¶ 12. The Company falsely reported Lee's resignation as "due to his inability to attend board meetings because his work and travel schedule prevented him from attending[,]" despite the alleged fact that his resignation was due to the spat with Knabb and the other Defendants and the fact the Board also held meetings via conference call (¶ 11)—a fact highlighted by Tsao's initial suspension by means of a conference-call voice vote. Courts have found that suspiciously-timed resignations can contribute to an inference of scienter. *See, e.g.*, *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004) (finding "no allegations establishing scienter by virtue of 'red flags' such as a management shakeup."); *Hall*, 2008 U.S. Dist. LEXIS 54790 at * 40; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007). *See also In re McKesson HBOC Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000). The timing of these resignations is particularly suspicious because it occurred at the same time as the "retirement" of Tsao, who in fact was forced to resign after confronting Knabb about Knabb's financial transactions with the

Company. That both Shih and Lee resigned at a time when the Company was suspending and then "retiring" another Director in connection with his confrontation of Knabb gives rise to a strong inference of scienter.

In addition to the myriad other scienter allegations detailed in the Complaint, the Individual Defendants' motive and opportunity to inflate the price of Pegasus stock (¶ 138) gives rise to a strong inference of scienter. Although neither motive nor opportunity is required under *Tellabs*, such allegations greatly bolster and support a strong inference of scienter. *See In re AFC Enterprises, Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (evidence of motive and opportunity may contribute to an implication of intent to defraud). Peraticos and the other Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme enabled Defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus. Defendants were also able to secure millions of dollars in payments to Knabb by the Company in exchange for no apparent valuable consideration by purporting to reimburse Knabb for payments made that had in fact not been made. By engaging in this scheme, Defendants were also able to make deals to benefit their close friends and family at the expense of the Company and its shareholders. ¶¶ 138, 85.

The acquisitions of CNet and SKI are sufficient motive in and of themselves. *See, e.g.*, *Fox v. First BanCorp*, No. 05-2148 (GAG), 2006 U.S. Dist. LEXIS 95723, at *11 (D. P.R. Nov. 6, 2006) (scienter adequately alleged where plaintiff averred, among other things, that "during the time that First BanCorp reported improving financial results, it made three public offerings, which raised more than $350 million for the company"); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1097 (9th Cir. 2002); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 411 (S.D.N.Y. 2005).

In spite of assurances to the contrary in repeated filings with the SEC, the Company did not have any meaningful internal controls. There were significant weaknesses in the design and operation of internal control over the Company's financial reporting. ¶¶ 52(b), 61(c), 73(c), 106. A failure to maintain sufficient internal controls to avoid fraud supports a strong inference of scienter. *See, e.g., In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362, 1364 (S.D. Fla. 2005) (courts within the Eleventh Circuit have held that lack of internal controls is a "red flag" contributing to scienter); *Hall v. Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252 (SAS),

2008 U.S. Dist. LEXIS 54790, at *40 (S.D.N.Y. July 18, 2008).

Taken together, Plaintiff's scienter allegations are sufficient to support a cogent and compelling inference of scienter and readily meet the new Supreme Court construction, in *Tellabs*, of the "strong inference" standard as established in the PSLRA.[13] Furthermore, under both *Tellabs* and the law of the Eleventh Circuit, Plaintiff may aggregate facts to imply scienter as to each Defendant. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004). The Complaint here pleads with particularity that the Individual Defendants, including Peraticos, were aware of, or at least recklessly disregarded, the Company's false public statements.

**II.  Plaintiff Has Adequately Pleaded Violations of 20(a) Against Defendant Peraticos**

Peraticos maintains that Plaintiff has not alleged and cannot allege control person liability against him.[14] During the Class Period, however, Peraticos was a member of the Board of Directors of the Company, signed the Company's SEC filings, and had the requisite control over the Company. *See, e.g.*, ¶¶ 13, 178, 179. Indeed, Peraticos' position as a member of the board of directors is sufficient alone to allege the requisite control. *See, e.g., In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-1360 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs . . . are sufficient to state a cause of action for controlling person liability." (citation omitted)). The additional allegations that Defendant Peraticos also signed the Company's allegedly false and misleading SEC Filings during the relevant fiscal years bolster his liability under 20(a). *See,*

---

[13]  In the face of this avalanche of scienter allegations, Defendant suggests that there can be no scienter here in the absence of insider sales. Peraticos Br. at 20. Putting aside that such a contention contradicts the mandate of *Tellabs* to view scienter allegations holistically, discounting none, cases regularly find scienter in the absence of insider sales. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *see also Hanon v. Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992)*; In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425, at 36 n. 6 (N.D. Cal. May 29, 2008). With regard to Peraticos, Plaintiff has adequately alleged knowledge regarding, *inter alia*, the circumstances of Tsao's departure and Peraticos' own background regarding Pegasus Ocean Services, LTD. In this Circuit, severe recklessness suffices, and there are numerous detailed scienter allegations discussed herein with respect to which Peraticos was, at minimum, severely reckless.

[14]  Whether a Defendant is a control person is a fact-intensive inquiry that is not appropriate for a motion to dismiss. *See In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1368 n.23 (S.D. Fla. 2001) (citation omitted).

*e.g., N.J.,* 314 F. Supp. 2d at 1144-45 ("[A]n allegation that a board member signed an SEC filing that contains a misleading or fraudulent statement can raise a sufficient inference of control because it comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."); *Hayley v. Parker*, No. 01-0069 DOC (EEx), 2002 U.S. Dist. LEXIS 4849, at *29 (C.D. Cal. Mar. 15, 2002).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Peraticos' motion to dismiss be denied in full.[15]

Dated this 27th day of October, 2008.

Respectfully submitted,

/s/ Julie Prag Vianale
Julie Prag Vianale (FBN 0184977)
VIANALE & VIANALE LLP
2499 Glades Road – Suite 112
Boca Raton FL 33431
Tel: (561) 392-4750
Fax: (561) 392-4775
jvianale@vianalelaw.com
*Liaison Counsel for Lead Plaintiff and the Class*

-and-

Kim E. Miller (admitted *pro hac vice*)
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis S. Kahn (admitted *pro hac vice*)
**KAHN GAUTHIER SWICK, LLC**
650 Poydras St., Ste 2150
New Orleans, LA 70130
Telephone: (504) 455-1498
Facsimile: (504)455-1498

---

[15] In the event that this Court determines that all of any portion of this Complaint should be dismissed, Plaintiff respectfully requests leave to re-plead in accordance with Fed. R. Civ. P. 15(a).

*Lead Counsel for Lead Plaintiff and the Class*

-and-

David A.P. Brower (*pro hac vice*)
BROWER PIVEN
A Professional Corporation
488 Madison Avenue Eighth Floor
New York, NY 10022
Tel: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

Mark P. Kindall (*pro hac vice*)
SCHATZ NOBEL IZARD, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Tel: (860) 493-6292
Fax: (860) 493-6290
mkindall@snilaw.com

*Additional Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>s/ Julie Prag Vianale</u>
Julie Prag Vianale (FBN 0184977)
**VIANALE & VIANALE LLP**
2499 Glades Road - Suite 112
Boca Raton, FL 33431
Tel: 561-392-4750
Fax:    561-392-4775
jvianale@vianalelaw.com

# SERVICE LIST

## In re Pegasus Wireless Corporation Securities Litigation
## Case No. 9:07-cv-81113-KAM

**E-Mail Notice List:**

**Chalon Tamara Allen**
callen@astidavis.com,LNC@astidavis.com

**John Cooke**
jcooke@goodwinprocter.com

**Catherine Gauthier**
catherine.gauthier@kgscounsel.com

**Jeffrey Robert Geldens**
JGeldens@BroadandCassel.com

**Lewis Kahn**
lewis.kahn@kgscounsel.com

**Mark P. Kindall**
mkindall@izardnobel.com

**Nancy A. Kulesa**
nkulesa@izardnobel.com

**Norman Malinski**
nmpa@att.net

**Louise McAlpin**
louise.mcalpin@hklaw.com,angel.barber@hklaw.com

**Kim E. Miller**
kim.miller@kgscounsel.com

**Edward Maurice Mullins**
emullins@astidavis.com,lnc@astidavis.com

**Daniel Stuart Newman**
Dnewman@broadandcassel.com,bfradera@broadandcassel.com

**Jeffrey S. Nobel**
jnobel@izardnobel.com

**Michael A. Swick**
michael.swick@kgscounsel.com

**Lloyd Winawer**
Lwinawer@goodwinprocter.com

## Manual Notice List:

**Michael David Braun**
Braun Law Group, P.C.
12304 Santa Monica Boulevard
Suite 109
Los Angeles, CA 90025

**David A.P. Brower**
Brower Piven, A Professional Corporation
8th Floor
488 Madison Ave
New York, NY 10022

**Aaron H. Darsky**
**Robert C. Schubert**
Schubert & Reed LLP
Three Embarcadero Center
Suite 1650
San Francisco, CA 94111

**Michael Robert Reese**
**Seth Adam Safier**
Gutride Safier LLP
230 Park Avenue
Suite 963
New York, NY 10169